UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AMERICAN AMBULETTE & | ) | CASE NO.:  13-07673-8-SWH |
| AMBULANCE SERVICE, INC., ET AL[1] | ) | CHAPTER 7 |
| | ) | JOINTLY ADMINISTERED |
| *Debtors* | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| ALGERNON L. BUTLER, as Chapter 7 | ) | |
| Trustee of AMERICAN AMBULETTE & | ) | |
| AMBULANCE SERVICE, INC., | ) | |
| COASTLINE CARE, INC., EASTERN | ) | |
| SHORE ACQUISITION CORPORATION, | ) | |
| EASTERN SHORE AMBULANCE, INC., | ) | |
| MARMAC TRANSPORTATION | ) | |
| SERVICES, INC., and TRANSMED, LLC | ) | |
| | ) | |
| *Plaintiff* | ) | ADVERSARY PROCEEDING |
| vs. | ) | |
| | ) | NO. _____ |
| ENHANCED EQUITY FUND II, L.P.; EEF | ) | |
| PARTNERS II, L.P.; AMBULANCE | ) | |
| HOLDINGS, LLC; MALCOLM | ) | |
| KOSTUCHENKO; ANDREW M. PAUL; | ) | |
| SAMARTH CHANDRA; BRYAN | ) | |
| GIBSON; STEVEN BLACKBURN; | ) | |
| ROBERT JEWELL; PRIORITY | ) | |
| AMBULANCE, LLC; and SHOALS | ) | |
| AMBULANCE, LLC | ) | |
| | ) | |
| *Defendants* | ) | |
| _____ | ) | |

---

[1] This case caption refers only to Case No. 13-07673-8-SWH pursuant to the Court's April 4, 2015 Order Directing Joint Administration [D.E. 492, Case No. 13-07673-8-SWH]

## COMPLAINT

Algernon L. Butler, III (the "Trustee"), in his capacity as Chapter 7 Trustee of American Ambulette & Ambulance Service, Inc. ("AAA"), Coastline Care, Inc. ("Coastline Care"), Eastern Shore Acquisition Corporation ("ESAC"), Eastern Shore Ambulance, Inc. ("Eastern Shore Ambulance"), MarMac Transportation Services, Inc. ("MarMac"), and Transmed, LLC ("Transmed") (collectively, the "FirstMed Entities"), for his Complaint against the named Defendants, states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      AAA is a corporation organized and existing pursuant to the laws of the State of Ohio.

2.      Coastline Care is a corporation organized and existing pursuant to the laws of the State of North Carolina.

3.      ESAC is a corporation organized and existing pursuant to the laws of the State of Delaware.

4.      Eastern Shore Ambulance is a corporation organized and existing pursuant to the laws of the State of Virginia.

5.      MarMac is a corporation organized and existing pursuant to the laws of the State of Virginia.

6.      Transmed is a limited liability company organized and existing pursuant to the laws of the State of South Carolina.

7.      Each of the FirstMed Entities was in the business of providing medical transport services.

8.      The FirstMed Entities conducted business as, and were commonly referred to, both individually and collectively, as "FirstMed."

9.      On December 6, 2013, the Board of Directors of each of the FirstMed Entities adopted resolutions which were identical in content and which directed that each entity file a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code.

10.     Each of the FirstMed Entities filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court") on December 11, 2013 (the "Petition Date").

11.     On December 13, 2013, the Bankruptcy Court appointed the Trustee as Chapter 7 Trustee for each of the FirstMed Entities.

12.     The Trustee is authorized to pursue the claims set forth in this Complaint on behalf of the bankruptcy estates of the FirstMed Entities.

13.     Enhanced Equity Fund II, L.P. ("EEF") is a limited partnership organized and existing pursuant to the laws of the State of Delaware.

14.     EEF Partners II, L.P. ("EEF Partners") is a limited partnership organized and existing pursuant to the laws of the State of Delaware.

15.     Ambulance Holdings, LLC ("Ambulance Holdings") is a limited liability company organized and existing pursuant to the laws of the State of Delaware.

16.     Upon information and belief, Malcolm Kostuchenko ("Kostuchenko") is a citizen and resident of the State of New York.

17.     Upon information and belief, Andrew Paul ("Paul") is a citizen and resident of the State of New York.

18.    Upon information and belief, Samarth Chandra ("Samarth") is a citizen and resident of the State of New York.

19.    Upon information and belief, Bryan Gibson ("Gibson") is a citizen and resident of the State of Tennessee.

20.    Upon information and belief, Steven Blackburn ("Blackburn") is a citizen and resident of the State of Tennessee.

21.    Upon information and belief, Robert Jewell ("Jewell") is a citizen and resident of the State of Indiana.

22.    Priority Ambulance, LLC ("Priority") is a limited liability company organized and existing pursuant to the laws of the State of Delaware.

23.    Shoals Ambulance, LLC is a limited liability company organized and existing pursuant to the laws of the State of Alabama.

24.    Defendant Shoals Ambulance, LLC is the successor by name change to Shoals Ambulance, Inc.

25.    The term "Shoals" shall mean and refer to Shoals Ambulance, Inc. and Shoals Ambulance, LLC.

**The Structure of the FirstMed Entities**

26.    The FirstMed Entities were each in the business of providing medical transportation services.

27.    The FirstMed Entities conducted operations in various states, including: North Carolina, Virginia, South Carolina, Ohio, Kentucky, and West Virginia.

28.    The operations of FirstMed were divided, for certain purposes, into two "branches," AAA, on the one hand, and ESAC and the ESAC Subsidiaries, on the other hand.

29.     ESAC and the ESAC Subsidiaries conducted their operations on the east coast in Virginia, North Carolina, and South Carolina.

30.     AAA conducted its operations primarily in Ohio, but also in Kentucky and West Virginia.

31.     Upon information and belief, AAA was the largest medical transport service company in Ohio during 2013.

32.     At all times relevant to these claims, the same individuals served as the officers and directors of each of the FirstMed Entities and of Ambulance Holdings.

33.     In 2013, Paul and Chandra were directors of each of the FirstMed Entities and of Ambulance Holdings.

34.     Prior to 2013, a former representative of EEF and/or EEF Partners named Christopher Garcia ("Garcia") was a director of each of the FirstMed Entities and of Ambulance Holdings.

35.     In 2013, Gibson became the CEO of each of the FirstMed Entities.

36.     Shortly before the Petition Date, Chandra became the CEO of each of the FirstMed Entities.

37.     In 2013, Blackburn became an officer of each of the FirstMed Entities.

38.     In 2013, Jewell became an officer of each of the FirstMed Entities.

39.     Ambulance Holdings owned all of the outstanding shares of AAA and ESAC.

40.     Coastline Care, Eastern Shore Ambulance, MarMac, and Transmed (collectively referred to herein as the "ESAC Subsidiaries") are subsidiaries of ESAC.

41.     ESAC owns all of the outstanding shares of Coastline Care.

42.     ESAC owns 99.91% of the outstanding shares of Eastern Shore Ambulance.

43. ESAC owns 99.33% of the outstanding shares of MarMac.

44. ESAC owns 99% of the outstanding membership interest of Transmed.

45. EEF owns approximately 82% of the outstanding membership interest of Ambulance Holdings.

46. The remaining ownership interest of Ambulance Holdings is owned by entities affiliated with or created by EEF and/or EEF Partners.

47. Ambulance Holdings is not an operating entity, but is a holding company which owns AAA and ESAC.

48. The only business of Ambulance Holdings pertains to its ownership of AAA and ESAC.

49. EEF Partners is the general partner of EEF.

50. Upon information and belief, Paul, Chandra, and Kostuchenko are general partners of EEF Partners.

51. Paul, Chandra, and Kostuchenko are employed by EEF and/or EEF Partners.

52. Paul, Chandra, and Kostuchenko control the business activities of EEF and/or EEF Partners.

53. Paul, Chandra, Kostuchenko, EEF and EEF Partners are collectively referred to herein as the "EEF Defendants."

54. EEF, EEF Partners, Chandra, Paul, Kostuchenko, Gibson, Blackburn, and Jewell are collectively referred to herein as the "FirstMed Defendants."

55. A chart illustrating the ownership structure of the FirstMed Entities, Ambulance Holdings, EEF, EEF Partners, and related entities, as well as the approximate ownership interests

of the FirstMed Entities and related entities is attached hereto as "Exhibit A" and is incorporated herein by reference as if fully set forth.

56.     Paul, Kostuchenko, and Chandra are each highly sophisticated professionals with exceptional skill and experience in business management and operation, investment, financial analysis, and financial management.

57.     The EEF Defendants engage in highly sophisticated private equity firm activities through which they control and invest many millions of dollars of capital and they hold themselves and their representatives out as having exceptional skill and experience in business management and operation, investment, financial analysis, and financial management.

58.     Upon information and belief, the EEF Defendants focus their investments and analysis on the health care industry, and have significant experience in the medical transport industry.

59.     Gibson, Blackburn, and Jewell each have significant management and operational experience within the medical transport industry.

**<u>Introduction to Claims</u>**

60.     The FirstMed Defendants mismanaged and breached their fiduciary duties to the FirstMed Entities and used the FirstMed Entities as a means of diverting tangible and intangible value into Priority and Shoals, benefitting the FirstMed Defendants and their new ventures at the expense of the FirstMed Entities, their employees, and their creditors.

61.     At a time when the FirstMed Entities were under a forbearance agreement and in default under their more than $30,000,000 obligation to their senior lender and under other obligations, the FirstMed Defendants developed detailed business models, strategies, and forecasts for, spent tremendous amounts of the FirstMed Entities' money on, and devoted

significant amounts of the FirstMed Entities' employee and management time to the expansion of medical transport services into new markets in Tennessee and Alabama (all of the foregoing and related activities collectively referred to herein as the "Expansion Plan").

62.    The FirstMed Defendants' tremendous spending on the Expansion Plan, coupled with a deliberate slashing of revenue in AAA, was a powerful one-two punch that destroyed the recently rejuvenated financial performance of the FirstMed Entities.

63.    Significantly, although the FirstMed Entities funded all of the work on the Expansion Plan, including relocation of vehicles, hiring and paying a significant number of additional employees, marketing efforts, charitable donations, lease expenditures, and other things, the FirstMed Defendants carried out the Expansion Plan under the name "Priority Ambulance" and "Shoals Ambulance."  At the direction of the FirstMed Defendants, employees paid by the FirstMed Entities worked for Shoals and vehicles and other assets were actually transferred to, and used by, Shoals, an operating business in Alabama owned by Gibson.

64.    Just before dumping the FirstMed Entities into Chapter 7 bankruptcy filings, the FirstMed Defendants formed Priority for the express purpose of seizing the value of the FirstMed Entities' investment in the Expansion Plan by continuing exactly the same business model, with exactly the same management team and substantially the same employees, thereby benefitting from all of the activities paid for by the FirstMed Entities in Tennessee and Alabama.

65.    The FirstMed Defendants filed or caused the filing of Chapter 7 bankruptcy cases for each of the FirstMed Entities without considering or pursuing obvious, more productive, and readily available alternatives despite the fact that ESAC and the ESAC Subsidiaries were consistently profitable and had significant tangible and intangible value, and despite the fact that

AAA had, just a few months before, been restructured, generated positive EBITDA for the first time, and had been trending toward positive and sustainable levels.

66.    Through their actions, the FirstMed Defendants deliberately stole substantially all of the tangible and intangible value of the FirstMed Entities for themselves and their new ventures, ensured that the FirstMed Entities would not be in the marketplace to compete with their new ventures, left behind all of the FirstMed Entities' liabilities, and continued exactly the same business plan with Priority and Shoals.

67.    The Chapter 7 filings were designed to, and did, benefit the FirstMed Defendants, Priority, and Shoals by removing competition in Tennessee, Alabama, and other states and by allowing the new entities to immediately utilize the FirstMed Entities' business plans, marketing efforts, contracts, employees, and assets.

68.    In their haste to shut down the operations of, and file Chapter 7 bankruptcy cases for, the FirstMed Entities, the FirstMed Defendants knowingly and/or recklessly and in bad faith failed to give any, or at best gave no more than a few hours', notice to employees before abruptly ceasing operations on December 6, 2013, the Friday afternoon before the filing of the Chapter 7 petitions in these bankruptcy cases, thereby subjecting the FirstMed Entities' bankruptcy estates to substantially increased costs of administration, and to claims in an adversary proceeding brought by or on behalf of now former employees seeking to impose potentially significant liability under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act") and various State statutes (the "WARN Act Litigation").

69.    Additionally, as a result of the FirstMed Defendants' actions, including but not limited to their causing the precipitous shut-down of the FirstMed Entities and the filing of the Chapter 7 petitions, other substantial damages and losses have been and will be sustained by the

FirstMed Entities, including but not limited to the loss of their tangible and intangible value, and substantially-diminished asset values and realization on those assets, that otherwise would have been obtained but for the actions of the FirstMed Defendants, and the value and gains obtained by the FirstMed Defendants through their theft of corporate opportunities of the FirstMed Defendants, including but not limited to those relating to the Expansion Plan.

70.      The actions of the FirstMed Defendants represented, at best, management of the FirstMed Entities in bad faith and with gross negligence or recklessness, or, at worst, an intentional and calculated strategy to force FirstMed to bear the significant development, start-up, and other costs of the Expansion Plan, then to siphon substantially all of the tangible and intangible value of the Expansion Plan from the FirstMed Entities for themselves and their new entities, Priority and Shoals, while leaving behind all of the FirstMed Entities' liabilities.

71.      By using the identical business plans and strategies, the same employees, and having the FirstMed Entities bear the significant start-up costs, the FirstMed Defendants, Priority, and Shoals have been successful in the Expansion Plan in Tennessee and Alabama, while the FirstMed Entities' creditors and employees are unpaid.

72.      The Trustee seeks to hold the Defendants accountable for their actions and to recover the tangible and intangible value lost by the FirstMed Entities on account of the Defendants' actions.

73.      The creditors of the FirstMed Entities' bankruptcy estates include not only lenders owed more than $30,000,000 and other creditors, but also thousands of now former employees of the FirstMed Entities whose wages went unpaid and whose jobs and insurance were terminated immediately and without notice.

**EEF Acquires the FirstMed Entities**

74.     In 2011, EEF and/or EEF Partners formed Ambulance Holdings for the purpose of acquiring all of the outstanding shares of ESAC.

75.     In 2011, Ambulance Holdings did acquire all of the outstanding shares of ESAC.

76.     Before they were acquired by Ambulance Holdings, ESAC and the ESAC Subsidiaries had histories of steady, profitable financial performance.

77.     By acquiring all of the outstanding shares of ESAC, Ambulance Holdings also acquired a controlling ownership interest in each of the ESAC Subsidiaries.

78.     EEF, EEF Partners, Paul, Chandra, and Kostuchenko each assessed in detail the financial records and historical performance of ESAC and the ESAC Subsidiaries before forming Ambulance Holdings.

79.     In 2011, the EEF Defendants caused Ambulance Holdings to acquire all of the outstanding shares of AAA.

80.     In 2011, the EEF Defendants caused AAA to acquire all of the assets of the entities known as "Life Ambulance" and "MedCorp."

81.     Thereafter, AAA used the trade names "Life Ambulance" and "MedCorp."

82.     Upon information and belief, the assets of Life Ambulance were purchased from a receivership and the assets of MedCorp were purchased from a bankruptcy estate.

83.     Upon information and belief, EEF and/or EEF Partners engaged an analyst to project the financial performance of the assets of Life Ambulance and MedCorp before AAA purchased those assets.

84.     Upon information and belief, that analyst concluded that those assets would generate positive return on EEF and/or EEF Partners' investment.

85. In connection with its acquisition of the assets of Life Ambulance and MedCorp, AAA incurred substantial debt and encumbered certain of its assets.

86. Upon information and belief, EEF and/or EEF Partners' investment in Ambulance Holdings and, by extension, in the FirstMed Entities, represented the largest investment in EEF and/or EEF Partners' portfolio.

87. For that reason, there was substantial pressure on the FirstMed Defendants for the FirstMed Entities to generate positive returns to EEF and/or EEF Partners and their investors and partners, and for those positive returns to come quickly.

88. When positive returns did not come quickly, there was substantial pressure on the FirstMed Defendants to take for themselves all available tangible and intangible value from the FirstMed Entities to produce up-side value for their new ventures in the same industry, Priority and Shoals.

**EEF and/or EEF Partners Controlled The FirstMed Entities and Ambulance Holdings**

89. EEF owns approximately 82% of the outstanding membership interest of Ambulance Holdings.

90. Upon information and belief, since Ambulance Holdings acquired AAA and ESAC, representatives of EEF and/or EEF Partners have made up a majority of the Board of Directors for each of the FirstMed Entities and Ambulance Holdings.

91. EEF and/or EEF Partners placed their representatives on the Board of Directors of each of the FirstMed Entities and Ambulance Holdings as a means of ensuring that EEF and/or EEF Partners would dictate the business operations, finances, funding, and strategies of the FirstMed Entities and Ambulance Holdings.

92.     EEF and/or EEF Partners did control and dictate the business operations, finances, funding, and strategies of the FirstMed Entities and Ambulance Holdings.

93.     The representatives of EEF and/or EEF Partners who served as directors of the FirstMed Entities and Ambulance Holdings were acting within the course and scope of their employment with EEF and/or EEF Partners, and were acting for the benefit of EEF and/or EEF Partners, when they acted as directors of the FirstMed Entities and Ambulance Holdings or took any action whatsoever relating to the FirstMed Entities, Ambulance Holdings, or the Expansion Plan.

94.     Prior to December of 2012, Paul and Garcia were members of the Board of Directors of each of the FirstMed Entities and Ambulance Holdings.

95.     In or around December of 2012, Chandra replaced Garcia as a member of the Board of Directors of each of the FirstMed Entities and Ambulance Holdings.

96.     Upon information and belief, Chandra, Paul, and/or Kostuchenko either developed, or were involved in and had to approve, all material decisions and strategies of the FirstMed Entities and Ambulance Holdings.

97.     The EEF Defendants controlled the strategies, decisions, operations, and activities of the FirstMed Entities and Ambulance Holdings.

98.     EEF and/or EEF Partners also controlled the FirstMed Entities through their funding of the operations of the FirstMed Entities.

99.     EEF and/or EEF Partners did not adequately fund Ambulance Holdings or the FirstMed Entities, so those entities could not operate independently of EEF and/or EEF Partners.

100.    Instead, the EEF Defendants intended for those entities to be dependent upon incremental funding from EEF and/or EEF Partners in order to carry out their operations so that the EEF Defendants could control the FirstMed Entities and Ambulance Holdings.

**The Loan From BMO**

101.    On or about July 1, 2011, AAA and ESAC, as Borrowers, and the ESAC Subsidiaries, as Guarantors, entered into agreements with Bank of Montreal and The F&M Bank and Trust Company (collectively, the "Lenders") whereby AAA and ESAC borrowed $26,500,000 under Term Notes and $5,000,000 under Revolving Notes pursuant to the terms of a Credit Agreement, as amended from time to time (the "Loans").

102.    Upon information and belief, a substantial portion of the Loans were utilized to purchase the assets of Life Ambulance and MedCorp by AAA.

103.    Upon information and belief, ESAC and AAA transferred to the Lenders a security interest in certain of their assets as security for the Loans.

104.    In 2012, the FirstMed Entities were not in compliance with, and were in default under, the terms and conditions of the Loans.

105.    In March of 2013, the FirstMed Entities and the Lenders entered into a Forbearance Agreement, the terms of which were extended and amended multiple times throughout 2013 (the "Forbearance Agreements").

106.    In the Forbearance Agreements, the FirstMed Entities acknowledged their default under the Loans and the Lenders agreed to forbear their rights under the Loans in exchange for the FirstMed Entities' compliance with the terms and conditions of the Forbearance Agreement.

107.    The Forbearance Agreements and related agreements required that EEF and/or EEF Partners provide certain funding to the FirstMed Entities to ensure certain levels of cash liquidity.

108.    The FirstMed Entities remained in default under the Loans until the Petition Date.

109.    The FirstMed Entities extended and amended the Forbearance Agreements until October of 2013.

110.    In October of 2013, the Lenders offered to extend the Forbearance Agreements for an additional period, but the FirstMed Defendants refused.

111.    After refusing to extend the Forbearance Agreements, the FirstMed Defendants demanded that the Lenders reduce the outstanding debt from more than $30,000,000 to approximately $4,000,000 and threatened to file a Chapter 7 bankruptcy case for each of the FirstMed Entities if the Lenders would not agree to do so.

**ESAC and the ESAC Subsidiaries Consistently Generate Positive EBITDA**

112.    In 2011, ESAC and the ESAC Subsidiaries had an established track record of profitable operations, consistently generating a positive EBITDA.

113.    ESAC and the ESAC Subsidiaries continued to consistently generate a positive EBITDA after their acquisition by Ambulance Holdings.

114.    ESAC and the ESAC Subsidiaries cumulatively generated substantial EBITDA during each quarter of 2012 and each of the first three quarters of 2013, even after their share of the FirstMed Entities' corporate expense.

115.    During each quarter of 2012 and each of the first three quarters of 2013, ESAC and the ESAC Subsidiaries exceeded $5,000,000 in cumulative revenue.

- 15 -

116.    During the year 2012, ESAC and the ESAC Subsidiaries generated nearly $2,000,000 in EBITDA, over and above their share of the FirstMed Entities' corporate expense.

117.    During the first two quarters of 2013, ESAC and the ESAC Subsidiaries were on pace to generate more than $2,000,000 in EBITDA for the year 2013, over and above their share of the FirstMed Entities' corporate expense.

118.    Upon information and belief, ESAC and the ESAC Subsidiaries would have continued to generate approximately $2,000,000 in EBITDA each year but for the wrongful acts of the FirstMed Defendants as described herein.

119.    ESAC and the ESAC Subsidiaries continued to generate positive EBITDA after corporate expense during the later portion of 2013, even in the face of tremendous increases to corporate expense, as described in greater detail below.

120.    The FirstMed Defendants substantially impaired the financial performance and the tangible and intangible value of ESAC and the ESAC Subsidiaries by increasing corporate expense through the hiring of many high-salaried employees in Tennessee and Alabama, by diverting assets and resources from ESAC and the ESAC Subsidiaries into the Expansion Plan, by focusing on the Expansion Plan rather than the existing business, then by dumping ESAC and the ESAC Subsidiaries into a Chapter 7 bankruptcy case.

121.    Upon information and belief, during 2012 and 2013, ESAC and the ESAC Subsidiaries performed as expected by EEF and/or EEF Partners at the time that Ambulance Holdings was formed.

122.    Any negative change in the EBITDA of ESAC and the ESAC Subsidiaries in late 2013 was due to the actions of the FirstMed Defendants in focus on the Expansion Plan,

diverting resources for those entities into the Expansion Plan, and significantly increasing corporate costs in connection with the Expansion Plan.

123.    ESAC and the ESAC Subsidiaries had large contracts for services, significant accounts receivable, a proven track record of positive EBITDA, and assets worth millions of dollars (including tangible assets such as a substantial number of ambulances and ambulettes), and a significant amount of valuable medical supplies and equipment.

124.    Up to the Petition Date, ESAC and the ESAC Subsidiaries had a significant going concern value.

125.    In late 2013, the FirstMed Defendants stated that the cumulative goodwill and other intangible value of ESAC and the ESAC Subsidiaries exceeded $20,000,000.

126.    The FirstMed Defendants represented up to the Petition Date that ESAC and the ESAC Subsidiaries would continue to generate positive EBITDA.

**FirstMed's Prior Management Team Corrected the AAA Operations by Mid-2013.**

127.    AAA did not generate the revenue that the EEF Defendants had anticipated.

128.    During each quarter of 2012, AAA's expenses exceeded its revenues.

129.    In or around December of 2012, FirstMed's Chief Executive Officer, Mike Franks ("Franks"), resigned or was fired by the EEF Defendants and FirstMed's then-Chief Operations Officer Chris Martin ("Martin"), was named the interim Chief Executive Officer.

130.    Also in or around December of 2012, Chandra replaced Garcia as director of the FirstMed Entities and Ambulance Holdings.

131.    In or around December of 2012, Martin and the EEF Defendants developed detailed plans for restructuring AAA's operations.

132.    The restructuring plans were designed to reduce a significant amount of AAA's expenses and to renegotiate contracts which AAA had in the Ohio area in order to trim the unprofitable components of those contracts.

133.    In December of 2012 and through the beginning of 2013, Martin and other AAA representatives carried out the restructuring plans and activities.

134.    As a result of the restructuring plans, for the first quarter of 2013, AAA reduced its expenses by nearly $3,500,000 per quarter as compared to 2012.

135.    As a result of the restructuring plans, in March of 2013, AAA had improved its financial position so that it generated a positive EBITDA after inclusion of its share of the FirstMed Entities' corporate expense for the first time since AAA was acquired by Ambulance Holdings.

136.    This represented a significant improvement from each of the quarters in the year 2012, where AAA saw negative EBITDA as high as $2,766,000 for a quarter.

137.    By March of 2013, AAA's financial data showed a demonstrable and significant positive trend.

138.    During this time, Martin stayed in contact with the Lenders and reported AAA's progress to the Lenders.  The Lenders were comfortable with the progress being made by AAA and with the dialogue that existed between it and Martin and other representatives of the FirstMed Entities.

139.    The Lenders were supportive of the restructuring plans and agreed to forbear and extend the duration of the Forbearance Agreements during the implementation of the restructuring plans.

140.    In addition to improving the operations of AAA, another component of the restructuring plans was to become involved in lobbying Ohio legislators concerning improved reimbursement rates in Ohio for medical transport services.

141.    AAA's executive team was involved in that lobbying effort.

142.    AAA's executive team understood that reimbursements rates in Ohio were set to be much improved beginning in January of 2014.

143.    As a result of that upcoming legislative change in Ohio, AAA's executive team anticipated that AAA's revenues would increase significantly beginning in January of 2014.

144.    The success of the restructuring plans in AAA was well publicized and lauded throughout the FirstMed Entities.

145.    In mid-2013, the FirstMed Entities' management team reasonably expected that the improvements to AAA's financial performance would continue and reasonably expected that AAA would contribute a positive EBITDA after corporate expense in the future.

146.    In mid-2013, AAA represented a large going concern with revenues which had been as high as $14,700,000 per quarter in 2012 and which were then approximately $12,000,000 per quarter.

147.    In mid-2013, AAA had many large contracts for medical transport services, had significant accounts receivable, and owned millions of dollars of assets (including tangible assets such as a substantial number of ambulances and ambulettes), and a significant amount of valuable medical supplies and equipment.

148.    In mid-2013, AAA's executive management team was committed to continuing its operations in its existing territories and continuing to realize improved financial performance as a result of the positive changes that they had made.

- 19 -

149.    In mid-2013, the FirstMed Entities had a consolidated positive EBITDA, after inclusion of corporate expense, and were on pace to achieve annual revenues of approximately $18,000,000.

150.    Even in late 2013, the FirstMed Defendants stated that AAA had goodwill and other intangible value exceeding $15,000,000.

151.    As with ESAC and the ESAC Subsidiaries, the FirstMed Defendants caused the financial performance of AAA to deteriorate in the third and fourth quarters of 2013 by, among other things, increasing corporate expense through the hiring of many high-salaried employees in Tennessee and Alabama, by diverting assets and resources from AAA into the Expansion Plan, and by focusing on the Expansion Plan rather than the existing business.

**EEF Brings on The Gibson Management Team in Mid-2013**

152.    After Franks left employment with the FirstMed Entities in late 2012, the EEF Defendants set out to find a new management team.

153.    The EEF Defendants identified Gibson as a candidate and, after discussions, finalized the terms of Gibson's employment during early 2013.

154.    The decision to hire Gibson was made solely by the EEF Defendants.

155.    When Martin learned that Gibson would be hired, Martin agreed to remain with FirstMed until after Gibson could officially begin his duties in late July of 2013, then Martin would resign shortly thereafter.

156.    Gibson had previously worked for RuralMetro, which was a large medical transport services company that had filed for bankruptcy protection.

157.    Upon information and belief, Gibson previously had an ownership interest in a medical transport services company located in Tennessee which utilized the trade name "Priority Ambulance."

158.    Upon information and belief, at the time that he was employed by the FirstMed Entities, Gibson had certain rights to use the trade name "Priority Ambulance."

159.    Before they hired Gibson, the EEF Defendants knew that Gibson owned an interest in Shoals, a medical transport services business in Alabama, and that Gibson devoted substantial time to the operation of Shoals.

160.    Upon information and belief, Gibson required, as a condition of his employment with the FirstMed Entities, that he be allowed to continue to devote substantial time to the operation of Shoals in Alabama.

161.    Upon information and belief, the EEF Defendants agreed to that condition.

162.    Gibson was officially announced as the Chief Executive Officer of the FirstMed Entities in late July of 2013.

163.    After that announcement, Gibson visited the operational headquarters of the FirstMed Entities in Wilmington, North Carolina.

164.    After that initial visit, Gibson never returned to the operational headquarters of the FirstMed Entities.

165.    Upon information and belief, Gibson performed his duties as Chief Executive Officer of the FirstMed Entities remotely and primarily from Phoenix, Arizona.

166.    Soon after Gibson began his tenure with the FirstMed Entities, Blackburn and Jewell were also hired as officers of each of the FirstMed Entities.

167.    Blackburn and Jewell had previously worked with Gibson in other medical transport services businesses.

168.    Gibson, Blackburn, and Jewell are collectively referred to herein as the "Gibson Management Team."

169.    Upon information and belief, the Gibson Management Team frequently met with the EEF Defendants and contributed to, helped to develop, and implemented the plans and strategies of the EEF Defendants.

170.    Martin's employment with the FirstMed Entities ended on or about October 1, 2013.

**The Gibson Management Team Slashes Revenue in Ohio**

171.    When the Gibson Management Team began employment, Martin and the prior management team had significantly improved AAA's financial performance.

172.    Upon information and belief, the FirstMed Defendants sought to reduce or eliminate AAA's business in Ohio so that AAA's resources, such as employees, vehicles, and medical equipment could be redeployed into the Expansion Plan.

173.    The FirstMed Defendants caused AAA to eliminate beneficial contracts that Martin and his prior management team had restructured, significantly reducing AAA's revenues.

174.    The FirstMed Defendants did not cut AAA's expenses nearly as quickly as they cut AAA's revenues, thereby creating a substantially negative impact on AAA's financial performance during the third and fourth quarters of 2013.

175.    The FirstMed Defendants utilized employees and resources of the FirstMed Entities, and particularly of AAA, to carry out tasks and strategies relating to the Expansion Plan, rather than to maintain and improve the existing business of the FirstMed Entities and of AAA.

176.    In the third quarter of 2013, the first quarter that the Gibson Management Team led the FirstMed Entities, AAA's EBITDA suffered a negative change of nearly $1,000,000.

177.    The decisions by the FirstMed Defendants to significantly reduce revenues in AAA's operation and to divert employees and resources of the FirstMed Entities toward the Expansion Plan substantially weakened the financial stability of the FirstMed Entities.

**The FirstMed Defendants Implement the Expansion Plan**

178.    Soon after the Gibson Management Team began, the FirstMed Defendants focused on developing, and did develop, a detailed and thoroughly researched business model and financial projections for the Expansion Plan into Tennessee and Alabama.

179.    The FirstMed Defendants devoted significant resources of the FirstMed Entities into developing and researching the business model for the Expansion Plan.

180.    The Expansion Plan was an asset of, and a corporate opportunity of, the FirstMed Entities.

181.    The FirstMed Defendants focused on the development of the Expansion Plan to the exclusion of the established business of the FirstMed Entities.

182.    During the time that Martin managed the FirstMed operations, Martin spent the overwhelming majority of his time restructuring and carefully analyzing and improving the day-to-day operations of the FirstMed Entities, and in providing information to the Lenders and monitoring the situation with the Lenders.

183.    Martin was located in Wilmington, North Carolina, the operational headquarters of the FirstMed Entities, where he worked alongside other key executives and employees of the FirstMed Entities.

184.    During the time that the Gibson Management Team operated FirstMed, the FirstMed Defendants did not spend any significant time analyzing or attempting to improve the existing business of FirstMed.  Instead, the FirstMed Defendants spent the majority of their time focusing on the Expansion Plan.

185.    Gibson only visited Wilmington, North Carolina once, when he was announced as the new Chief Executive Officer.  He conducted the majority of his activities as Chief Executive Officer of the FirstMed Entities remotely from his home in Phoenix, Arizona.

186.    The FirstMed Defendants were particularly inattentive to the ongoing business and did not spend time or energy in monitoring or improving operations of ESAC and the ESAC Subsidiaries, and the FirstMed Defendants did not, except for one occasion upon information and belief, even visit the FirstMed Entities' operational headquarters in Wilmington, North Carolina.

187.    The FirstMed Defendants knew that the Expansion Plan would be very expensive, would not generate revenue for a long period of time because there were no existing contracts in Tennessee or Alabama, and would divert significant resources and time away from the existing business of the FirstMed Entities.

188.    At the time that the FirstMed Defendants focused on the Expansion Plan, the FirstMed Entities were in default under the Loans, were subject to the Forbearance Agreements with the Lenders, and, although their financial performance was improved from 2012, the FirstMed Entities had only recently achieved a small positive EBITDA on a consolidated basis.

189.    The FirstMed Defendants knew or should have known that the FirstMed Entities were not in a financial position to undertake or sustain the significant expense of the Expansion Plan without funding from an outside source.

190.    Despite the then-existing financial characteristics of the FirstMed Entities, the FirstMed Defendants made the intentional decision to cut revenues in AAA while, at the same time, adding significant expenses to the FirstMed Entities' operation by hiring many new, high-salaried employees in Tennessee and Alabama and spending significant amounts in furtherance of the Expansion Plan.

191.    The FirstMed Entities never performed any medical transport services in the states of Tennessee and Alabama and never generated any revenue whatsoever in the states of Tennessee and Alabama.

**Although Paid for by the FirstMed Entities, the Expansion Plan Was Carried Out Under the Name "Priority Ambulance" and "Shoals Ambulance"**

192.    In 2013, Gibson had certain rights to use the trade name "Priority Ambulance" and Gibson owned an interest in Shoals.

193.    When the FirstMed Defendants directed the FirstMed Entities to spend money and divert resources into the Expansion Plan in Tennessee or Alabama, those actions were done under Gibson's trade names "Priority Ambulance" or "Shoals Ambulance" and not under any trade name utilized by the FirstMed Entities.

194.    The FirstMed Defendants directed the FirstMed Entities to utilize those trade names, rather than their own trade names, in the Expansion Plan so that the activities funded by the FirstMed Entities would benefit Shoals and Priority and so that the FirstMed Defendants could seize the value of those activities, and leave all of the FirstMed Entities' liabilities behind, in the event that the Lenders would not agree to the FirstMed Defendants' demands to restructure the Loans.

195.    In 2013, the FirstMed Defendants directed the FirstMed Entities' employees to carry out all of the work necessary to research the process for, apply for, and obtain business licenses in Tennessee and Alabama.

196.    Upon information and belief, according to the instructions of the FirstMed Defendants, those licenses were applied for by employees of the FirstMed Entities under the names of "Priority Ambulance" or "Shoals Ambulance."

197.    In 2013, the FirstMed Defendants directed an employee of the FirstMed Entities to design similar "shield" logos for Priority and Shoals based on a design which Gibson had previously utilized.

198.    A true and accurate copy of exemplars of the logos for both Priority and Shoals developed by an employee of the FirstMed Entities is attached hereto as "Exhibit B" and is incorporated herein by reference as if fully set forth.

199.    Further, and as described in greater detail below, the FirstMed Defendants directed the FirstMed Entities to hire new, mostly high-salaried employees in Tennessee and Alabama.  Although the FirstMed Entities paid those employees, the FirstMed Defendants caused those employees to hold themselves out as representatives of "Priority Ambulance" or "Shoals Ambulance" and to actually do work for Shoals.

200.    Further, and as described in greater detail below, the FirstMed Defendants directed the FirstMed Entities to transfer a substantial number of FirstMed vehicles to Tennessee and/or Alabama and, once there, those vehicles were re-painted with logos and trade names of "Priority Ambulance" and "Shoals Ambulance" and certain of those vehicles were used by Shoals.

201.    Further, and as described in greater detail below, the FirstMed Defendants directed and caused the FirstMed Entities to use their funds to make charitable donations in Tennessee and Alabama under the name "Priority Ambulance" or "Shoals Ambulance."

202.    At no time did the FirstMed Entities own an interest in Priority or Shoals.

203.    At no time did the FirstMed Entities have any enforceable agreement with Priority or Shoals whatsoever.

204.    At no time did Priority or Shoals reimburse or pay any money to the FirstMed Entities.

205.    At no time was there a note, receivable, or any accounting entry accruing for the benefit of the FirstMed Entities relating to reimbursement or repayment of the expenses paid or incurred by the FirstMed Entities in connection with the Expansion Plan by Shoals, Priority, or any other person or entity.

**The FirstMed Defendants Transfer the Newest Vehicles in the Fleet to Tennessee and Alabama and Allow Shoals to Use Them**

206.    In the fall of 2013, the FirstMed Defendants directed that the FirstMed Entities and their employees begin to relocate a significant number of FirstMed vehicles to locations in Tennessee and/or Alabama.

207.    At the time that these vehicles were being relocated, the FirstMed Entities had no operations in, and owned no property in, Tennessee or Alabama.

208.    However, Shoals did operate, and have business locations, in Alabama.

209.    Upon information and belief, a large number of the FirstMed Entities' vehicles were relocated by the FirstMed Entities' employees to one or more of Shoals' facilities in Alabama.

210.    Upon information and belief, the FirstMed Defendants allowed Shoals to use the FirstMed Entities' vehicles in Shoals' business, and Shoals did use the FirstMed Entities vehicles, without any compensation being paid by Shoals to the FirstMed Entities.

211.    Upon information and belief, those vehicles that were relocated into Tennessee and Alabama by the FirstMed Entities' employees and which were not used by Shoals sat idle because the FirstMed Entities had no contracts or business in Alabama or Tennessee.

212.    The FirstMed Defendants directed that the vehicles to be relocated into Tennessee or Alabama would be the newest and lowest-mileage ambulances in the fleets, including low-mileage Mercedes sprinter ambulances.

213.    The majority of the ambulances relocated into Tennessee and Alabama were owned by AAA, but the FirstMed Defendants also directed that ESAC and the ESAC Subsidiaries relocate a number of their newest and lowest-mileage ambulances to Tennessee and Alabama.

214.    The effect of relocating into Tennessee and Alabama many of the newest and lowest-mileage vehicles in the FirstMed Entities' fleets was that the FirstMed Entities were forced to continue to operate with older, higher-mileage vehicles which were significantly less efficient and which were significantly more costly to operate and maintain, while the more efficient and cheaper to maintain vehicles were utilized by Shoals and Priority or sat idle in states where the FirstMed Entities did not conduct business.

215.    The FirstMed Defendants' directive that the newest and lowest-mileage vehicles be relocated into Tennessee or Alabama increased costs for the FirstMed Entities and deprived the FirstMed Entities of the investment they had already made in those new, more efficient vehicles.

216. Upon information and belief, the FirstMed Defendants ordered the newest and lowest-mileage vehicles to be relocated into Alabama or Tennessee with the intent that those ambulances would be used by Shoals or Priority in their business, or for Shoals or Priority to purchase those ambulances for liquidation prices after the FirstMed Defendants filed Chapter 7 bankruptcy cases for the FirstMed Entities.

217. Employees of the FirstMed Entities drove these vehicles to the specified locations in Tennessee and Alabama, thereby diverting their production from the FirstMed Entities' core business.

218. Upon information and belief, the FirstMed Entities paid substantial sums of money for time, fuel, lodging, meals, and return flights from Tennessee and Alabama for those employees.

219. After the vehicles were relocated into Tennessee or Alabama, the FirstMed Defendants directed that those ambulances be taken to body shops for those ambulances to be re-painted with the logo and names of "Priority Ambulance" and "Shoals Ambulance."

220. The FirstMed Defendants directed that FirstMed Entities pay significant sums for their own ambulances to be re-painted with the logo and names of "Priority Ambulance" and "Shoals Ambulance."

221. When the Trustee recovered vehicles belonging to the FirstMed Entities which had been relocated into Tennessee and Alabama, some of those vehicles had been re-painted while others were in the process of being re-painted with the logo and names of "Priority Ambulance" and "Shoals Ambulance."

222. Neither Priority nor Shoals paid any money to the FirstMed Entities in connection with the re-painting of the FirstMed Entities' vehicles.

223.    Photographs of some of the vehicles belonging to the FirstMed Entities which either had been re-painted, or which were in the process of being re-painted, are attached hereto as "Exhibit C" and are incorporated herein by reference as if fully set forth.

224.    Examples of invoices for the painting of the "Shoals Ambulance" or "Priority Ambulance" logos onto vehicles belonging to the FirstMed Entities are attached hereto as "Exhibit D" and are incorporated herein by reference as if fully set forth.

225.    In mid to late 2013, the FirstMed Defendants had discussions relating to the fact that a Chapter 7 bankruptcy filing by the FirstMed Entities would present an opportunity for Shoals or a new entity controlled by EEF and/or EEF Partners to purchase the FirstMed Entities ambulances at significantly reduced prices.

226.    Again, immediately prior to the Chapter 7 bankruptcy filings for the FirstMed Entities, the FirstMed Defendants again discussed the opportunity to purchase the ambulances owned by the FirstMed Entities' at significantly reduced prices.

227.    Upon information and belief, after the Petition Date, the FirstMed Defendants decided not to pursue the purchase of vehicles from the FirstMed Entities through Priority and/or Shoals because the relocation and re-painting of those vehicles had garnered negative attention from the media and former employees of the FirstMed Entities or because they were advised that such a transaction may subject them, Priority, and Shoals to legal claims.

228.    The vehicles which were relocated to Tennessee and Alabama were never utilized in those states for the benefit of the FirstMed Entities.

229.    Along with vehicles, the FirstMed Defendants directed employees of the FirstMed Entities to relocate valuable medical supplies and equipment belonging to the FirstMed Entities to Tennessee or Alabama.

230.    Additionally, the FirstMed Defendants directed employees of the FirstMed Entities to order and pay for new equipment to outfit the FirstMed Entities vehicles which had been transferred to Alabama or Tennessee.

231.    The new equipment ordered and paid for by the FirstMed Entities for those vehicles was intended to be used by Shoals or Priority.

232.    Examples of invoices for equipment ordered and paid for by the FirstMed Entities for those vehicles transferred to Alabama and Tennessee is attached hereto as "Exhibit E" and is incorporated herein by reference as if fully set forth.

233.    Upon information and belief, Shoals and/or Priority utilized equipment belonging to or paid for by the FirstMed Entities in their business without paying any compensation to the FirstMed Entities.

234.    The equipment transferred to, or purchased for, Shoals or Priority has not been returned to the Trustee or otherwise accounted for.

235.    The relocation of vehicles and equipment caused significant loss of tangible and intangible value for the FirstMed Entities through the increased cost of operation of its business with older and higher-mileage vehicles and the diversion of its employees, resources, and funds from its core business.

236.    For the vehicles and equipment relocated into Tennessee and Alabama, the FirstMed Defendants did not follow the established procedures utilized by the FirstMed Entities for the tracking and record-keeping of the location of their vehicles.

237.    At the same time the FirstMed Defendants were directing employees of the FirstMed Entities to relocate vehicles and equipment to Tennessee and Alabama, the Lenders

were demanding that the FirstMed Defendants deliver the titles to those vehicles to the Lenders so that the Lenders could perfect their security interest in those vehicles.

238.    Upon information and belief, the FirstMed Defendants refused to deliver or substantially delayed in the delivery of the titles to those vehicles to the Lenders.

## The FirstMed Defendants Hire High-Salaried Employees in Tennessee and Alabama to Work for "Priority Ambulance" or "Shoals Ambulance"

239.    In the fall of 2013, the FirstMed Defendants caused the FirstMed Entities to hire at least 12 new employees based in Tennessee and Alabama, not including members of the Gibson Management Team (the "TN / AL Employees").

240.    The TN / AL Employees were hired specifically to perform work in Tennessee and Alabama.

241.    The TN / AL Employees were not low wage or menial workers, but were mostly experienced professionals with significant salaries, many exceeding $100,000 annually.

242.    The FirstMed Entities paid the TN / AL Employees a combined amount of $30,806.48 per week, which equates to more than $1,600,000 per year.

243.    At the time that the FirstMed Entities hired the new TN / AL Employees, and paid those individuals at a rate of more than $1,600,000 per year, the FirstMed Entities had no business operations, no business location, no contracts, and no revenue in Tennessee or Alabama.

244.    At the time that the FirstMed Entities hired the new TN / AL Employees, and paid those individuals at a rate of more than $1,600,000 per year, the FirstMed Defendants knew or should have known that the FirstMed Entities would receive no revenue on account of any labor of the TN / AL Employees for a substantial period of time.

245.    At the time that the FirstMed Entities hired the new TN / AL Employees, the FirstMed Entities were under a forbearance agreement with the Lenders and the FirstMed Entities had returned to a negative EBITDA as a result of the actions of the FirstMed Defendants.

246.    When the TN / AL Employees were hired by the FirstMed Entities in the fall of 2013, the FirstMed Defendants tasked an employee of the FirstMed Entities with sending "welcome packages" to those employees.

247.    The "welcome packages" that the FirstMed employee was instructed to put together, and which the FirstMed Entities paid for, included products that did not bear the FirstMed logo, but instead bore either the "Priority Ambulance" or "Shoals Ambulance" logo.

248.    When the TN / AL Employees were hired by the FirstMed Entities in the fall of 2013, the FirstMed Defendants directed an employee of the FirstMed Entities to order business cards for those employees which bore the logo of and referenced "Priority Ambulance" or "Shoals Ambulance."

249.    An example of certain business cards ordered by the FirstMed Entities for a TN / AL Employee is attached hereto as "Exhibit F" and is incorporated herein by reference as if fully set forth.

250.    The FirstMed Defendants caused the TN / AL Employees to hold themselves out not as representatives of FirstMed but as representatives of Priority or Shoals.

251.    Employees of the FirstMed Entities were directed by the FirstMed Defendants to do work for Shoals, a competing medical transport company owned by Gibson, and they did do work for Shoals.

252.    All work that the TN / AL Employees conducted in Tennessee or Alabama was not for the benefit of the FirstMed Entities, but was for the benefit of Priority or Shoals.

253.    Even high-level management employees and officers of the FirstMed Entities - other than the FirstMed Defendants - did not know what the TN / AL Employees were doing in Tennessee or Alabama or why they were hired.

254.    The LinkedIn pages, or other social medial or professional marketing pages, for some of the TN / AL Employees show that those individuals held themselves out not as employees of FirstMed, but as employees of Priority or Shoals prior to the Petition Date.

255.    Virtually all, if not all, of the TN / AL Employees were hired by Shoals or Priority after the Petition Date.

256.    Upon information and belief, the FirstMed Defendants directed the FirstMed Entities to hire the TN / AL Employees as an intentional strategy to have the FirstMed Entities fund the significant expense of recruiting, hiring, training, and paying for a high-quality work force in Tennessee and Alabama so that Shoals and Priority would not have to bear that cost.

257.    In the fall of 2013, the FirstMed Defendants directed and caused the FirstMed Entities to make deposits on leases for facilities in Tennessee and Alabama, which the FirstMed Entities never leased or used.

258.    Upon information and belief, the FirstMed Defendants directed the FirstMed Entities to make those deposits so that Shoals and Priority could benefit from the FirstMed Entities' payment of those expenses should they need to utilize those facilities.

259.    Upon information and belief, Shoals or Priority are currently using facilities that the TN / AL Employees researched and located and for which the FirstMed Entities paid deposits.

260.    In the fall of 2013, the FirstMed Defendants directed and caused the FirstMed Entities to make a number of significant charitable donations in the name of "Priority Ambulance" or "Shoals Ambulance" in Tennessee and/or Alabama.

261.    Upon information and belief, the FirstMed Defendants directed the FirstMed Entities to make those charitable donations so that Priority and Shoals would benefit from the goodwill of those donations without incurring expense.

**The Expansion Plan Caused a Dramatic Spike In Corporate Expense and Ruined the FirstMed Entities' Financial Performance**

262.    As a result of the FirstMed Defendants' pursuit of the Expansion Plan, the FirstMed Entities' corporate costs increased from approximately $300,000 per month in early 2013 to nearly $700,000 per month by October of 2013, or an annualized increase in costs of approximately $4,800,000.

263.    Those significantly increased corporate costs eroded all of the combined EBITDA of the FirstMed Entities and caused the FirstMed Entities to lose substantial tangible and intangible value by the Petition Date.

264.    Those increased corporate costs benefitted Shoals, Priority, and the FirstMed Defendants, not the FirstMed Entities.

265.    On a consolidated basis, the FirstMed Entities went from a positive EBITDA of nearly $300,000 per month in March of 2013 to an EBITDA more negative than $1,000,000 per month in October of 2013.

**EEF and or EEF Partners' Promise to Fund the Expansion Plan**

266.    Employees of the FirstMed Entities frequently raised concerns to their superiors and other employees about the reduction in revenues within AAA, the increased spending in

Tennessee and Alabama, the relocation of vehicles into Tennessee and Alabama, and the hiring of a significant number of new, high-salary employees in Tennessee and Alabama.

267.    Even senior employees and officers of the FirstMed Entities – other than the FirstMed Defendants - were concerned with, and lacked information concerning, the Expansion Plan given the immediately prior significant restructuring efforts and improved financial condition of the FirstMed Entities and the fact that the Expansion Plan was significantly increasing cost while decreasing revenue.

268.    In response to these concerns, the Gibson Management Team informed several key employees of the FirstMed Entities that EEF and/or EEF Partners had committed to funding the Expansion Plan with $7,500,000 to $10,000,000 in new investment (the "Expansion Investment"), and that this new investment from EEF and/or EEF Partners would be sufficient to completely fund the Expansion Plan while sustaining the core business of the FirstMed Entities.

269.    Upon information and belief, EEF and/or EEF Partners either agreed to make the Expansion Investment without having any intention to do so, or the FirstMed Defendants intentionally misled employees of the FirstMed Entities into believing that EEF and/or EEF Partners would make the Expansion Investment.

270.    The FirstMed Defendants informed the Lenders that the Expansion Investment was required in order to pursue the Expansion Plan.

271.    Upon information and belief, EEF and/or EEF Partners either committed to the Lenders that they would make the Expansion Investment without having any intention to do so, or the FirstMed Defendants intentionally misled the Lenders into believing that they would make the Expansion Investment.

272.    Despite informing the Lenders that the Expansion Investment was required in order to pursue the Expansion Plan, the FirstMed Defendants moved forward with the Expansion Plan without the Expansion Investment.

273.    EEF and/or EEF Partners did not make the Expansion Investment, leaving the FirstMed Entities to absorb the cost of the Expansion Plan substantially on their own.

274.    Any investment that EEF and/or EEF Partners made into the Expansion Plan was significantly less than the Expansion Investment and was made to benefit Priority and/or Shoals and not the FirstMed Entities.

**The FirstMed Defendants' Communications With the Lenders**

275.    In October of 2013, after the Forbearance Agreements had been extended several times, the Lenders agreed to again extend the period of the Forbearance Agreements.

276.    However, the FirstMed Defendants informed the Lenders that they would not sign an extension of the Forbearance Agreements.

277.    The FirstMed Defendants' refusal to agree to an extension of the Forbearance Agreements surprised the Lenders.

278.    After refusing an extension of the Forbearance Agreements, the FirstMed Defendants made various demands on the Lenders that they compromise the outstanding debt owed to them of over $30,000,000.  Initially, the First Med Defendants demanded that the Lenders write down the debt to a principal of $10,000,000 plus deferred interest and a small equity stake.  After the Lenders made a counter-proposal to that demand, the FirstMed Defendants not only refused that counter-proposal but also withdrew their initial demand and demanded that the Lenders write off the entire indebtedness in exchange for a payment of approximately $4,000,000 and threatened to shut down the businesses of the FirstMed Entities

and to file a Chapter 7 bankruptcy for each of the FirstMed Entities if the Lenders would not agree to do so.

279.   Consistent with their domination and control over the FirstMed Entities and Ambulance Holdings, the EEF Defendants led the discussions with the Lenders.

280.   Kostuchenko, who was not an officer or director of the FirstMed Entities, but who was a partner of EEF and/or EEF Partners, took an active role in discussions with the Lenders.

281.   Upon information and belief, Kostuchenko likewise took an active role in the development of strategies and operations of the FirstMed Entities and the Expansion Plan in late 2013 and the decision to file Chapter 7 bankruptcy cases for each of the FirstMed Entities.

282.   The FirstMed Defendants informed the Lenders that if the Lenders were unwilling to compromise the debt of more than $30,000,000 for approximately $4,000,000, the Gibson Management Team would leave the FirstMed Entities and would pursue the Expansion Plan in a new entity with new capital raised by or invested by EEF and/or EEF Partners.

283.   Upon information and belief, the FirstMed Defendants were implying that, if the Lenders did not accept the FirstMed Defendants' proposal, the FirstMed Defendants would cease the business operations of the FirstMed Entities and continue the Expansion Plan through Priority and Shoals, eliminating the going concern value of, and substantially harming the asset value of, the FirstMed Entities.

284.   In November of 2013, the EEF Defendants made a number of presentations to the Lenders and their agents outlining the FirstMed Entities' financial situations and providing information about the Expansion Plan.

285.   The EEF Defendants described to the Lenders in great detail the research, strategy, and business model for the FirstMed Entities' Expansion Plan.

286.    In the presentations made by the EEF Defendants to the Lenders, the EEF Defendants explained that the FirstMed Entities' business plans to expand into Tennessee and Alabama were expected to yield more than $30,000,000 in EBITDA by the year 2018.

287.    In the presentations made by the EEF Defendants to the Lenders in November of 2013, the EEF Defendants represented that the FirstMed Entities' Expansion Plan was dependent upon a capital infusion by EEF and/or EEF Partners of at least $7,500,000.

288.    However, the FirstMed Entities had already begun aggressively pursuing the Expansion Plan and expending significant resources in doing so, and continued to do so, despite not receiving that capital infusion by EEF and/or EEF Partners.

289.    By November of 2013, the FirstMed Defendants already had utilized the FirstMed Entities to, among other things, develop and research the business model for the Expansion Plan, hire the TN / AL Employees at an annualized cost of more than $1,600,000, begin marketing business as "Priority Ambulance" and "Shoals Ambulance" in Tennessee and Alabama, and relocate ambulances, medical supplies, and equipment of the FirstMed Entities to Tennessee and Alabama.

290.    The various presentations made by the EEF Defendants to the Lenders in November of 2013 contained cash flow and financial forecasts which varied widely from presentation to presentation, even though the forecasts were submitted only a few days apart.

291.    The EEF Defendants consistently represented to the Lenders that ESAC and the ESAC Subsidiaries had generated consistent stand-alone profit and that those entities were expected to continue to generate stand-alone profit of at least $2,000,000 each year going forward.

292.    After the EEF Defendants informed the Lenders in one presentation that there was a liquidity crisis at the FirstMed Entities, the Lenders requested in-person meetings with the Gibson Management Team, but the EEF Defendants informed the Lenders that all of the members of the Gibson Management Team were unavailable to meet because they were attending a week-long event in Las Vegas.

293.    In November of 2013, the Lenders engaged a professional advisory firm to assess the financial characteristics of the FirstMed Entities and the forecasts provided by the EEF Defendants and to recommend restructuring plans.

294.    The Lenders made proposals for restructuring to the EEF Defendants based on the recommendations of its professional advisory firm, but the EEF Defendants refused each proposal and ignored the suggestions of the professional advisory firm.

295.    In November and December of 2013, the EEF Defendants continued to threaten to shut down the businesses of the FirstMed Entities and to file Chapter 7 bankruptcy cases for the FirstMed Entities if the Lenders did not dramatically reduce the debt owed by the FirstMed Entities.

296.    In their presentations to the Lenders, the EEF Defendants indicated that a decision had to be made quickly because RuralMetro, a competing medical transport services company which formerly had employed Gibson, would be emerging from bankruptcy and would be primed to begin operations in Tennessee and Alabama by December 13, 2013.

297.    In early December of 2013, a call was scheduled between the Lenders, counsel for the Lenders, the EEF Defendants, and counsel for the EEF Defendants in order to discuss restructuring of the Loan.

298.    When the Lenders and counsel for the Lenders got on the call, counsel for the EEF Defendants indicated that none of the EEF Defendants would be on the call because they had decided to shut down the businesses of the FirstMed Entities and to file a Chapter 7 bankruptcy case for each of the FirstMed Entities immediately.

299.    In the days before the Petition Date, counsel for the Lenders informed counsel for the EEF Defendants that a shut-down of the businesses of the FirstMed Entities, the reduction of workforce, and the filing of Chapter 7 petitions would violate various fiduciary duties owed to the FirstMed Entities and their creditors by the FirstMed Defendants because those actions would be blatantly wasteful, irresponsible, and the most harmful course of action in that, among other things, it would fail to maximize or preserve the value of the businesses of the FirstMed Entities and their assets   In addition, the Lender's counsel pointed out that the reduction in workforce would raise potential WARN Act issues and possible liability.

300.    Counsel for the Lenders restated his positions in a letter received by counsel for the EEF Defendants prior to the Petition Date.

301.    The EEF Defendants ignored those warnings.

302.    In the days prior to the Petition Date, the Lenders offered to provide debtor-in-possession financing for the FirstMed Entities for a Chapter 11 bankruptcy filing, but the EEF Defendants refused that offer and filed Chapter 7 bankruptcy cases for the FirstMed Entities.

**The Decision to File Chapter 7 Cases for the FirstMed Entities and the WARN Act Claims**

303.    Late in the afternoon on Friday, December 6, 2013, the FirstMed Defendants began to inform the FirstMed Entities' employees that the FirstMed Entities would file Chapter 7 bankruptcy cases and would cease their operations effective immediately, and that the employees were terminated immediately.

304.    Upon information and belief, the FirstMed Defendants failed to implement, and did not even seriously consider alternatives to the precipitous shutdown of the businesses of the FirstMed Entities or the filing of Chapter 7 bankruptcy petitions, such as non-bankruptcy restructuring, sale of assets, orderly liquidation, receivership, or Chapter 11 bankruptcy cases.

305.    Upon information and belief, those alternatives were available to the FirstMed Defendants and would have preserved substantially more value in the FirstMed Entities than termination of their operations and the filing of Chapter 7 bankruptcy cases for each of the FirstMed Entities.

306.    Upon information and belief, the FirstMed Defendants did not seriously consider alternatives to Chapter 7 bankruptcy cases for financially stable ESAC and the ESAC Subsidiaries, such as continued operation independent of AAA, non-bankruptcy restructuring, sale of assets, orderly liquidation, receivership, or Chapter 11 bankruptcy cases.

307.    Upon information and belief, those alternatives were available to the FirstMed Defendants for ESAC and the ESAC Subsidiaries and would have preserved substantially more value than the filing of Chapter 7 bankruptcy cases.

308.    Upon information and belief, the Lenders were supportive of, and actively pled with the FirstMed Defendants to implement, a restructuring plan for the FirstMed Entities other than Chapter 7 bankruptcy cases.

309.    Upon information and belief, the Lenders would have accepted and agreed to virtually any other reasonable restructuring proposal besides Chapter 7 bankruptcy cases for each of the FirstMed Entities.

310.    Upon information and belief, the Lenders offered to provide debtor-in-possession financing in order to allow the FirstMed Entities to file Chapter 11 bankruptcy filings, but the FirstMed Defendants rejected that proposal.

311.    Upon information and belief, the FirstMed Defendants directed the shutdown of the operations of the FirstMed Entities and elected to file Chapter 7 bankruptcy cases for each of the FirstMed Entities as a means of benefitting themselves and Priority and Shoals by, *inter alia*, eliminating the FirstMed Entities from competing with those new entities, by creating an opportunity for those new entities to immediately move forward with the Expansion Plan belonging to the FirstMed Entities, by creating an opportunity for those new entities to immediately hire employees of the FirstMed Entities, and by creating a potential opportunity for those new entities to purchase vehicles, equipment, and supplies belonging to the FirstMed Entities at liquidation value.

312.    Alternatives to Chapter 7 bankruptcy filings for the FirstMed Entities which would have preserved significantly more of the value of the FirstMed Entities were available to the FirstMed Defendants, but the FirstMed Defendants did not pursue those alternatives and, instead, chose to shut down their businesses and file Chapter 7 bankruptcy cases despite their knowledge that those actions would, of all of the available options, be the most destructive course for the value of the FirstMed Entities.

313.    Upon information and belief, as of the Petition Date, each of the FirstMed Entities had considerable going concern value, had assets which were both valuable and marketable, and had recognizable brands and goodwill which would have attracted new investment capital or purchasers.

314.    Upon information and belief, employees of the FirstMed Entities were given no advance notice, or at most a few hours' notice, that their employment would be terminated as of Friday December 6, 2013.

315.    As a result of decision of the FirstMed Defendants to terminate the business operations of the FirstMed Entitie, the employees of the FirstMed Entities who were terminated on December 6, 2013 - estimated to number over 2,000 - were not paid wages for periods prior to the Petition Date.

316.    Upon information and belief, the abrupt filing of Chapter 7 bankruptcy cases caused interruption in health insurance for the employees of the FirstMed Entities.

317.    As a result of the FirstMed Defendants' actions in causing each of the FirstMed Defendants to hastily file Chapter 7 bankruptcy cases without providing more than a few hours' notice to, or paying the wages of, the FirstMed Entities' employees, the FirstMed Entities' bankruptcy estates are now subject to the WARN Act Litigation brought by representatives of a class, alleged to consist of approximately 2,000 former employees of the FirstMed Entities, asserting claims for millions of dollars in damages, punitive damages, and attorneys' fees for violation of the WARN Act.

318.    The WARN Act Litigation is pending before this Court.

319.    The FirstMed Entities' bankruptcy estates have expended significant resources in the investigation into and the defense of the WARN Act Litigation.

320.    The liability of the FirstMed Entities' bankruptcy estates on account of the claims set forth in the WARN Act Litigation is not yet certain, but any such liability is the direct result of the FirstMed Defendants' wrongful actions.

**Corporate Filings for Shoals and Priority Before the Petition Date**

321.    On November 6, 2013, Shoals Ambulance, Inc., which had previously been registered to conduct business only in Alabama, became registered with the Office of the Tennessee Secretary of State to conduct business in Tennessee.

322.    In its filings the Officer of the Tennessee Secretary of State, Shoals Ambulance, Inc. listed, as assumed names, "FirstMed EMS" and "Priority Ambulance."

323.    A true and accurate copy of the Business Entity Detail listing published by, and certain filings made by Shoals Ambulance, Inc. with, the Office of the Tennessee Secretary of State showing Shoals Ambulance, Inc.'s registration of the assumed names "FirstMed EMS" and "Priority Ambulance" is attached hereto as "Exhibit G" and is incorporated herein by reference as if fully set forth.

324.    Upon information and belief, the EEF Defendants and Gibson directed the listing of "FirstMed EMS" and "Priority Ambulance" as assumed names of Shoals Ambulance, Inc. on the initial filing with the Office of the Tennessee Secretary of State.

325.    Upon information and belief, the FirstMed Entities had no agreement with Shoals for the use of their trade name and the FirstMed Entities did not receive any compensation from Shoals for the use of their name.

326.    On December 5, 2013, the day before the FirstMed Defendants terminated all operations of the FirstMed Entities and informed all of the employees of the FirstMed Entities that they were terminated immediately, the EEF Defendants formed Priority Ambulance, LLC and registered Priority with the Office of the Delaware Secretary of State.

327.    On the same day, December 5, 2013, the EEF Defendants also formed Priority Ambulance Intermediate Holdings, LLC, Priority Ambulance Holdings, LLC, and Priority

Ambulance Blocker Corporation, and registered those entities with the Office of the Delaware Secretary of State.

328.    Each of those entities was related to Priority.

329.    True and accurate copies of the Entity Details listings published by the Office of the Delaware Secretary of State for Priority, Priority Ambulance Intermediate Holdings, LLC, Priority Ambulance Holdings, LLC, and Priority Ambulance Blocker Corporation are attached hereto as "Exhibit H" and are incorporated herein by reference as if fully set forth.

330.    The EEF Defendants formed Priority and the other related entities on December 5, 2013 because they had decided to file Chapter 7 bankruptcy cases for the FirstMed Entities and they needed a new entity within which to continue exactly the same strategy and business plan set forth in the Expansion Plan for their own benefit using the Gibson Management Team, the TN / AL Employees, and other key employees of the FirstMed Entities once the FirstMed Entities filed their Chapter 7 bankruptcy cases.

331.    Upon information and belief, the FirstMed Defendants developed the intention to form Priority well before December 5, 2013 and it took the FirstMed Defendants substantial time and effort to develop the structure of Priority before it was formed on December 5, 2013.

332.    Upon information and belief, the FirstMed Defendants began fundraising and soliciting investments for Priority and/or Shoals well before Priority was formed on December 5, 2013.

333.    Shortly after the Petition Date, on or about December 18, 2013, Shoals Ambulance, Inc. changed its name to Shoals Ambulance, LLC.

334.    A true and accurate copy of the Business Entity Details listing published by the Office of the Alabama Secretary of State for Shoals Ambulance, LLC is attached hereto as "Exhibit I" and is incorporated herein by reference as if fully set forth.

335.    Then, on or about December 23, 2013, Priority purchased all of the outstanding membership interest of Shoals, including all of the membership interest owned by Gibson.

336.    Shoals is now a wholly owned subsidiary of Priority.

337.    Upon information and belief, Gibson formed an entity, BG Holdings, Inc., and invested in Priority through that entity.

338.    A chart outlining the organization structure of Priority, Shoals, and related entities is attached hereto as "Exhibit J" and is incorporated herein by reference as if fully set forth.

**Priority Ambulance and Shoals Ambulance Utilize the FirstMed Entities' Investment After the Bankruptcy Filing**

339.    Upon information and belief, before the Petition Date the FirstMed Defendants discussed and developed a plan to continue exactly the same Expansion Plan that had been developed by, started in, and paid for by the FirstMed Entities in Priority and Shoals after the FirstMed Entities filed Chapter 7 bankruptcy cases.

340.    Priority and Shoals did continue, and are presently operating, exactly the same Expansion Plan that was developed by, started in, and paid for by the FirstMed Entities.

341.    All members of the Gibson Management Team were hired by either Priority or Shoals.

342.    Upon information and belief, all or substantially all of the TN / AL Employees were hired by either Priority or Shoals.

343.    Upon information and belief, all or substantially all of the TN / AL Employees were recruited to work for either Priority or Shoals by one or more of the FirstMed Defendants.

344.     By continuing exactly the same Expansion Plan that was developed by, started in, and paid for by the FirstMed Entities, the FirstMed Defendants, Priority, and Shoals wrongfully misappropriated and converted the FirstMed Entities' business plan, corporate opportunity, labor, employment lists, confidential information, marketing, research and development, contracts, customers, and other assets and efforts, while leaving all of the FirstMed Entities' liabilities behind.

345.     Upon information and belief, representatives of EEF and/or EEF Partners constitute a majority of the Board of Directors of Priority and Shoals.

346.     Upon information and belief, Priority and Shoals have been and continue to be profitable by employing exactly the same Expansion Plan developed by, started in, and paid for by the FirstMed Entities.

**The Gibson and Blackburn Employment Agreements**

347.     On or about July 29, 2013, Gibson entered into an Executive Agreement with ESAC (the "Gibson Employment Agreement").

348.     A true and accurate copy of the Gibson Employment Agreement is attached hereto as "Exhibit K" and is incorporated herein by reference as if fully set forth.

349.     The Gibson Employment Agreement called for Gibson to receive a base salary of $350,000, the opportunity for an annual bonus of up to $350,000, certain units of ownership in Ambulance Holdings, and reimbursement of entertainment and travel expenses, including first class airfare.

350.     Paragraph 2(b) of the Gibson Employment Agreement required Gibson to "devote his full business time and attention to the business and affairs of the Company."

351.   Paragraph 2(b) of the Gibson Employment Agreements allows Gibson to continue as an officer or director of Shoals but requires that Gibson's activities for Shoals do not "materially detract from the performance of his duties to [the FirstMed Entities] or conflict with his obligations under this Agreement."

352.   Gibson breached his obligation under Paragraph 2(b) of the Gibson Employment Agreement by, among other things, devoting substantial time and attention to the Expansion Plan, which was for the benefit of Priority and/or Shoals and himself, personally, and to the detriment of the FirstMed Entities.

353.   Paragraph 4(b) of the Gibson Employment Agreement provides that all Work Product, generally including all plans and ideas, generated by Gibson during his employment is the property of ESAC.

354.   Paragraph 5(a) of the Gibson Employment Agreement provides that Gibson will not appropriate the FirstMed Entities' confidential information, including, but not limited to, expansion and business plans, and employee lists and information, for his own benefit or the benefit of any other person or entity.

355.   By stealing the exact Expansion Plan developed and paid for by the FirstMed Entities and utilizing that business plan in Shoals and Priority, as well as recruiting the TN / AL Employees to work for Priority or Shoals, Gibson has misappropriated and converted the assets of the FirstMed Entities and violated Paragraphs 4(b) and 5(a) of the Gibson Employment Agreement.

356.   Paragraph 5(b) of the Gibson Employment Agreement prohibits Gibson from taking certain actions in competition with the FirstMed Entities.

357.    Gibson violated Paragraph 5(b) of the Gibson Employment Agreement by, among other things, carrying out the Expansion Plan in a manner which benefitted Priority and Shoals to the detriment of the FirstMed Entities and by misappropriating and converting the Expansion Plan and other business information of the FirstMed Entities for use by Priority and Shoals.

358.    Paragraph 5(c) of the Gibson Employment Agreement prohibits Gibson from soliciting any customer or prospective customer of the FirstMed Entities.

359.    Upon information and belief, Gibson violated Paragraph 5(c) of the Gibson Employment Agreement by, among other things, soliciting those customers or potential customers which had been identified by the FirstMed Entities in connection with their Expansion Plan in Tennessee or Alabama for the purpose of doing business with those customers within Shoals or Priority.

360.    On or about August 26, 2013, Blackburn entered into an Employment Agreement with ESAC (the "Blackburn Employment Agreement").

361.    A true and accurate copy of the Blackburn Employment Agreement is attached hereto as "Exhibit L" and is incorporated herein by reference as if fully set forth.

362.    The Blackburn Employment Agreement calls for Blackburn to receive a base salary of $250,000, the opportunity for an annual bonus of up to 60% of his base salary, certain opportunities to be granted units of ownership in Ambulance Holdings, and the reimbursement of certain expenses.

363.    Paragraph 2(b) of the Blackburn Employment Agreement required Blackburn to "devote his full business time and attention to the business and affairs of the [FirstMed Entities.]"

364.    Blackburn breached his obligation under Paragraph 2(b) of the Blackburn Employment Agreement by, among other things, devoting substantial time and attention to the

Expansion Plan, which was for the benefit of Priority and/or Shoals and himself, personally, and to the detriment of the FirstMed Entities.

365.    Paragraph 4(b) of the Blackburn Employment Agreement provides that all Work Product, generally including all plans and ideas, generated by Blackburn during his employment is the property of ESAC.

366.    Paragraph 5(a) of the Blackburn Employment Agreement provides that Blackburn will not appropriate the FirstMed Entities' confidential information, including, but not limited to, expansion and business plans, and employee lists and information, for his own benefit or the benefit of any other person or entity.

367.    By stealing the exact Expansion Plan developed by the FirstMed Entities and utilizing that business plan in Shoals and Priority, as well as recruiting the TN / AL Employees to work for Priority or Shoals, Blackburn has misappropriated and converted the assets of the FirstMed Entities and violated Paragraphs 4(b) and 5(a) of the Blackburn Employment Agreement.

368.    Paragraph 5(b) of the Blackburn Employment Agreement prohibits Blackburn from taking certain actions in competition with the FirstMed Entities.

369.    Blackburn violated Paragraph 5(b) of the Blackburn Employment Agreement by, among other things, carrying out the Expansion Plan in a manner which benefitted Priority and Shoals to the detriment of the FirstMed Entities and by misappropriating and converting the Expansion Plan and other business information of the FirstMed Entities for use by Priority and Shoals.

370.    Paragraph 5(c) of the Blackburn Employment Agreement prohibits Blackburn from soliciting any customer or prospective customer of the FirstMed Entities.

371.     Upon information and belief, Blackburn violated Paragraph 5(c) of the Blackburn Employment Agreement by, among other things, soliciting those customers or potential customers which had been identified by the FirstMed Entities in connection with their Expansion Plan in Tennessee or Alabama for the purpose of doing business with those customers within Shoals or Priority.

### FIRST CLAIM FOR RELIEF
*(Breach of Duty of Care to FirstMed Entities and their Creditors - Paul, Chandra, Gibson, Blackburn, and Jewell)*

372.     The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

373.     Paul and Chandra were directors of each of the FirstMed Entities.

374.     Gibson, Blackburn, and Jewell and Chandra were officers of each of the FirstMed Entities.

375.     Paul, Chandra, Gibson, Blackburn, and Jewell owed a duty of care to and for the benefit of each of the FirstMed Entities and their creditors.

376.     Paul, Chandra, Gibson, Blackburn, and Jewell violated their duty of care to and for the benefit of each of the FirstMed Entities and their creditors through the actions alleged in this Complaint.

377.     By way of example, Paul and Chandra violated their duty of care to and for the benefit of each of the FirstMed Entities and their creditors by:

a.     Hiring a Chief Executive Officer, Gibson, which owned a competing company, Shoals, and allowing Gibson to continue to work for and focus on Shoals while employed by the FirstMed Entities.

b.      Being inattentive to the existing business of the FirstMed Entities and focusing on the Expansion Plan.

c.      Pursuing the Expansion Plan with assets and resources of the FirstMed Entities where that Expansion Plan benefitted Shoals and Priority, did not benefit the FirstMed Entities, and substantially eroded the value of the FirstMed Entities.

d.      Pursuing the Expansion Plan before the FirstMed Entities had received the Expansion Investment when they knew or should have known that the FirstMed Entities were not in a position to successfully implement the Expansion Plan without the Expansion Investment.

e.      Using the resources of the FirstMed Entities to transfer the FirstMed Entities' vehicles and equipment to Tennessee and Alabama, directing the FirstMed Entities to pay to re-paint their vehicles as Shoals and Priority vehicles, and allowing Shoals to use the FirstMed Entities' vehicles and equipment for no consideration.

f.      Recruiting, hiring, and directing the FirstMed Entities to pay the high-salaried the TN / AL Employees and directing that those employees conduct work for Shoals and Priority and hold themselves out as representatives of Shoals and Priority.

g.      Directing the FirstMed Entities to pay marketing expenses, charitable donations, lease deposits, and other start-up costs for the Expansion Plan, in the name of Shoals and Priority.

h.      Negotiating with the Lenders in a manner not designed to preserve the value of the FirstMed Entities and with the sole intent to maximize return for themselves, EEF, and/or EEF Partners, or their new ventures, Shoals and Priority.

i.      Failing to adequately communicate with or to communicate accurate financial information to the Lenders.

- 53 -

j.      Failing to actually consider readily-available and far more productive and less damaging alternatives to the termination of operations and the Chapter 7 bankruptcy filings for the FirstMed Entities, such as continued operations and restructuring, sale of assets, orderly liquidation, receivership, or Chapter 11 bankruptcy cases.

k.      By directing that the FirstMed Entities file Chapter 7 bankruptcy filings, where that decision benefitted their new ventures, Shoals and Priority by removing competition and allowing Shoals and Priority to continue with the Expansion Plan and to make use of the efforts, business information, and employees of and paid for by the FirstMed Entities.

l.      Terminating employees of the FirstMed Entities without advance notice, thereby subjecting the FirstMed Entities' bankruptcy estates to the WARN Act Litigation and, pending the outcome of the WARN Act Litigation, potential substantial liability under the WARN Act.

m.      Developing strategies for, fundraising for, creating, and implementing Priority prior to the Petition Date for the purpose of continuing precisely the same Expansion Plan developed and paid for and implemented by the FirstMed Entities with the same management and employees the FirstMed Entities had been utilizing.

n.      Converting, usurping, and misappropriating the Expansion Plan, as well as all business information and employees relating to the Expansion Plan for the benefit of themselves, EEF, EEF Partners, Shoals and Priority.

o.      Developing plans, while in a fiduciary role with the FirstMed Entities, to utilize the assets, resources, business plans, efforts, employees, and business information of the FirstMed Entities for the benefit of new, competing ventures, Shoals and Priority.

- 54 -

378.    By way of example, Gibson, Blackburn, and Jewell violated their duty of care to and for the benefit of each of the FirstMed Entities and their creditors by undertaking those actions described in the preceding paragraph, with the exceptions of subparagraphs (a) and (h).

379.    Both ESAC and AAA are liable for the full outstanding balance owing on the Loans.

380.    When the liabilities of the FirstMed Entities, including the liabilities for the full outstanding balance owing on the Loans, are considered, the FirstMed Entities were insolvent, as each of them individually and on a consolidated basis, as of the dates that each of the above-referenced actions occurred.

381.    In June of 2013 and continuing in each month prior to the Petition Date, the FirstMed Entities were insolvent in that they were dependent upon incremental funding authorized by or made by the EEF Defendants.

382.    In June of 2013 and continuing in each month prior to the Petition Date, the consolidated income statements prepared by the FirstMed Entities reported a consolidated negative EBITDA and a consolidated negative Net Income.

383.    A true and accurate copy of a consolidated income statement prepared by the FirstMed Entities and dated October 31, 2013 is attached hereto as "Exhibit M" and is incorporated herein by reference as if fully set forth.

384.    By October of 2013, as a result of the actions of the FirstMed Defendants, the FirstMed Entities had a consolidated EBITDA more negative than $1,000,000 per month as a result of the actions of the FirstMed Defendants as described in this Complaint.

385.    From mid to late 2013, the FirstMed Entities were implementing the Expansion Plan and the Expansion Plan represented a business for which the FirstMed Entities had

unreasonably small capital and, to the extent that the FirstMed Entities were not insolvent prior, caused the FirstMed Entities to become insolvent.

386.    When the total amounts owed by each of the FirstMed Entities, including the total outstanding balance owing on the Loans, are included, in June of 2013 and continuing in each month prior to the Petition Date, the assets owned by the FirstMed Entities, as to each individually and also on a consolidated basis, had a value which was significantly less than the amount of the obligations owed by the FirstMed Entities.

387.    The FirstMed Entities were insolvent on the Petition Date as evidenced by the following facts set forth by the FirstMed Entities in their Schedules filed with this Court:

        a.    AAA listed assets worth $18,711,892.02 and liabilities totaling $42,006,119.94.

        b.    ESAC listed assets worth $739,532.83 and liabilities totaling $37,997,452.77.

        c.    Eastern Shore Ambulance listed assets worth $1,062,257.32 and liabilities totaling $34,686,503.18.

        d.    Coastline Care listed assets worth $776,012.77 and liabilities totaling $34,698,190.21.

        e.    MarMac listed assets worth $2,327,227.23 and liabilities totaling $34,790,188.43.

        f.    TransMed listed assets worth $980,276.66 and liabilities totaling $34,650,900.92.

388.    The extent and values of the assets of the FirstMed Entities decreased between June 2013 and the Petition Date as a result of the actions of the FirstMed Defendants as alleged herein.

389.    The extent and amount of the liabilities of the FirstMed Entities did not change substantially between June 2013 and the Petition Date, except that the actions of the FirstMed Defendants during that period of time resulted in an increase in the amount of the FirstMed Entities' liabilities.

390.    According to the Statements of Financial Affairs filed on December 20, 2013, no property of the FirstMed Entities was transferred outside of the ordinary course of business within the two years preceding the Petition Date.

391.    Between June 2013 and the Petition Date, the FirstMed Entities' debt to the Lenders was their largest indebtedness and during this period of time they failed to pay it, and other debts, as they came due.

392.    The actions of Chandra, Paul, Gibson, Blackburn, and Jewell as described in this Complaint were negligent, grossly negligent and/or intentional, were done in bad faith, were done with an improper motive, were not done to benefit the FirstMed Entities or to preserve the value of the FirstMed Entities, were done with an impermissible conflict of interest, were done for the benefit of themselves, EEF, EEF Partners, Priority and/or Shoals, were wanton, not done with the degree of care which is required of reasonable persons or persons with the special skill and learning of these defendants, and were not done on an informed basis.

393.    The breach of their duty of care by Chandra, Paul, Gibson, Blackburn, and Jewell as described in this Complaint is the direct and proximate cause of significant damage suffered by the FirstMed Entities and their creditors in an amount to be proven at the trial of this action.

394.    The Trustee and the FirstMed Entities are entitled to have and recover of Chandra, Paul, Gibson, Blackburn, and Jewell damages in an amount to be determined at the trial in this matter.

## SECOND CLAIM FOR RELIEF
*(Breach of Duty of Loyalty to FirstMed Entities and their Creditors – Paul, Chandra, Gibson, Blackburn, Jewell)*

395.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

396.    Paul, Chandra, Gibson, Blackburn, and Jewell owed a duty of loyalty to each of the FirstMed Entities and their creditors.

397.    Paul, Chandra, Gibson, Blackburn, and Jewell violated their duty of loyalty to each of the FirstMed Entities and their creditors through the actions alleged in this Complaint and in the preceding Claim for Relief.

398.    The actions of Paul, Chandra, Gibson, Blackburn, and Jewell alleged in this Complaint and in the preceding Claim for Relief were done with an impermissible conflict of interest, were done for the benefit of the FirstMed Defendants, Priority, and Shoals.

399.    The actions of Paul, Chandra, Gibson, Blackburn, and Jewell did benefit EEF and/or EEF Partners, did benefit themselves, and did benefit Shoals and Priority at the expense of the FirstMed Entities and their creditors.

400.    During their role as directors of each of the FirstMed Entities, Paul and Chandra were partners, employees, and representatives of EEF and/or EEF Partners, were beholden to EEF and/or EEF Partners, and acted with the specific intent to benefit EEF and/or EEF Partners even at the expense of the FirstMed Entities.

401.     During their role as directors of each of the FirstMed Entities, Paul and Chandra had a personal stake and interest in the success of Shoals and Priority in that they, EEF and/or EEF Partners either already had made a substantial investment in Shoals and Priority or had formed the specific intention and plan to do so, and later did do so.

402.     During his employment with and as an officer of the FirstMed Entities, Gibson had an ownership interest in Shoals and acted with the specific intent to benefit Shoals even at the expense of the FirstMed Entities and their creditors.

403.     During their employment with and as officers of the FirstMed Entities, Gibson, Blackburn, and Jewell made and carried out plans for the continuation of the Expansion Plan in Shoals and Priority with themselves as the executive management team of Shoals and Priority.

404.     The breach of their duty of loyalty by Paul, Chandra, Gibson, Blackburn, and Jewell as described in this Complaint is the direct and proximate cause of significant damage suffered by the FirstMed Entities and their creditors in an amount to be proven at the trial of this action.

405.     The Trustee and the FirstMed Entities are entitled to have and recover of Paul, Chandra, Gibson, Blackburn, and Jewell damages in an amount to be determined at the trial of this matter.

### THIRD CLAIM FOR RELIEF
*(Misappropriation of Corporate Opportunities - Paul, Chandra, Gibson, Blackburn, Jewell)*

406.     The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

407.     The Expansion Plan including the funds and resources expended in its pursuit was an asset of and a corporate opportunity of the FirstMed Entities.

408.     The FirstMed Entities were implementing the Expansion Plan.

409.    The FirstMed Entities spent tremendous amounts of money and resources in developing and implementing the Expansion Plan.

410.    Paul, Chandra, Gibson, Blackburn, and Jewell were each substantially involved in the plan, decision, and action to implement the Expansion Plan under the name of Priority and Shoals, and to continue the exact Expansion Plan through Priority and Shoals using the FirstMed Entities' management team, employees, work, marketing, effort, and business information which had been developed and paid for by the FirstMed Entities.

411.    Paul, Chandra, Gibson, Blackburn, and Jewell each usurped, converted, and misappropriated the FirstMed Entities' valuable corporate opportunities relating to the Expansion Plan.

412.    At the direction of Paul, Chandra, Gibson, Blackburn, and Jewell, Priority and Shoals have made substantial profit from the FirstMed Entities' corporate opportunities relating to the Expansion Plan, thereby wrongfully profiting at the FirstMed Entities' expense.

413.    Paul, Chandra, Gibson, Blackburn, and Jewell have personally benefitted and profited from their misappropriation of the FirstMed Entities' valuable corporate opportunities relating to the Expansion Plan at the expense of the FirstMed Entities and their creditors.

414.    The misappropriation of the FirstMed Entities' corporate opportunities relating to the Expansion Plan as described in this Complaint by Paul, Chandra, Gibson, Blackburn, and Jewell is the direct and proximate cause of significant damage suffered by the FirstMed Entities and their creditors in an amount to be proven at the trial of this action.

415.    The Trustee and the FirstMed Entities are entitled to have and recovery of Paul, Chandra, Gibson, Blackburn, and Jewell damages in an amount to be determined at the trial of this matter.

## FOURTH CLAIM FOR RELIEF

*(Aiding and Abetting Breaches of Fiduciary Duties, Misappropriation of Corporate Opportunities, Conversion, and Fraudulent Transfers – EEF, EEF Partners, Kostuchenko)*

416.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

417.    With knowledge that the conduct constituted a breach of fiduciary duties to the FirstMed Entities and their creditors, conversion, and fraudulent transfers, EEF, EEF Partners, and Kostuchenko aided and abetted the breaches of the duty of care, the breaches of the duty of loyalty, the misappropriation of the FirstMed Entities' corporate opportunities, and the conversion and fraudulent transfer of assets by Chandra, Paul, Gibson, Blackburn, and Jewell as described in this Complaint.

418.    EEF and EEF Partners controlled the FirstMed Entities through their controlling ownership interest in the FirstMed Entities through Ambulance Holdings, their placement of their own representatives as a majority of the members of the Board of Directors of the FirstMed Entities, and their actions in ensuring that the FirstMed Entities were not adequately capitalized but were dependent upon EEF and/or EEF Partners for incremental funding.

419.    At all times during their role as directors of each of the FirstMed Entities, Paul and Chandra were beholden to EEF and EEF Partners, were acting on behalf of EEF and EEF Partners, and were acting for the specific purpose of benefitting EEF and EEF Partners even at the expense of the FirstMed Entities.

420.    The actions of Paul and Chandra were directed by and were done on behalf of EEF and EEF Partners.

421.    EEF, EEF Partners, and Kostuchenko were substantially and integrally involved in the development of the plan and strategy carried out by Paul, Chandra, Gibson, Blackburn,

and Jewell to implement the Expansion Plan under the name of Priority and Shoals, and to continue the exact Expansion Plan through Priority and Shoals using the FirstMed Entities' management team, employees, work, marketing, effort, and business information which had been developed or paid for by the FirstMed Entities.

422.    EEF, EEF Partners, and Kostuchenko were substantially and integrally involved in the negotiations with the Lenders and the decision to file Chapter 7 bankruptcy cases for each of the FirstMed Entities.

423.    EEF, EEF Partners, and Kostuchenko actively encouraged and directed Chandra, Paul, Gibson, Blackburn, and Jewell to undertake those wrongful actions described in this Complaint and in the causes of action set forth herein for their own benefit or for the benefit of Shoals and Priority, and at the expense of the FirstMed Entities and their creditors.

424.    EEF, EEF Partners, and Kostuchenko had a financial stake in those actions described in this Complaint and in the preceding causes of action because they directly or indirectly owned and controlled the FirstMed Entities and later owned and controlled Priority and Shoals.

425.    By aiding and abetting the breaches of the duty of care, the breaches of the duty of loyalty, the misappropriation of the FirstMed Entities' corporate opportunities, and the conversion and fraudulent transfer of assets as described in this Complaint, EEF, EEF Partners, and Kostuchenko have directly and proximately caused the FirstMed Entities and their creditors to suffer significant damage in an amount to be proven at the trial of this action.

426.    The Trustee and the FirstMed Entities are entitled to have and recover of EEF, EEF Partners, and Kostuchenko damages in an amount to be determined at the trial of this matter.

## FIFTH CLAIM FOR RELIEF
*(Respondeat Superior – EEF, EEF Partners)*

427.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

428.    Chandra and Paul were, at all times relevant to the actions alleged in this Complaint, employees of EEF and EEF Partners.

429.    In undertaking all of the actions alleged in this Complaint and in the preceding claims for relief, and in their roles as members of the Board of Directors and/or officers of each of the FirstMed Entities, Chandra and Paul were acting within the course and scope of their employment with EEF and EEF Partners.

430.    In undertaking all of the actions alleged in this Complaint and in the preceding claims for relief, and in their roles as members of the Board of Directors and/or officers of each of the FirstMed Entities, Chandra and Paul were carrying out the plans, strategies, and directives of EEF and EEF Partners and were acting for the benefit of EEF and EEF Partners.

431.    EEF and EEF Partners placed Chandra and Paul on the Board of Directors and/or installed them as officers of each of the FirstMed Entities so that EEF and EEF Partners could ensure that EEF and EEF Partners controlled and directed all material decisions, actions, and strategies of the FirstMed Entities.

432.    Under the principle of respondeat superior, EEF and EEF Partners are liable for the actions of their employees, Chandra and Paul, under any and all of the claims for relief asserted in this Complaint.

433.    The Trustee and the FirstMed Entities are entitled to have and recover of EEF and EEF Partners damages in an amount to be determined at the trial of this action.

## SIXTH CLAIM FOR RELIEF

*(Conversion – Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, Kostuchenko, Priority, Shoals)*

434.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully asserted herein.

435.    The Expansion Plan was the property of the FirstMed Entities.

436.    Business information developed by and utilized by representatives and employees of the FirstMed Entities in connection with the Expansion Plan was also the property of the FirstMed Entities.   Such business information included prospective customer information, strategies, plans, research, goodwill, and employee information.

437.    Through their actions as described in this Complaint and in the preceding claims for relief, Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko each wrongfully converted the Expansion Plan, business information, and equipment belonging to the FirstMed Entities and used those assets for the benefit of themselves, Priority, and Shoals.

438.    Priority and Shoals, through their agents, Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko, wrongfully converted the Expansion Plan, equipment, and business information belonging to the FirstMed Entities and used those assets in their business.

439.    Priority and Shoals have actually utilized the Expansion Plan, equipment, and business information belonging to the FirstMed Entities in their business and have made substantial profit from the conversion of those assets.

440.    As the direct proximate cause of the conversion of Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, Kostuchenko, Priority, and Shoals, those defendants have

wrongfully profited at the expense of the FirstMed Entities, and the FirstMed Entities have suffered significant damage in an amount to be proven at the trial of this action.

441.    The Trustee and the FirstMed Entities are entitled to have and recover of Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, Kostuchenko, Priority, and Shoals damages in an amount to be determined at the trial of this matter.

### SEVENTH CLAIM FOR RELIEF
(*Alter Ego, Instrumentality, Veil Piercing – Ambulance Holdings, EEF, EEF Partners*)

442.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully asserted herein.

443.    EEF owns a super-majority interest in Ambulance Holdings.  In turn, Ambulance Holdings owns all of the outstanding ownership interest in ESAC and AAA.

444.    This Court should pierce the corporate veil of Ambulance Holdings, and disregard its corporate existence, because it is a mere instrumentality or alter ego of EEF and EEF Partners, whose sole purpose is to provide a perceived corporate barrier between the FirstMed Entities and EEF and EEF Partners.

445.    Ambulance Holdings conducts no business for itself, and is a mere holding company.

446.    Upon information and belief, the only asset of Ambulance Holdings is the ownership interest in ESAC and AAA.

447.    Ambulance Holding has the same Board of Directors as each of the FirstMed Entities.

448.    Representatives of EEF and EEF Partners constitute a majority of the members of the Board of Directors of Ambulance Holdings.

449.    If there are any actions, strategies, and decisions undertaken by Ambulance Holdings, those actions, strategies, and decisions are controlled by EEF and EEF Partners and are done for the benefit of EEF and EEF Partners.

450.    As a result of the foregoing, Ambulance Holdings' corporate existence should be disregarded.

### EIGHTH CLAIM FOR RELIEF
(*Fraudulent Transfer – 11 U.S.C. §§ 544, 548, 550; and the Uniform Fraudulent Transfer Act – Priority, Shoals, EEF, EEF Partners, Paul, Chandra, Gibson*)

451.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

452.    As described herein, the FirstMed Defendants caused and directed the FirstMed Entities to transfer certain of their assets to or for the benefit of Shoals and Priority.

453.    By way of example, the FirstMed Defendants caused and directed the FirstMed Entities to transfer the following assets to or for the benefit of Shoals and Priority:

a.    Vehicles and equipment.

b.    The TN / AL Employees and other managerial and administrative employees.

c.    Funds used by the FirstMed Entities to recruit, hire, and pay the TN / AL Employees, to develop and research the Expansion Plan, to transfer vehicles and equipment, to repaint vehicles, and to market and develop customers and contacts in Tennessee and Alabama.

d.    The Expansion Plan, and all plans, models, customer information, research, goodwill, employee information, and strategies relating to the Expansion Plan.

454.    The transfers of the FirstMed Entities' assets to or for the benefit of Shoals and Priority were done by the FirstMed Defendants with the actual intent to hinder, delay, or defraud the FirstMed Entities and their creditors including the Lenders.

455.    The transfers of the FirstMed Entities assets to or for the benefit of Shoals and Priority were done while the FirstMed Entities were in default under the Loans, were negotiating with the Lenders and were threatening to file Chapter 7 bankruptcy cases if the Lenders did not acquiesce to the FirstMed Defendants' demands, and were done for the specific intent to take all of the upside value in the FirstMed Entities and transfer it to Shoals and Priority while also benefitting from the FirstMed Entities' payment of significant start-up costs.

456.    The FirstMed Defendants directed that the FirstMed Entities transfer their assets to Shoals and Priority for the purpose of ensuring that those assets would be utilized to benefit themselves and their new ventures, Shoals and Priority, and that those assets would thus not be available for the FirstMed Entities and their creditors including the Lenders going forward.

457.    The FirstMed Entities did not receive reasonably equivalent value from Shoals, Priority, or any other party on account of the transfers of the FirstMed Entities' assets to or for the benefit of Shoals and Priority and the FirstMed Defendants.

458.    In fact, the FirstMed Entities received no consideration whatsoever for the transfers of the FirstMed Entities' assets to or for the benefit of Shoals and Priority and the FirstMed Defendants.

459.    The FirstMed Entities were insolvent on the dates throughout mid to late 2013 and before the Petition Date when their assets were being transferred to or for the benefit of Shoals and Priority or they became insolvent as a result of those transfers.

460.    The transfers of the FirstMed Entities' assets to or for the benefit of Shoals and Priority were also made for the benefit of EEF, EEF Partners, Paul, Chandra, Gibson, Blackburn, and Jewell, and did benefit those parties.

461.    EEF, EEF Partners, Paul, Chandra, Gibson, Blackburn, and Jewell are each insiders of the FirstMed Entities.

462.    Shoals and Priority are insiders of the FirstMed Entities because they are owned or controlled by officers and directors of the FirstMed Entities and the same entities which controlled the FirstMed Entities.

463.    As a result of the fraudulent transfer of the FirstMed Entities' assets to or for the benefit of Shoals, Priority, EEF, EEF Partners, Paul, Chandra, Gibson, Blackburn, and Jewell, the FirstMed Entities have been damaged in an amount equal to the value of the assets transferred, the precise amount to be proven at the trial of this action.

464.    The Trustee is entitled to have and recover of Shoals, Priority, EEF, EEF Partners, Paul, Chandra, Gibson, Blackburn, and Jewell damages in any amount to be determined at the trial of this action pursuant to 11 U.S.C. §§ 544, 548, and 550, and applicable State law including, *inter alia*, the North Carolina Fraudulent Transfer Act set forth in N.C. Gen. Stat. § 39-23.1 *et seq*.

## NINTH CLAIM FOR RELIEF
(*Unjust Enrichment – EEF, EEF Partners, Chandra, Paul, Kostuchenko, Gibson, Blackburn, Jewell, Priority, Shoals*)

465.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

466.    In addition to and/or in the alternative to the preceding claims for relief, the Trustee and the FirstMed Entities are entitled to equitable relief to recover the value of the assets

misappropriated by the FirstMed Entities and utilized for the benefit of the FirstMed Defendants, Priority, and Shoals.

467.    The FirstMed Defendants directed the FirstMed Entities to spend tremendous sums of money in connection with the Expansion Plan, including developing and strategizing as to the business model of the Expansion Plan, recruiting, hiring, and paying for the TN / AL Employees, relocating vehicles and equipment, repainting vehicles, marketing efforts, charitable donations, lease expenditures, and other things.

468.    The investment made by the FirstMed Entities in the Expansion Plan was not for the benefit of the FirstMed Entities, and did not benefit the FirstMed Entities, but was for the benefit of, and did benefit, the FirstMed Defendants, Shoals, and Priority.

469.    The FirstMed Defendants usurped, converted, and misappropriated assets of the FirstMed Entities, including the Expansion Plan, business information, and equipment belonging to the FirstMed Entities and used those assets for the benefit of themselves, Priority, and Shoals.

470.    The FirstMed Defendants, Priority, and Shoals have obtained a significant benefit from the use of the FirstMed Entities' assets and investment at the FirstMed Entities' expense.

471.    It would be unfair and unjust for the FirstMed Defendants, Priority, and Shoals to retain the benefit and the value of the FirstMed Entities' assets and investments without a corresponding obligation to repay the FirstMed Entities for that value.

472.    The Trustee and the FirstMed Entities are entitled to recover of the FirstMed Defendants, Priority, and Shoals the value of the FirstMed Entities' assets and investments utilized by Priority and Shoals.

473.    Such an award and recovery is necessary to prevent the unjust enrichment of the FirstMed Defendants, Priority, and Shoals.

## TENTH CLAIM FOR RELIEF
(*Constructive Fraud – Paul, Chandra, Gibson, Blackburn, Jewell*)

474.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

475.    Paul, Chandra, Gibson, Blackburn, and Jewell owed fiduciary duties to each of the FirstMed Entities for the benefit of those entities and their creditors.

476.    Through the actions alleged in this Complaint and in the preceding claims for relief, Paul, Chandra, Gibson, Blackburn, and Jewell directed the FirstMed Entities to take actions which benefitted themselves.

477.    The actions alleged in this Complaint and in the preceding claims for relief constitute constructive fraud by Paul, Chandra, Gibson, Blackburn, and Jewell.

478.    The Trustee is entitled to have and recover of Paul, Chandra, Gibson, Blackburn, and Jewell damages in an amount to be determined at the trial of this action.

## ELEVENTH CLAIM FOR RELIEF
(*Punitive Damages – Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, Kostuchenko*)

479.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

480.    The actions of Paul, Chandra, Gibson, Blackburn, and Jewell as alleged herein were willful and wanton, and were done with malice.  For example, Paul, Chandra, Gibson, Blackburn, and Jewell knew and understood that their actions were done for the benefit of Shoals and/or Priority and themselves, and knew and understood that their actions would result in loss of value of the FirstMed Entities.

481.    The actions of EEF, EEF Partners, and Kostuchenko as alleged herein were willful and wanton, and were done with malice.  For example, EEF, EEF Partners, and

Kostuchenko directed the strategies and actions carried out at the FirstMed Entities and aided and abetted the breaches of the fiduciary duties by Paul, Chandra, Gibson, Blackburn, and Jewell with the knowledge that the actions were done for the benefit of Shoals and/or Priority and themselves, and with the knowledge that they actions would result in loss of value of the FirstMed Entities.

482.    Further, as described in detail below, Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko fraudulently misrepresented to the FirstMed Entities that EEF and/or EEF Partners would make the Expansion Investment in the FirstMed Entities.

483.    Those actions warrant the imposition of punitive damages against Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko and the Trustee is entitled to have and recover an award of punitive damages in any amount which this Court deems just and proper.

**TWELFTH CLAIM FOR RELIEF**
*(Breach of Contract or Agreement to Make Expansion Investment  – EEF, EEF Partners)*

484.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

485.    EEF and/or EEF Partners reached an agreement with the FirstMed Entities to make the Expansion Investment in the FirstMed Entities.

486.    The agreement to make the Expansion Investment in the FirstMed Entities was binding on EEF and/or EEF Partners and constitutes a valid and enforceable agreement.

487.    EEF and/or EEF Partners breached that agreement by failing to make the Expansion Investment in the FirstMed Entities.

488.    As a result of EEF and/or EEF Partners' breach of their agreement to make the Expansion Investment in the FirstMed Entities, the FirstMed Entities have been damaged in an amount to be proven at the trial of this action.

489.    The Trustee is entitled to have and recover damages of EEF and/or EEF Partners on account of their breach in an amount to be proven at the trial of this action.

### THIRTEENTH CLAIM FOR RELIEF
(*Fraudulent Misrepresentation Regarding Expansion Investment – EEF, EEF Partners, Kostuchenko, Chandra, Paul, Gibson, Blackburn, Jewell*)

490.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

491.    In late 2013, during the time that the FirstMed Entities were making significant expenditures in connection with the Expansion Plan, Gibson and other members of the Gibson Management Team expressly represented to a number of FirstMed employees, including Jerry LeCato and Kathy Futch, that EEF and/or EEF Partners agreed to make the Expansion Investment in the FirstMed Entities, would make the Expansion Investment, and that those funds would be utilized to pay for the Expansion Plan.

492.    Those representations were made by the Gibson Management Team with the intention to placate, satisfy, and explain to FirstMed employees why the FirstMed Entities were making tremendous expenditures in connection with the Expansion Plan.

493.    The Gibson Management Team made those representations at the direction of Chandra, Paul, EEF, EEF Partners, and Kostuchenko and in furtherance of the strategy created by those defendants to utilize the FirstMed Entities for the benefit of themselves, Shoals, and Priority.

494.    At the time that the representations was made, the Gibson Management Team, Chandra, Paul, EEF, EEF Partners, and Kostuchenko knew that EEF and/or EEF Partners would not make the Expansion Investment in the FirstMed Entities, or knew that EEF and/or EEF Partners would only make the Expansion Investment in the FirstMed Entities if the Lenders agreed to EEF's and EEF Partners' demands concerning restructuring the Loan, an event which had not occurred.

495.    Accordingly, at the time those representations was made, the Gibson Management Team, Chandra, Paul, EEF, and EEF Partners knew that those representations were false.

496.    Those representations related to a material fact.

497.    Those representations were made for the purpose of inducing, and did induce, the FirstMed employees not to take any action, not to inform any other employees or representatives of the FirstMed Entities, not to inform any parties outside of the FirstMed Entities, such as the lenders or the media, and not to leave employment with the FirstMed Entities.

498.    The FirstMed employees justifiably relied on those representations, since they came from the Gibson Management Team and the FirstMed employees were not privy to the strategy discussions of the Gibson Management Team, Chandra, Paul, EEF, EEF Partners, and Kostuchenko.

499.    The fraudulent misrepresentations made to the FirstMed employees concerning the Expansion Investment actually damaged the FirstMed Entities in that it prevented the FirstMed employees from having a true understanding of the breaches of fiduciary duty and other wrongful actions which were being carried out by the FirstMed Defendants and allowed the FirstMed Defendants to continue to perpetrate their breaches of fiduciary duties and other

wrongful actions as alleged herein resulting in continuing and increasing damages to the FirstMed Entities.

500.    As a result of the fraudulent misrepresentations made to the FirstMed employees concerning the Expansion Investment, the Trustee is entitled to have any recover of Gibson, Blackburn, Jewell, Chandra, Paul, EEF, EEF Partners, and Kostuchenko, jointly and severally, in an amount to be determined at the trial of this action.

## FOURTEENTH CLAIM FOR RELIEF
*(Partnership Liability – EEF Partners, Chandra, Paul, Kostuchenko)*

501.    The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully asserted herein.

502.    Upon information and belief, EEF Partners is a general partner of EEF.

503.    In the event that EEF Partners is not a general partner of EEF, but is a limited partner of EEF, then, upon information and belief, EEF Partners participated in the control of EEF and it held itself out to the FirstMed Entities as its general partner, so that EEF Partners has the same liability as would a general partner in EEF.

504.    As a result, EEF Partners is jointly and severally liable with EEF for any and all liabilities under the claims asserted in this action.

505.    Upon information and belief, Paul, Chandra, and Kostuchenko are general partners of EEF Partners.

506.    In the event that Paul, Chandra, and Kostuchenko are not general partners of EEF Partners, but are limited partners of EEF Partners, then, upon information and belief, Paul, Chandra, and Kostuchenko participated in the control of EEF Partners and held themselves out to the FirstMed Entities as its general partners, so that those individuals have the same liability as would a general partner in EEF Partners.

507. As a result, Paul, Chandra, and Kostuchenko are jointly and severally liable with EEF Partners for any and all liabilities under the claims asserted in this action.

### FIFTEENTH CLAIM FOR RELIEF
*(Breach of Employment Agreement – Gibson, Blackburn)*

508. The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully asserted herein.

509. The Gibson Employment Agreement is a binding and enforceable contract.

510. The Blackburn Employment Agreement is a binding and enforceable contract.

511. Through the actions described in this Complaint, Gibson violated the Gibson Employment Agreement.

512. Through the actions described in this Complaint, Blackburn violated the Blackburn Employment Agreement.

513. As a result of those breaches, the FirstMed Entities have suffered damages including, but not limited to, the value of those employees' labor and the loss of the value of their corporate opportunities, prospective business, customer lists, trade secrets, and other business information.

514. As a result of those breaches, the Trustee and the FirstMed Entities are entitled to have and recover of Gibson and Blackburn damages in an amount to be determined at the trial of this matter.

### SIXTEENTH CLAIM FOR RELIEF
*(Unfair and Deceptive Trade Practices – EEF, EEF Partners, Paul, Chandra, Kostuchenko, Gibson, Blackburn, Jewell)*

515. The Trustee incorporates each and every allegation contained in the preceding paragraphs of this Complaint as if fully asserted herein.

516.    The actions of the FirstMed Defendants as described herein, constitute unfair or deceptive acts or practices in or affecting commerce.

517.    As a direct and proximate result of the FirstMed Defendants' actions as described herein, the FirstMed Entities have suffered significant financial loss and other damages.

518.    The Trustee and the FirstMed Entities are entitled to have and recover damages from the FirstMed Defendants in an amount to be determined at the trial of this matter.

519.    The Trustee and the FirstMed Entities are also entitled to recover from the FirstMed Defendants treble the amount fixed by any verdict, such equitable relief as the Court deems necessary or proper, and reasonable costs and attorneys' fees.

## RELIEF REQUESTED

WHEREFORE, the Trustee respectfully requests that this Court award him the following relief on the claims asserted herein:

1.    For an Order awarding damages against Chandra, Paul, Gibson, Blackburn, and Jewell, jointly and severally, for breaches of their fiduciary duties to the FirstMed Entities;

2.    For an Order awarding damages against Chandra, Paul, Gibson, Blackburn, and Jewell, jointly and severally, for their misappropriation of the corporate opportunities of the FirstMed Entities;

3.    For an Order awarding damages against EEF, EEF Partners, and Kostuchenko, jointly and severally, for their aiding and abetting the breaches of fiduciary duties and misappropriation of corporate opportunities carried out by Chandra, Paul, Gibson, Blackburn, and Jewell;

4.      For an Order holding EEF and EEF Partners responsible for all liability of Chandra and Paul under the claims set forth in this Complaint under the doctrine of respondeat superior;

5.      For an Order awarding damages against Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, Kostuchenko, Priority, and Shoals, jointly and severally, for their conversion of the assets and property of the FirstMed Entities;

6.      For an Order disregarding the corporate form of Ambulance Holdings as the mere instrumentality or alter ego of EEF and EEF Partners;

7.      For an Order awarding damages against Shoals, Priority, EEF, EEF Partners, Paul, Chandra, Gibson, Blackburn, and Jewell, jointly and severally, on account of the fraudulent transfer of the assets and property of the FirstMed Entities;

8.      For an Order awarding damages against EEF, EEF Partners, Chandra, Paul, Kostuchenko, Gibson, Blackburn, Jewell, Priority, Shoals in order to prevent the unjust enrichment of those parties at the expense of the FirstMed Entities;

9.      For an Order awarding damages against Paul, Chandra, Gibson, Blackburn, Jewell, jointly and severally, on account of their constructive fraud against the FirstMed Entities;

10.      For an Order awarding punitive damages against Paul, Chandra, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko for their fraudulent, malicious, willful, and wanton actions against the FirstMed Entities;

11.      For an Order awarding damages against EEF and EEF Partners on account of their breach of their agreement to make the Expansion Investment in the FirstMed Entities;

12.     For an Order awarding damages against Chandra, Paul, Gibson, Blackburn, Jewell, EEF, EEF Partners, and Kostuchenko for their fraudulent misrepresentations to the FirstMed Entities' employees concerning the Expansion Investment;

13.     For an Order holding EEF Partners jointly and severally liable with EEF for any and all liability of EEF under the claims set forth in this Complaint;

14.     For an Order holding Chandra, Paul, and Kostuchenko jointly and severally liable with EEF Partners for any and all liability of EEF Partners under the claims set forth in this Complaint;

15.     For an Order awarding damages against Gibson for breaches of the Gibson Employment Agreement;

16.     For an Order awarding damages against Blackburn for breaches of the Gibson Employment Agreement;

17.     For an Order awarding damages against EEF, EEF Partners, Paul, Chandra, Kostuchenko, Gibson, Blackburn, and Jewell for their unfair or deceptive practices and acts, and for an Order trebling those damages;

18.     For an Order awarding the Trustee his costs and attorneys' fees to the maximum extent allowable by applicable law; and

19.     For such other and further relief as to the Court may seem just and proper.

This the 13th day of November, 2015.


*s/ Michael J. Parrish*
Michael J. Parrish
N.C. State Bar I.D. No.:  38419
email:  mjp@wardandsmith.com
E. Bradley Evans
N.C. State Bar I.D. No.:  028515
email:  ebe@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 867
New Bern, NC  28563-0867
Telephone:  252.672.5400
Facsimile:  252.672.5477
Special Counsel for the Trustee

# Exhibit

# A



# Exhibit

# B











# Exhibit

C















# Exhibit

D

# DESIGNERS
## Graphics

1501 Broadway St. Sheffield, AL 35660
**256-383-5217**
fax: 256-383-8586

Shoals Ambulance
310 E. Dr. Hicks
Florence, AL 35630

# Invoice

| Date | 11/19/2013 |
| --- | --- |
| Invoice # | 29458 |
| P.O. No. | |
| Terms | Due on receipt |
| WORK ORDER # | 014162 |

| Description | Qty | Rate | Amount |
| --- | --- | --- | --- |
| First Med Ambulance VIN #626383--Add full reflective lettering, logo and graphics | 1 | 1,489.00 | 1,489.00 |
| Window film installation--classic | | 189.00 | 189.00 |
| First Med Ambulance VIN #627419--Add full reflective lettering, logo and graphics | 1 | 1,489.00 | 1,489.00 |
| Window film installation--classic | | 189.00 | 189.00 |
| Shoals Ambulance 301 VIN #27410--Add full reflective lettering, logo and graphics | 1 | 1,389.00 | 1,389.00 |
| Window film installation--classic | | 189.00 | 189.00 |
| First Med Ambulance VIN #24704--Add full reflective lettering, logo and graphics | 1 | 1,489.00 | 1,489.00 |
| Window film installation--classic | | 189.00 | 189.00 |
| Shoals Ambulance 302 VIN #628554--Add full reflective lettering, logo and graphics | 1 | 1,389.00 | 1,389.00 |
| Window film installation--classic | | 189.00 | 189.00 |
| First Med Ambulance VIN #590495--Add full reflective lettering, logo and graphics (Already tinted) | 1 | 1,489.00 | 1,489.00 |

| | |
| --- | --- |
| Subtotal | $9,679.00 |
| Sales Tax (3.6%) | $0.00 |
| Total | $9,679.00 |
| Payments/Credits | $0.00 |
| **Balance Due** | $9,679.00 |

**Visit Us On The WEB @**
**www.designersgraphics.com**

9600961.00001

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

11/15/2013

Customer No: 224
Report No: 174
Claim #:  574-8
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256) - | |
| Color Code: | Work Phone: (256) - | Phone #1: - |
| Production Date: / 0 | Fax #: (256) - | Phone #2: - |
| License: State: AL | **Insured -** | **Claimant -** |
| VIN: WD3PE7CC0C5625255 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256) - | Home Phone: (256) - |
| Condition: Excellent | Work Phone: (256) - | Work Phone: (256) - |
| Estimator: Joey Riley | Fax #: (256) - | Fax #: (256) - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| **GRILLE - GRILLE & COMPONENTS** | | | | | |
| Refinish Filler panel | | | | | |
| **HOOD - HOOD & COMPONENTS** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| **FENDER - FENDER & COMPONENTS** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| **FRONT DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **SIDE PANEL, PASSENGER SIDE - SIDE PANEL** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **SIDE PANEL, DRIVER SIDE - SIDE PANEL** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **REAR LOADING DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **Sub Totals** | | | | 38.1 | |

Page 1 of 2

9701041.00001

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/15/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE.  Unless otherwise noted all items are derived from the Guide.  NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications.  Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times.  NAGS labor operation times are not included.  Guide used is (ERI5910).  2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9701041.00002

# J & K Customs and Collision

**Federal Tax ID: 45-2315271**
**4536 Highway 43**
**Killen, AL 35645**
**Phone #: (256) 412-3300**

**Estimate**

10/29/2013

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | | |
| VIN: WD3PE7CC9C5624704 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| *GRILLE - GRILLE & COMPONENTS* | | | | | |
| Refinish Filler panel | | | | | |
| *HOOD - HOOD & COMPONENTS* | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| *FENDER - FENDER & COMPONENTS* | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| *FRONT DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *SIDE PANEL, PASSENGER SIDE - SIDE PANEL* | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o skd door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *SIDE PANEL, DRIVER SIDE - SIDE PANEL* | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *REAR LOADING DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |

| | | | Sub Totals | 38.1 | |

NOV 0 4 2013

*Please Remit Payment to Above.*

Page 1 of 2

operations manager

9700798.00001

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/29/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE.  Unless otherwise noted all items are derived from the Guide.  NAGS Part Numbers and
Benchmark Prices are provided by National Auto Glass Specifications.  Labor operation times listed on the line with the NAGS information are MOTOR
suggested labor operation times.  NAGS labor operation times are not included.  Guide used is (ERI5910).  2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9700798.00002

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4538 Highway 43
Killen, AL 35645
Phone #: (258) 412-3300

**Estimate**

10/29/2013

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)   - | |
| Color Code: | Work Phone: (256)   - | Phone #1:   - |
| Production Date:  / 0 | Fax #: (256)   - | Phone #2:   - |
| License:    State: AL | **Insured -** | **Claimant -** |
| VIN: WD3PE7CC3C5628554 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)   - | Home Phone: (256)   - |
| Condition: Excellent | Work Phone: (256)   - | Work Phone: (256)   - |
| Estimator: Joey Riley | Fax #: (256)   - | Fax #: (256)   - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| **GRILLE - GRILLE & COMPONENTS** | | | | | |
| Refinish Filler panel | | | | | |
| **HOOD - HOOD & COMPONENTS** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| **FENDER - FENDER & COMPONENTS** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| **FRONT DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **SIDE PANEL. PASSENGER SIDE - SIDE PANEL** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **SIDE PANEL. DRIVER SIDE - SIDE PANEL** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **REAR LOADING DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| | **Sub Totals** | | | 38.1 | |

*Please Remit Payment to Above.*

Page 1 of

9700798.00003

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/29/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
\* Indicates Estimator's Judgment
T Indicates Taxed Item

9700798.00004

# J & K Customs and Collision

**Federal Tax ID: 45-2315271**
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/4/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | | |
| VIN: | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| *GRILLE - GRILLE & COMPONENTS* | | | | | |
| Refinish Filler panel | | | | | |
| *HOOD - HOOD & COMPONENTS* | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| *FENDER - FENDER & COMPONENTS* | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| *FRONT DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *SIDE PANEL, PASSENGER SIDE - SIDE PANEL* | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *SIDE PANEL, DRIVER SIDE - SIDE PANEL* | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *REAR LOADING DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **Sub Totals** | | | | **38.1** | |

*Birmingham Alabama*
*Ambulance Unit#*
*Repainted for New Market*

*Operations Manager -*
*Blake Hargett*
Blake HARGETT    256-627-4816

Page 1 of 2

9701057.00008

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/11/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Paint Labor | 38.1hrs | $44.00/hr | $1,676.40 |
| Paint Supplies | 38.1hrs | $30.00/hr | $1,143.00 T |
| Tax | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9701057.00009

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

10/11/2013

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location , |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | **Insured -** | **Claimant -** |
| VIN: WD3PE7CC3C5627419 | | |
| Miles In: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Miles Out: 0 | Work Phone: (256)  - | Work Phone: (256)  - |
| Condition: Excellent | Fax #: (256)  - | Fax #: (256)  - |
| Estimator: Joey Riley | | |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| **GRILLE - GRILLE & COMPONENTS** | | | | | |
| Refinish Filler panel | | | | | |
| **HOOD - HOOD & COMPONENTS** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| **FENDER - FENDER & COMPONENTS** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| **FRONT DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **SIDE PANEL, PASSENGER SIDE - SIDE PANEL** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **SIDE PANEL, DRIVER SIDE - SIDE PANEL** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **REAR LOADING DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **Sub Totals** | | | | 38.1 | |

*Please Remit payment to Above.*

*JBWhitworth NRP operations.*

Page 1 of 2

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/4/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9701057.00007

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/11/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No: 574-6

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1: - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2: - |
| License:  State: AL | | |
| VIN: WD3PE7CCX B3 5590495 | **Insured -** | **Claimant -** |
| Miles in: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| ***GRILLE - GRILLE & COMPONENTS*** | | | | | |
| Refinish Filler panel | | | | | |
| ***HOOD - HOOD & COMPONENTS*** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| ***FENDER - FENDER & COMPONENTS*** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| ***FRONT DOOR - DOOR & COMPONENTS*** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| ***SIDE PANEL, PASSENGER SIDE - SIDE PANEL*** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| ***SIDE PANEL, DRIVER SIDE - SIDE PANEL*** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| ***REAR LOADING DOOR - DOOR & COMPONENTS*** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| | | ***Sub Totals*** | | 38.1 | |

Page 1 of 2

*[signature]*
*Operations Manager*
*Shoals Ambulance*

9702646.00008

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/11/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total | |
|---|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 | |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 | T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 | |
| **Grand Total** | | | **$2,882.27** | |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9702646.00009

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/9/2013*

Customer No: 226
Report No: 176
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2009 Dodge Durango | | |
| Style: SE | Killen, AL 35645 | |
| Color: | Home Phone: (256) - | |
| Color Code: | Work Phone: (256) - | Phone #1: - |
| Production Date: / 0 | Fax #: (256) - | Phone #2: - |
| License: State: AL  *Ohio* | | |
| VIN: 1D8HB38P39F715740 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256) - | Home Phone: (256) - |
| Condition: Good | Work Phone: (256) - | Work Phone: (256) - |
| Estimator: Joey Riley | Fax #: (256) - | Fax #: (256) - |
| Date Assigned: 10/9/2013 | Date of Loss: 10/9/2013 | Date of Inspection: 10/9/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | $450.00 |

*Remove All Sticker*
*&*
*Decal*
*Buff out & Polish*
*&*
*Clean*

*Mailed in 10-10-2013*

*Start cep of the Knoxville TN.*
*Market.*

RECEIVED
OCT 15 2013

*256-627-4816*

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (DR3TG04). 7/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est - A product of CCC Information Services Inc.

*Page 1 of 1*

9700798.00005

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

10/9/2013

Customer No: 228
Report No: 178
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2009 Dodge Durango | | |
| Style: SE | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date: / 0 | Fax #: (256)  - | Phone #2:  - |
| License:   State: AL   *Ohio* | | |
| VIN: 1D8HB38P79F715742 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Good | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 10/9/2013 | Date of Loss: 10/9/2013 | Date of Inspection: 10/9/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | // 450⁰⁰ |

*Remove All decals*
*↓*
*Stickers*
*Boff & Polish*
*↓*
*Clean*

*Start up of the    Mailed 10-10-2013*
*Knoxville Market*

*J Bloke Hast*
*256-627-4816*

OCT 15 2013

Estimate based on MOTOR CRASH ESTIMATING GUIDE.  Unless otherwise noted all items are derived from the Guide.  NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications.  Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times.  NAGS labor operation times are not included.  Guide used is (DR3TG04).  7/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est  -  A product of CCC Information Services Inc.

Page 1 of 1

9700798.00006

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/11/2013*

Customer No: 229
Report No: 179
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Ford Econoline | | |
| Style: CARGO | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | **Insured -** | **Claimant -** |
| VIN: 1FTNE1EW3CDA38782 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Good | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 10/11/2013 | Date of Loss: 10/11/2013 | Date of Inspection: 10/11/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | $250°° |



Please Remite payment to Above address

Shoals Ambulance operations

J Bibb Hogett NRP
256-627-4816

Estimate based on MOTOR CRASH ESTIMATING GUIDE.  Unless otherwise noted all items are derived from the Guide.  NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications.  Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times.  NAGS labor operation times are not included.  Guide used is (DR2MB06). 7/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est  -  A product of CCC Information Services Inc.
*Page 1 of 1*

9700798.00007

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/11/2013*

Customer No: 229
Report No: 179
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Ford Econoline | | |
| Style: CARGO | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: *10 ViNit* | Work Phone: (256)  - | Phone #1:  - |
| Production Date: *10* | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL *1FTNE1EW4CDA38788* | Insured - | Claimant - |
| VIN: 1FTNE1EW3CDA38782 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Good | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 10/11/2013 | Date of Loss: 10/11/2013 | Date of Inspection: 10/11/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | *$250⁰⁰* |

*Please Remit payment to Above Adress*

*Shoals Ambulance*
*Operations*
*[signature]*
*256-627-4816*



Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (DR2MB05). 7/13

* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est  -  A product of CCC Information Services Inc.
*Page 1 of 1*

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/11/2013*

Customer No: 229
Report No: 179
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Ford Econoline | | |
| Style: CARGO | Killen, AL 35645 | |
| Color: | Home Phone: (256)   - | |
| Color Code: | Work Phone: (256)   - | Phone #1:   - |
| Production Date:  / 0 | Fax #: (256)   - | Phone #2:   - |
| License:     State: AL | | |
| VIN: 1FTNE1EW3CDA38782 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)   - | Home Phone: (256)   -  . |
| Condition: Good | Work Phone: (256)   - | Work Phone: (256)   - |
| Estimator: Joey Riley | Fax #: (256)   - | Fax #: (256)   - |
| Date Assigned: 10/11/2013 | Date of Loss: 10/11/2013 | Date of Inspection: 10/11/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | $250⁰⁰ |

*handwritten:*

Please Remite payment to Above address

Shoals Ambulance operations

J.Blk Hustt NRP

256-627-4816

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (DR2MB08). 7/13

\* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est - A product of CCC Information Services Inc.
*Page 1 of 1*

9701057.00011

# J & K Customs and Collision

**Federal Tax ID: 45-2315271**
**4536 Highway 43**
**Killen, AL 35645**
**Phone #: (256) 412-3300**

**Estimate**

*10/9/2013*

Customer No: 228
Report No: 178
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2009 Dodge Durango | | |
| Style: SE | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date: / 0 | Fax #: (256)  - | Phone #2:  - |
| License:   State: AL  *Ohio* | | |
| VIN: 1D8HB38P79F715742 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Good | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 10/9/2013 | Date of Loss: 10/9/2013 | Date of Inspection: 10/9/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|

***Sub Totals***

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | $ 450⁰⁰ |

*Remove All decals*
*→*
*stickers*
*Buff & Polish*
*&*
*Clean*

*start up of the*   *Mailed 10-10-2013*
*Knoxville Market*

*JBobh Hast*
*256-627-4816*

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (DR3TG04). 7/13
\* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est - A product of CCC Information Services Inc.
*Page 1 of 1*

9701057.00012

# J & K Customs and Collision

**Federal Tax ID: 45-2315271**
**4536 Highway 43**
**Killen, AL 35645**
**Phone #: (256) 412-3300**

**Estimate**

*11/6/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | **Insured -** | **Claimant -** |
| VIN: | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| *GRILLE - GRILLE & COMPONENTS* | | | | | |
| Refinish Filler panel | | | | | |
| *HOOD - HOOD & COMPONENTS* | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| *FENDER - FENDER & COMPONENTS* | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| *FRONT DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *SIDE PANEL. PASSENGER SIDE - SIDE PANEL* | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *SIDE PANEL. DRIVER SIDE - SIDE PANEL* | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *REAR LOADING DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| | | *Sub Totals* | | 38.1 | |

*Page 1 of 2*

9701057.00013

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/6/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total | |
|---|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 | |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 | T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 | |
| **Grand Total** | | | **$2,882.27** | |

Estimate based on MOTOR CRASH ESTIMATING GUIDE.  Unless otherwise noted all items are derived from the Guide.  NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications.  Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times.  NAGS labor operation times are not included.  Guide used is (ERI5910).  2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9701057.00014

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

11/14/2013

Customer No: 238
Report No: 188
Claim #:
Assign No: 574-9

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2008 Dodge Durango | | |
| Style: SXT | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | | |
| VIN: 1D4HB38N96F170445 | Insured - | Claimant - |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Good | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 11/14/2013 | Date of Loss: 11/14/2013 | Date of Inspection: 11/14/2013 |

| Description of Work | | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|---|

**Sub Totals**

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Tax | Non-Taxed | | |
| **Grand Total** | | | |

$ 450.00

Remove All graphix
an Buff out + polish
allover

_Blake Hagett_
_Opertions_
_Shoals Amb._

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (DR3TG04). 7/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

9702646.00001

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/6/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:    State: AL | **Insured -** | **Claimant -** |
| VIN:  W D 3 P E 7 C C 7 C S 0 2 7 9 1 0 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (256)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| *GRILLE - GRILLE & COMPONENTS* | | | | | |
| Refinish Filler panel | | | | | |
| *HOOD - HOOD & COMPONENTS* | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| *FENDER - FENDER & COMPONENTS* | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| *FRONT DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *SIDE PANEL, PASSENGER SIDE - SIDE PANEL* | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *SIDE PANEL, DRIVER SIDE - SIDE PANEL* | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *REAR LOADING DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *Sub Totals* | | | | 38.1 | |

*Bob Hartt operations Manager*
*Shoals Ambulance*

*Page 1 of 2*

9702646.00014

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/6/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

|  | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% |  | $62.87 |
| **Grand Total** |  |  | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed item

9702646.00015

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

## Estimate

*10/4/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: | Killen, AL 35645 | |
| Color: | Home Phone: (256)  - | |
| Color Code: | Work Phone: (256)  - | Phone #1:  - |
| Production Date:  / 0 | Fax #: (256)  - | Phone #2:  - |
| License:  State: AL | **Insured** - | **Claimant** - |
| VIN: WD3PE7CC XCS626285 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256)  - | Home Phone: (256)  - |
| Condition: Excellent | Work Phone: (256)  - | Work Phone: (266)  - |
| Estimator: Joey Riley | Fax #: (256)  - | Fax #: (256)  - |
| Date Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| **GRILLE - GRILLE & COMPONENTS** | | | | | |
| Refinish Filler panel | | | | | |
| **HOOD - HOOD & COMPONENTS** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| **FENDER - FENDER & COMPONENTS** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| **FRONT DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **SIDE PANEL, PASSENGER SIDE - SIDE PANEL** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **SIDE PANEL, DRIVER SIDE - SIDE PANEL** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **REAR LOADING DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **Sub Totals** | | | | 38.1 | |

*BIRMINGHAM ALABAMA*
*AMBULANCE VIN#*
*Repainted for NEW MARKET*

*OPERATIONS MANAGER.*
Page 1 of 2
*Blake Hargitt*
*BLAKE HARGETT    256-627-4816*

## J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*10/4/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| **Paint Labor** | 38.1hrs | $44.00/hr | $1,676.40 |
| **Paint Supplies** | 38.1hrs | $30.00/hr | $1,143.00 T |
| **Tax** | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est  -  A product of CCC Information Services Inc.
*Page 2 of 2*

9702646.00019

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

11/21/2013

Customer No: 224
Report No: 174
Claim #:
Assign No: 574-7

| Vehicle Information | Owner - Shoals Ambulance | Accident Location |
|---|---|---|
| 2012 Mercedes Benz Sprinter Van | | |
| Style: 04 Dodge | Killen, AL 35645 | |
| Color: | Home Phone: (256) - | Phone #1: - |
| Color Code: | Work Phone: (256) - | Phone #2: - |
| Production Date: /0 | Fax #: (256) - | |
| License: State: AL | **Insured -** | **Claimant -** |
| VIN: WDOPE7451953716 74 | | |
| Miles In: 0 | | |
| Miles Out: 0 | Home Phone: (256) - | Home Phone: (256) - |
| Condition: Excellent | Work Phone: (256) - | Work Phone: (256) - |
| Estimator: Joey Riley | Fax #: (256) - | Fax #: (256) - |
| Date-Assigned: 9/19/2013 | Date of Loss: 9/19/2013 | Date of Inspection: 9/19/2013 |

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| *GRILLE - GRILLE & COMPONENTS* | | | | | |
| Refinish Filler panel | | | | | |
| *HOOD - HOOD & COMPONENTS* | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| *FENDER - FENDER & COMPONENTS* | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| *FRONT DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *SIDE PANEL, PASSENGER SIDE - SIDE PANEL* | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *SIDE PANEL, DRIVER SIDE - SIDE PANEL* | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| *REAR LOADING DOOR - DOOR & COMPONENTS* | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **Sub Totals** | | | | 38.1 | |

RECEIVED
NOV 2 2 2013
BY:

*Signature*

*Page 1 of 2*

# J & K Customs and Collision

Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

*11/21/2013*

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Paint Labor | 38.1hrs | $44.00/hr | $1,676.40 |
| Paint Supplies | 38.1hrs | $30.00/hr | $1,143.00 T |
| Tax | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

+ 403.68

*Added Work on this one*   3,285.95

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERUS610). 2/13
* Indicates Estimator's Judgment
T Indicates Taxed Item

CCC Comp-Est - A product of CCC Information Services Inc.
*Page 2 of 2*

9702721.00002

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

11/21/2013

Customer No: 224
Report No: 174
Claim #:
Assign No: 574-10

### Vehicle Information
2012 Mercedes-Benz Sprinter Van
Style:
Color:
Color Code:
Production Date: /0
License:    State: AL
VIN: WD3PE7CC9C5625254
Miles In: 0
Miles Out: 0
Condition: Excellent
Estimator: Joey Riley
Date Assigned: 9/19/2013

### Owner - Shoals Ambulance
Killen, AL 35645
Home Phone: (256)  -
Work Phone: (256)  -
Fax #: (256)  -
Insured -

Home Phone: (256)  -
Work Phone: (256)  -
Fax #: (256)  -
Date of Loss: 9/19/2013

### Accident Location

Phone #1:  -
Phone #2:  -

Claimant -

Home Phone: (256)  -
Work Phone: (256)  -
Fax #: (256)  -
Date of Inspection: 9/19/2013

| Description of Work | Part Number | Price | Labor | Paint | Other |
|---|---|---|---|---|---|
| **GRILLE - GRILLE & COMPONENTS** | | | | | |
| Refinish Filler panel | | | | | |
| **HOOD - HOOD & COMPONENTS** | | | | | |
| Refinish Hood | | | | 2.9 | |
| +Clearcoat (1.2) | | | | 1.2 | |
| **FENDER - FENDER & COMPONENTS** | | | | | |
| Refinish Right Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| Refinish Left Fender | | | | 2.0 | |
| -Adjacent (0.4) +Clearcoat (0.3) | | | | -0.1 | |
| **FRONT DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Front Door shell | | | | 3.4 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| **SIDE PANEL, PASSENGER SIDE - SIDE PANEL** | | | | | |
| Refinish Right Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Right Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **SIDE PANEL, DRIVER SIDE - SIDE PANEL** | | | | | |
| Refinish Left Front panel | | | | 3.5 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear panel, 144 wb, w/o sld door | | | | 3.7 | |
| -Adjacent (0.4) +Clearcoat (0.7) | | | | 0.3 | |
| **REAR LOADING DOOR - DOOR & COMPONENTS** | | | | | |
| Refinish Right Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| Refinish Left Rear Door shell, w/o window, w/high roof | | | | 3.6 | |
| -Adjacent (0.4) +Clearcoat (0.6) | | | | 0.2 | |
| *Sub Totals* | | | | 38.1 | |

RECEIVED
NOV 2 2 2013
BY:

Page 1 of 2

9702709.00001

# J & K Customs and Collision
Federal Tax ID: 45-2315271
4536 Highway 43
Killen, AL 35645
Phone #: (256) 412-3300

**Estimate**

11/21/2013

Customer No: 224
Report No: 174
Claim #:
Assign No:

THANK YOU FOR LETTING US SERVE YOU

| | Hours | Rate | Total |
|---|---|---|---|
| Paint Labor | 38.1 hrs | $44.00/hr | $1,676.40 |
| Paint Supplies | 38.1 hrs | $30.00/hr | $1,143.00 T |
| Tax | $1143.00 @ 5.5000% | | $62.87 |
| **Grand Total** | | | **$2,882.27** |

Estimate based on MOTOR CRASH ESTIMATING GUIDE. Unless otherwise noted all items are derived from the Guide. NAGS Part Numbers and Benchmark Prices are provided by National Auto Glass Specifications. Labor operation times listed on the line with the NAGS information are MOTOR suggested labor operation times. NAGS labor operation times are not included. Guide used is (ERI5910). 2/13
* indicates Estimator's Judgment
T indicates Taxed Item

CCC Comp-Est - A product of CCC Information Services Inc.
Page 2 of 2

9702709.00002

# Exhibit

# E

Max Williams dba Communication Executives

7040 County Road 189
Florence, AL 35633

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/20/2013 | 746 |

| Bill To |
|---------|
| First Med Ambulance<br>c/o Bryan Gibson<br>Knoxville, Tennessee |

| Ship To |
|---------|
| |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| B. GIBSON K... | Net 30 | MKW | 11/20/2013 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 15 | DUAL BAND ... | VERTEX VXDB VX-5500 DUAL BAND UHF/VHF RADIO. FRONT HEAD AND REMOTE HEAD, W/UHF-VHF ANTENNA INSTALLED  50 W VHF, 45 W UHF "FREE PROGRAMMING"<br>3 YEAR WARRANTY<br><br>THESE RADIO TO BE INSTALLED IN THE SHOALS FLORENCE ALABAMA BASE PRIOR TO SHIPMENT TO KNOXVILLE TENNESSEE FOR SERVICE. | 1,375.00 | 20,625.00T |
| | | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

| Thank you for your business. | Total | $20,625.00 |
|------------------------------|-------|------------|

9601191.00001

Serving Northwest Alabama and Middle Tennessee Since 1987

# Communication Executives

7040 County Road 189, Florence Alabama 35633

09/27/2013

*Quote: Priority Ambulance*

| Item: | | Unit Price | | Total Price |
|---|---|---|---|---|
| Item: 1 | Vertex VX-2200 VHF 50 watt mobile radio | 350.00 x | 9 | 3150.00 |
| Item: 2 | MLS 100 12 watt External speaker | 56.00 x | 9 | 504.00 |
| Item: 3 | In-console radio mount for VX-2200 | 25.00 x | 9 | 225.00 |
| Item: 4 | Advance Tech IDEN mobile kit with cradle | 299.00 x | 9 | 2691.00 |
| Item: 5 | Advance Tech Microphone for mobile kit | 80.00 x | 9 | 720.00 |
| Item: 6 | 800-860mhz IDEN power amp for Linc | 199.00 x | 9 | 1791.00 |
| Item: 7 | Southern Linc 800mhz antenna  3bd gain | 27.00 x | 9 | 243.00 |
| Item: 8 | VHF ¼ wave antenna | 15.00 x | 9 | 135.00 |
| Item: 9 | NMO cable assembly 17' for VHF Radio | 15.00 x | 9 | 135.00 |
| Item: 10 | NMO cable assembly 30' for 800nhz Linc radio | 18.00 x | 9 | 162.00 |
| Item: 11 | Installation of VHF radio with speaker/ant | 50.00 x | 9 | 4S0.00 |
| Item: 12 | Installation of Advance Tech IDEN Kit and Amp | 75.00 x | 9 | 675.00 |
| Item: 13 | Programming of radio's VHF Radios      "FREE" | 00.00 x | 9 | 00.00 |
| | | **Total:** | | **$10,881.00** |

**Contact:** Max Williams    PH: 256-740-9141

# MIDSOUTH = SOLUTIONS

P O Box 601
Ellendale, TN 38029

# Invoice

| Date | Invoice # |
|---|---|
| 4/24/2013 | 48945 |

| Bill To | Ship To |
|---|---|
| Shoals Ambulance | |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| | Net 30 | DDP | 4/24/2013 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 7 | UNIFORM | Omni Pro Bag | 221.95 | 1,553.65T |
| 7 | UNIFORM | Oxygen Pro Bag | 189.95 | 1,329.65T |
| 7 | UNIFORM | Airway Kits | 53.93 | 377.51T |
| 7 | UNIFORM | Narkit | 37.73 | 264.11T |
| 7 | UNIFORM | Extra Fills | 40.00 | 280.00T |
| 1 | Shipping | Shipping and Handling | 61.28 | 61.28T |
| | no | NO STATEMENT WILL BE SENT PLEASE PAY BY THIS INVOICE | 0.00 | 0.00T |
| | | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

Thank you for your business.

| Total | $3,866.20 |
|---|---|
| Payments/Credits | -$3,866.20 |
| Balance Due | $0.00 |

| Phone # |
|---|
| 901-373-8597 |

9702654.00001

# MIDSOUTH = SOLUTIONS

P O Box 601
Ellendale, TN 38029

# Invoice

| Date | Invoice # |
|---|---|
| 12/4/2013 | 55825 |

| Bill To | Ship To |
|---|---|
| First Med EMS | |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| | Net 30 | DDP | 12/4/2013 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 6 | UNIFORM | Omin Pro Bag- Shoals Logo | 221.95 | 1,331.70T |
| 6 | UNIFORM | Oxygen Pro Bag- Shoals Logo | 189.95 | 1,139.70T |
| 6 | UNIFORM | Airway Kits- Shoals | 53.93 | 323.58T |
| 6 | UNIFORM | Narkit- Shoals | 37.73 | 226.38T |
| 6 | UNIFORM | Extra Fills- Shoals | 40.00 | 240.00T |
| | no | NO STATEMENT WILL BE SENT PLEASE PAY BY THIS INVOICE | 0.00 | 0.00T |
| | | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

Thank you for your business.

| | |
|---|---|
| **Total** | $3,261.36 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $3,261.36 |

| Phone # |
|---|
| 901-373-8597 |

9702632.00001

# Exhibit

# F



**PRIORITY** AMBULANCE

**Dennis Rowe**
Director of Operations

Knoxville, Tennessee
P:  865-210-6393

E: Dennis.Rowe@firstmedems.com
www.firstmedems.com









**SHOALS**
AMBULANCE

**Eric Messer**
Director of Marketing

4199 Prince Street
Bessemer, AL 35022
205-937-3238

E: eric.messer@firstmedems.com
www.firstmed.com

9600873.00001

**SHOALS** AMBULANCE

**Jim Wells**
Healthcare Account Executive

4199 Prince Street
Bessemer, AL 35022
205-572-8625

E: jim.wells@firstmedems.com
www.firstmed.com

SHOALS
AMBULANCE

**Nick Diliberto**
Vice President

4199 Prince Street
Bessemer, AL 35022
205-718-5023

E: nick.diliberto@firstmedems.com
www.firstmed.com

9600875.00001

# Exhibit

# G



**STATE OF TENNESSEE**
**Tre Hargett, Secretary of State**
Division of Business Services
William R. Snodgrass Tower
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

## Filing Information

Name:    **Shoals Ambulance, Inc.**

### General Information

| | | | |
|---|---|---|---|
| **SOS Control # :** | **737159** | Formation Locale: | ALABAMA |
| Filing Type: | Corporation For-Profit - Foreign | Date Formed: | 02/06/2012 |
| Filing Date: | 11/06/2013 12:05 PM | Fiscal Year Close | 12 |
| Status: | Active | | |
| Duration Term: | Perpetual | | |

**Registered Agent Address**
C T CORPORATION SYSTEM
STE 2021
800 S GAY ST
KNOXVILLE, TN  37929-9710

**Principal Address**
310 E DR HICKS BLVD
FLORENCE, AL  35630-5770

The following document(s) was/were filed in this office on the date(s) indicated below:

| Date Filed | Filing Description | Image # |
|---|---|---|
| 12/10/2013 | Assumed Name Cancellation | 7262-1800 |
| | Name Status Changed  From: Active (FirstMed EMS)  To: Inactive - Name Cancelled (FirstMed EMS) | |
| 11/25/2013 | Assumed Name | 7258-2143 |
| | New Assumed Name Changed  From: No Value  To: Priority Ambulance | |
| 11/06/2013 | Initial Filing | 7255-0985 |
| 11/06/2013 | Assumed Name | 7255-0988 |
| | New Assumed Name Changed  From: No Value  To: FirstMed EMS | |

| Active Assumed Names (if any) | Date | Expires |
|---|---|---|
| Priority Ambulance | 11/26/2013 | 11/25/2018 |

1/8/2014 8:13:40 AM

Page 1 of 1

Business Entity Detail - Business Services Online



Department Home | Contact Us | Search: [ ] Go

Administrative Hearings | Business Services | Charitable Fundraising | Elections | Library & Archives | Publications

# Tennessee Secretary of State
## Tre Hargett

Home | Apostilles/Authentications | Corporations | Summons | Trademarks | UCC | Workers' Comp Exemption | More Services

Business Services Online > Find and Update a Business Record > Business Entity Detail

# Business Entity Detail

| Available Entity Actions |  File Annual Report<br> Certificate of Existence<br>··More | Entity details cannot be edited. This detail reflects the current state of the filing in the system.<br><br>Return to the Business Information Search. |
|---|---|---|

| 000737159: For-profit Corporation - Foreign | Printer Friendly Version |
|---|---|

| | | |
|---|---|---|
| **Name:** Shoals Ambulance, Inc. | | |
| **Foreign Name:** | | |
| **Status:** Inactive - Revoked (Administrative) | **Initial Filing Date:** 11/06/2013 | |
| **Formed in:** ALABAMA | **Delayed Effective Date:** | |
| **Fiscal Year Close:** December | **AR Due Date:** 04/01/2014 | |
| **Term of Duration:** Perpetual | **Inactive Date:** 08/09/2014 | |
| **Principal Office:** 310 E DR HICKS BLVD FLORENCE, AL 35630-5770 USA | | |
| **AR Exempt:** No | **Obligated Member Entity:** No | |
| **Shares of Stock:** | | |

| Assumed Names | History | Registered Agent |
|---|---|---|

| Type | Date | Image # | Detail |
|---|---|---|---|
| **Dissolution/Revocation - Administrative** | 08/09/2014 | A0261-3070 | Detail ⌃ |
| Filing Status Changed From:**Active To:Inactive - Revoked (Administrative)** Inactive Date Changed From:**No Value To:08/09/2014** | | | |
| **Notice of Determination** | 06/03/2014 | A0249-2148 | |
| **Assumed Name Cancellation** | 01/17/2014 | 7272-1916 | Detail ⌃ |
| Name Status Changed From:**Active (Priority Ambulance) To:Inactive - Name Cancelled (Priority Ambulance)** | | | |
| **Assumed Name Cancellation** | 12/10/2013 | 7262-1800 | Detail ⌃ |
| Name Status Changed From:**Active (FirstMed EMS) To:Inactive - Name Cancelled (FirstMed EMS)** | | | |
| **Assumed Name** | 11/25/2013 | 7258-2143 | Detail ⌃ |
| New Assumed Name Changed From:**No Value To:Priority Ambulance** | | | |
| **Assumed Name** | 11/06/2013 | 7255-0988 | Detail ⌃ |
| New Assumed Name Changed From:**No Value To:FirstMed EMS** | | | |
| **Initial Filing** | 11/06/2013 | 7255-0985 | |

Business Services Division
312 Rosa L. Parks Avenue, Snodgrass Tower, 6th Floor
Nashville, TN 37243
615-741-2286
Email | Directions | Hours and Holidays | Methods of Payment

Contact Us | Site Map | Web Policies | Disclaimer | Department of State | Tennessee.gov

https://tnbear.tn.gov/ECommerce/FilingDetail.aspx?CN=0231550012460381691001115191...    2/25/2015



**State of Tennessee**

**Department of State**
Corporate Filings
312 Rosa L. Parks Ave.
6th Floor, William R. Snodgrass Tower
Nashville, TN 37243

**APPLICATION FOR
REGISTRATION OF
ASSUMED CORPORATE
NAME**

For Office Use Only

---

Pursuant to the provisions of Section 48-14-101(d) of the Tennessee Business Corporation Act or Section 48-54-101(d) of the Tennessee Nonprofit Corporation Act, the undersigned corporation hereby submits this application:

1. The true name of the corporation is ___Shoals Ambulance, Inc.___

_____

2. The state or country of incorporation is ___Alabama___

3. The corporation intends to transact business in Tennessee under an assumed corporate name.

4. The assumed corporate name the corporation proposes to use is
___FirstMed EMS___

[**NOTE:** The assumed corporate name must meet the requirements of Section 48-14-101 of the Tennessee Business Corporation Act or Section 48-54-101 of the Tennessee Nonprofit Corporation Act.}

| | |
|---|---|
| | Shoals Ambulance, Inc. |
| Signature Date | Name of Corporation |
| President | |
| Signer's Capacity | Signature |
| | Bryan Gibson |
| | Name (typed or printed) |

SS-4402 (Rev. 4/01)          Filing Fee: $20          RDA1720

11600359.00001

# APPLICATION FOR CERTIFICATE OF AUTHORITY
## FOR-PROFIT CORPORATION (ss-4431)

Page 1 of 2



Business Services Division
**Tre Hargett, Secretary of State**
**State of Tennessee**
312 Rosa L. Parks AVE, 6th Fl.
Nashville, TN 37243-1102
(615) 741-2286

Filing Fee: $600.00

For Office Only

---

**To the Secretary of the State of Tennessee:**
Pursuant to the provisions of Section T.C.A. §48-25-103 of the Tennessee Business Corporation Act, the undersigned corporation hereby applies for a certificate of authority to transact business in the State of Tennessee, and for that purpose sets forth:

**1. The name of the corporation is:** Shoals Ambulance, Inc  d/b/a  FirstMed EMS

    **If different, the name under which the certificate of authority is to be obtained is:** FirstMed EMS

NOTE: The Secretary of State of the State of Tennessee may not issue a certificate of authority to a foreign corporation for-profit if its name does not comply with the requirements of Section T.C.A. §48-14-101 of the Tennessee Business Corporation Act. If obtaining a certificate of authority under a different corporate name, an application for registration of an assumed corporate name must be filed pursuant to Section T.C.A. §48-14-101(d) with an additional $20.00 fee.

**2. The state or country under whose law it is incorporated is:** Alabama

    **and the date of its incorporation is:** 2 / 6 / 12
    *Month  Day  Year*

    **and the period of duration, if other than perpetual, is:** ___ / ___ / ___
    *Month  Day  Year*

    **and, if prior to qualifying, the date it commenced doing business in Tennessee is:** ___ / ___ / ___
    *Month  Day  Year*

NOTE: Additional filing fees and proof of tax clearance confirming good standing may apply if the corporation commenced doing business in Tennessee prior to the approval of this application.  See T.C.A. §48-25-103(c) and T.C.A. §48-65-103(c).

**3. This company has the additional designation of:** FirstMed EMS Company

**4. The name and complete address of its registered agent and office located in the state of Tennessee is:**
Name:  C T Corporation System
Address:  800 S. Gay Street, Suite 2021
City:  Knoxville          State: TN Zip Code:  37929          County:  Knox

**5. Fiscal Year Close Month:** December

**6. If the document is not to be effective upon filing by the Secretary of State, the delayed effective date and time is:**
(Not to exceed 90 days)     Effective Date: ___ / ___ / ___     Time: _____
                                 *Month  Day  Year*

**7. The corporation is for profit.**

**8. The complete address of its principal executive office is:**
Address:  310 E. Dr. Hicks
City:  Florence          State:  AL          Zip Code:  35633

***Note: Pursuant to T.C.A. §10-7-503 all information on this form is public record.**

---

Submitter Information: Name:  Conrad Pitts          Phone #:  ( 256 ) 718-3600

SS-4431 (Rev. 1/13)
TN021 - 01/23/2013 Wolters Kluwer Online

RDA 1678

11600359.00002

## APPLICATION FOR CERTIFICATE OF AUTHORITY
### FOR-PROFIT CORPORATION (ss-4431)

Page 2 of 2

Business Services Division
**Tre Hargett, Secretary of State**
**State of Tennessee**
312 Rosa L. Parks AVE, 6th Fl.
Nashville, TN 37243-1102
(615) 741-2286

Filing Fee: $600.00

For Office Use Only

**The name of the corporation is:** Shoals Ambulance, Inc  d/b/a   FirstMed EMS

**9. The complete mailing address of the entity (if different from the principal office) is:**

Address:  310 E. Dr. Hicks

City: Florence          State:  AL          Zip Code:  35633

**10. List the name and complete address of each of its current officers:**

| Title | Name | Business Address | City, State, Zip |
|---|---|---|---|
| President | Bryan Gibson | 310 E. Dr. Hicks | Florence, AL 35633 |
|  |  |  |  |
|  |  |  |  |

**11. List the name and complete address of each of its current board of directors:**

| Name | Business Address | City, State, Zip |
|---|---|---|
| Bryan Gibson | 310 E. Dr. Hicks | Florence      AL 35633 |
|  |  |  |
|  |  |  |

**12. Professional Corporation:** (required if the additional designation of "Professional Corporation" is entered in section 3.)

☐ I certify that this is a Professional Corporation.

Licensed Profession: _____

***Note: Pursuant to T.C.A. §10-7-503 all information on this form is public record.***

Signature Date _____          Signature _____

President          Bryan Gibson

Signer's Capacity          Name (printed or typed)

SS-4431 (Rev. 01/13)

RDA 1678

TN021 - 01/25/2013 Wolters Kluwer Online

11600359.00003



**STATE OF TENNESSEE**
**Tre Hargett, Secretary of State**
Division of Business Services
William R. Snodgrass Tower
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

Shoals Ambulance, Inc.                                               November 6, 2013
310 E DR HICKS BLVD
FLORENCE, AL 35630-5770

## Filing Acknowledgment

Please review the filing information below and notify our office immediately of any discrepancies.

**Control # : 737159**          Status:     Active

Filing Type:  Corporation For-Profit - Foreign

| Document Receipt | | |
|---|---|---|
| Receipt # :  1203351 | Filing Fee: | $20.00 |
| Payment-Account -  SHOALS AMBULANCE, INC, MUSCLE SHOALS, AL | | $20.00 |

Amendment Type: Assumed Name                          Image # : 7255-0988
Filed Date:          11/06/2013 12:05 PM

This will acknowledge the filing of the attached assumed name with an effective date as indicated above.  When corresponding with this office or submitting documents for filing, please refer to the control number given above.  The name registration is effective for five years from the date the original registration was filed with the Secretary of State.

Tre Hargett
Secretary of State

Processed By:  Susan Anderson

| Field Name | Changed From | Changed To |
|---|---|---|
| New Assumed Name | No Value | FirstMed EMS |

Phone (615) 741-2286  *  Fax (615) 741-7310  *  Website: http://tnbear.tn.gov/

9701952.00005



**State of Tennessee**

**Department of State**
Corporate Filings
312 Rosa L. Parks Ave.
6th Floor, William R. Snodgrass Tower
Nashville, TN 37243

**APPLICATION FOR
REGISTRATION OF
ASSUMED CORPORATE
NAME**

For Office Use Only



Pursuant to the provisions of Section 48-14-101(d) of the Tennessee Business Corporation Act or Section 48-54-101(d) of the Tennessee Nonprofit Corporation Act, the undersigned corporation hereby submits this application:

1. The true name of the corporation is _Shoals Ambulance, Inc._

2. The state or country of incorporation is _Alabama_

3. The corporation intends to transact business in Tennessee under an assumed corporate name.

4. The assumed corporate name the corporation proposes to use is
_FirstMed EMS_

[NOTE: The assumed corporate name must meet the requirements of Section 48-14-101 of the Tennessee Business Corporation Act or Section 48-54-101 of the Tennessee Nonprofit Corporation Act.]

_10-31-13_
Signature Date

_President_
Signer's Capacity

Shoals Ambulance, Inc.
Name of Corporation

Signature

Bryan Gibson
Name (typed or printed)

SS-4402 (Rev. 4/01)                    Filing Fee: $20                    RDA1720

TN008 - 09/20/2013 Walters Kluwer Online

9701952.00006

# Exhibit

# H



**Department of State: Division of Corporations**

Privacy Policy    Frequently Asked Questions    View Search Results

---

### Entity Details

| HOME | |
|---|---|
| About Agency | |
| Secretary's Letter | |
| Newsroom | |

THIS IS NOT A STATEMENT OF GOOD STANDING

| | |
|---|---|
| **File Number:** | 5443570 |
| **Entity Name:** | PRIORITY AMBULANCE, LLC |

| Incorporation Date / Formation Date: | 12/05/2013 (mm/dd/yyyy) |
|---|---|

| **Entity Kind:** | LIMITED LIABILITY COMPANY (LLC) | **Entity Type:** | GENERAL |
|---|---|---|---|
| **Residency:** | DOMESTIC | **State:** | DE |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| **Name:** | THE CORPORATION TRUST COMPANY |
| **Address:** | CORPORATION TRUST CENTER 1209 ORANGE ST |
| **City:** | WILMINGTON | **County:** | NEW CASTLE |
| **State:** | DE | **Postal Code:** | 19801 |
| **Phone:** | (302)658-7581 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov

https://delecorp.delaware.gov/tin/controller

2/25/2015



Delaware.gov | Text Only                                  Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Privacy Policy   Frequently Asked Questions   View Search Results

---

### Entity Details

#### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 5443566 | Incorporation Date / Formation Date: | 12/05/2013 (mm/dd/yyyy) |
| Entity Name: | PRIORITY AMBULANCE INTERMEDIATE HOLDINGS, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

#### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | THE CORPORATION TRUST COMPANY | | |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | (302)658-7581 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ⦾ Status ⦾ Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

---

site map | about this site | contact us | translate | delaware.gov

### SIDEBAR

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

SERVICES
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search Status
Validate Certificate
Customer Service Survey

INFORMATION
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request  How to
Form a New Business Entity
Certifications, Apostilles &
Authentication of Documents

https://delecorp.delaware.gov/tin/controller                                    2/25/2015



Division of Corporations - Online Services                                                                          Page 1 of 1

Delaware.gov | Text Only                                    Revenue | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Privacy Policy   Frequently Asked Questions   View Search Results

---

### Entity Details

#### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 5443563 | Incorporation Date / Formation Date: | 12/05/2013 (mm/dd/yyyy) |
| Entity Name: | PRIORITY AMBULANCE HOLDINGS, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | THE CORPORATION TRUST COMPANY | | |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | (302)658-7581 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov

https://delecorp.delaware.gov/tin/controller                                                        2/25/2015



Division of Corporations - Online Services                                    Page 1 of 1

Delaware.gov | Text Only                          Governor | General Assembly | Courts | Elected Officials | State Agencies

## Department of State: Division of Corporations

Privacy Policy    Frequently Asked Questions    View Search Results

### Entity Details

#### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 5443560 | Incorporation Date / Formation Date: | 12/05/2013 (mm/dd/yyyy) |
| Entity Name: | PRIORITY AMBULANCE BLOCKER CORP. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

#### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | THE CORPORATION TRUST COMPANY | | |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | (302)658-7581 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

HOME
About Agency
Secretary's Letter
Newsroom
Frequent
Questions
Related Links
Contact Us
Office Location

SERVICES
Pay Taxes
File UCC's
Delaware Laws
Online
Name Reservation
Entity Search
Status
Validate
Certificate
Customer Service
Survey

INFORMATION
Corporate Forms
Corporate Fees
UCC Forms and
Fees
Taxes
Expedited
Services
Service of Process
Registered Agents
Get Corporate
Status
Submitting a
Request  How to
Form a New
Business Entity
Certifications,
Apostilles &
Authentication of
Documents

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

# Exhibit

# I



Home ➤ Government Records ➤ Business Entities ➤ Search ➤ Details

## Business Entity Details

| SHOALS AMBULANCE, LLC | |
|---|---|
| Entity ID Number | 027 - 593 |
| Entity Type | Domestic Limited Liability Company |
| Principal Address | 201 AVALON AVENUE<br>MUSCLE SHOALS, AL 35661 |
| Principal Mailing Address | 201 AVALON AVENUE<br>MUSCLE SHOALS, AL 35661 |
| Status | Exists |
| Place of Formation | Lauderdale County |
| Formation Date | 2-6-2012 |
| Registered Agent Name | CT CORPORATION SYSTEM |
| Registered Office Street Address | 2 NORTH JACKSON STREET SUITE 605<br>MONTGOMERY, AL 36104 |
| Registered Office Mailing Address | 2 NORTH JACKSON STREET SUITE 605<br>MONTGOMERY, AL 36104 |
| Nature of Business | TO OWN,OPERATE,MANAGE,AND GENERALLY TO<br>CONDUCT ANY BUSINESS |
| Capital Authorized | |
| Capital Paid In | |
| **Managers** | |
| Manager Name | GIBSON, BRYAN |
| Manager Street Address | 7610 E.SOARING EAGLE WAY<br>SCOTTSDALE, AZ 85266 |
| Manager Mailing Address | 7610 E.SOARING EAGLE WAY<br>SCOTTSDALE, AZ 85266 |
| **Organizers** | |
| Organizer Name | PITTS, CONRAD C |
| Organizer Street Address | 7610 E SOARING EAGLE WAY<br>SCOTTSDALE, AZ 85266 |
| Organizer Mailing Address | 7610 E SOARING EAGLE WAY<br>SCOTTSDALE, AZ 85266 |
| **Annual Reports** | |
| Annual Report information is filed and maintained by the Alabama Department of Revenue.<br>If you have questions about any of these filings, please contact Revenue's Business Privilege Tax<br>Division at 334-242-1170 or www.ador.alabama.gov. The Secretary of State's Office cannot answer<br>questions about or make changes to these reports. | |
| Report Year | 2013 |
| **Transactions** | |
| Transaction Date | 12-18-2013 |
| Legal Name Changed From | SHOALS AMBULANCE,INC. |
| Transaction Date | 12-18-2013 |
| Registered Agent Changed From | PITTS, CONRAD C<br>401 EAST TUSCALOOSA SREET<br>FLORENCE, AL 35630 |
| Transaction Date | 12-18-2013 |
| Principal Office Changed From | NOT PROVIDED<br>NOT PROVIDED, AL |
| Transaction Date | 12-18-2013 |
| Member/Shr Activity | *Removed    PITTS, CONRAD C |
| Transaction Date | 12-18-2013 |
| Miscellaneous Filing Entry | Conversion Effective 12-18-2013 |
| Transaction Date | 12-18-2013 |



| Miscellaneous Filing Entry | CONVERSION FROM D/C FILED |
|---|---|
| Transaction Date | 12-18-2013 |
| Agent Mailing Address Changed From | PITTS, CONRAD C<br>401 EAST TUSCALOOSA SREET<br>FLORENCE, AL 35630 |
| Transaction Date | 12-18-2013 |
| Principal Mailing Address Changed From | NOT PROVIDED<br>NOT PROVIDED, AL |
| Transaction Date | 12-18-2013 |
| Director/Manager/Organizer Activity | *Added    PITTS, CONRAD C |

| Scanned Documents | |
|---|---|
| Click here to purchase copies. | |
| Document Date / Type / Pages | 2-7-2012    Articles of Formation    9 pgs. |
| Document Date / Type / Pages | 12-18-2013    Conversion    4 pgs. |

**Browse Results**    **New Search**

P.O. Box 5616                    Alabama Directory | Media | Online Services | Alabama.gov                    Phone:  (334) 242-7200
Montgomery, AL 36103-5616        Statements/Policies | Alerts | Survey/Comments | Feeds | Contact Us        Fax:  (334) 242-4993

# Exhibit

# J



Organizational Structure of Priority Ambulance Holdings, LLC

# Exhibit

# K

## EXECUTIVE AGREEMENT

This Executive Agreement (this "Agreement") is made as of July 29, 2013 (the "Effective Date") by and between Eastern Shore Acquisition Corporation, a Delaware corporation (the "Company"), and Bryan Gibson, a resident of the State of Arizona ("Executive"). Capitalized terms used and not otherwise defined in the body of this Agreement have the meanings assigned to such terms in Section 8.

## RECITALS

A.    The Company desires to employ Executive as an employee of the Company, and Executive desires to enter into this Agreement with the Company, subject to the terms and conditions set forth in this Agreement.

B.    During Executive's employment with the Company Executive will have access to the Company's and its Affiliates' confidential, proprietary, and trade secret information. It is desirable and in the best interests of the Company to protect the confidential, proprietary, and trade secret information of the Company and its Affiliates, to prevent unfair competition by employees and former employees of the Company following separation of their employment with the Company and to secure cooperation from employees and former employees with respect to matters related to their employment with the Company.

## AGREEMENTS

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

1.    Term of Employment.  The Company will employ Executive, and Executive will serve the Company, for a continuous term beginning on the Effective Date and ending on the fifth anniversary of the Effective Date (the "Initial Term"). The Initial Term will be extended automatically for additional one-year periods (each a "Renewal Term"), on the same terms and conditions as set forth in this Agreement (as modified from time to time by the parties), beginning on the fifth anniversary of the Effective Date unless either party gives the other party written notice of such party's decision not to renew the term of this Agreement at least 60 days prior to the end of the Initial Term or any Renewal Term. Notwithstanding the foregoing, Executive's employment under this Agreement may terminate earlier pursuant to, and with the effect set forth in, Section 6. The period of time between the Effective Date and the termination of Executive's employment hereunder will be referred to herein as the "Term."

2.    Position, Duties, and Responsibilities.

(a)    Position and Duties.  During the Term, the Company will employ Executive, and Executive will serve the Company, as the Company's Chief Executive Officer, reporting directly to the Company's Board of Directors (the "Board"). Executive will perform the duties and responsibilities commensurate with such positions and as may be lawfully assigned to him from time to time by the Board, which may include serving as the Chief Executive Officer of any of the Company's Affiliates or as a member of the Board or any board of directors or board of managers of any of the Company's Affiliates.

(b)    Standard of Performance.  Executive will be employed on a full-time basis and will devote his full business time and attention to the business and affairs of the Company and its Affiliates. Executive will perform his duties under this Agreement primarily from the Scottsdale, Arizona metropolitan area, except that Executive agrees that he will travel as reasonably required to perform his

obligations hereunder, including, if the Company's principal executive offices remain in Wilmington, North Carolina for such time, for a temporary assignment of less than one year to Wilmington, North Carolina. Executive will serve the Company and its Affiliates, faithfully and to the best of his ability in a diligent, trustworthy, businesslike, and efficient manner and will comply with all of the Company's policies, practices, and procedures in effect from time to time ("Policies") as in effect from time to time for the conduct of its employees. Executive will use his best efforts to promote the interests, prospects, condition (financial and otherwise) and welfare of the Company and its Affiliates. Without limiting the generality of the foregoing, during the Term Executive will not, without the prior written approval of the Board, render services of a business, professional or commercial nature for compensation or otherwise to any Person other than the Company and its Affiliates; provided, however, that Executive may (i) serve on association and corporate boards of charitable organizations, (ii) serve as a director or officer of Shoals Ambulance, Inc. ("Shoals"), or (iii) serve as a director or officer of an entity (other than an Affiliate of the Company) located in Arizona that is an ambulance service provider specializing in non-emergency and emergency inter facility transport (an "Arizona Entity"), so long as, in the case of each of clause (i), (ii), or (iii), such service does not, individually or in the aggregate, materially detract from the performance of his duties to Company and its Affiliates or conflict with his obligations under this Agreement.

  3.  <u>Compensation and Benefits</u>. During the Term, as full compensation for the services to be rendered to or on behalf of the Company and the other obligations undertaken by Executive, the Company will pay and provide to Executive the following compensation and benefits:

    (a)  <u>Base Salary</u>. During the Term, the Company will pay to Executive, in accordance with the Company's payroll Policies, an annual base salary (the "Annual Base Salary") at an annual rate (i) from the Effective Date through December 31, 2014, of $350,000; and (ii) from January 1, 2015 through the remainder of the Term, proposed by Executive in the Company's annual budget and approved by the Board. The Annual Base Salary shall not be reduced during the Term.

    (b)  <u>Performance Bonus</u>. Executive will be eligible to earn an annual bonus (each a "Bonus") in an amount (i) for 2013 and 2014, equal to up to 100% percent (100%) of his Annual Base Salary for such calendar year (pro-rated for 2013 based on the number of days from the Effective Date through December 31, 2013) and (ii) for each year thereafter remaining during the Term, proposed by Executive in the Company's annual budget and approved by the Board. Each Bonus will be based on Company financial and performance targets for each calendar year ended during the Term as determined by the Board. The percentage of the performance targets achieved, and any Bonus earned by Executive, for a calendar year will be determined by the Board, in good faith in the case of objective criteria and in its sole discretion in the case of subjective criteria, within 15 business days after the final audit report relating to the financial statements of the Company is issued for the applicable calendar year. Any Bonus earned by Executive will be paid in the calendar year following the year for which it was earned as soon as reasonably practicable after determined and otherwise in accordance with the Policies. Other than as set forth in <u>Section 6(d)</u> or <u>(e)</u>, in order to be eligible to receive any Bonus, Executive must be employed by the Company or one of its Affiliates through the date such Bonus is paid.

    (c)  <u>Restricted Units</u>.

      (i)  <u>Time-Vesting Restricted Units</u>. As soon as practicable following the Effective Date, Ambulance Holdings LLC, a Delaware limited liability company and the direct parent of the Company ("Holdings"), will grant Executive 33,696 Class D Units (as defined in the Operating Agreement), which will vest and become exercisable (A) over a period of four years (with one-quarter of such shares vesting on the first anniversary of the Effective Date and the remainder vesting ratably over the 12 fiscal quarters thereafter), or (B) immediately upon a Change of Control; provided that, in the case of either clause (A) or (B), Executive is still performing services for the Company immediately prior to

-2-

such time ("Time Units").

(ii)    Performance-Vesting Restricted Units.  As soon as practicable following the Effective Date, Holdings will grant Executive 14,442 Class D Units, which will vest and become exercisable (as illustrated in Schedule 3(c)(ii) attached hereto) immediately prior to the consummation of any Change of Control as follows:

(A)    with respect to 4,814 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 100% of Total Invested Capital ("1x Performance Units");

(B)    with respect to 4,814 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 200% of Total Invested Capital ("2x Performance Units");

(C)    with respect to 4,814 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 300% of Total Invested Capital ("3x Performance Units," and together with the Time Units, the 1x Performance Units, and the 2x Performance Units, the "Restricted Units");

provided that, in the case of clause (A), (B), or (C), Executive is still performing services for the Company immediately prior to such time.

(iii)    Anti-Dilution Restricted Units.

(A)    In the event of a subsequent dilutive equity issuance by Holdings as a result of any additional investment by EEF (up to an aggregate investment by EEF of $10,000,000) during the Term, and as soon as practicable after the occurrence of such dilutive event, Holdings will grant Executive Restricted Units (in accordance with Section 3(c)(iii)(C)) as shall be necessary for Executive to maintain his overall percentage ownership in Holdings after such subsequent dilutive equity issuance to EEF (to illustrate how this anti-dilution mechanism is intended to work, a sample calculation is set forth on Schedule 3(c)(iii)(A) attached hereto).

(B)    In the event of a subsequent dilutive equity issuance by Holdings of Class D Units (up to an aggregate of 42,266 Class D Units (the "Unit Pool") during the Term, and as soon as practicable after the occurrence of such dilutive event, Holdings will grant Executive Restricted Units (in accordance with Section 3(c)(iii)(C)) as shall be necessary for Executive to maintain his overall percentage ownership in Holdings after such subsequent dilutive equity issuance.

(C)    Any Restricted Units granted pursuant to Section 3(c)(iii)(A) or (B) shall be allocated such that the Time Units, 1x Performance Units, 2x Performance Units, and 3x Performance Units constitute, respectively, 70.0%, 10.0%, 10.0%, and 10.0% of such Restricted Units, rounded to the nearest integer.  In the event that an equity issuance that would result in the grant of Restricted Units pursuant to Section 3(c)(iii)(A) would also result in the grant of Restricted Units pursuant to Section 3(c)(iii)(B), only a number of Restricted Units equal to the greater of (1) the number of Restricted Units that would otherwise be granted pursuant to Section 3(c)(iii)(A) and (2) the number of Restricted Units that would otherwise be granted pursuant to Section 3(c)(iii)(B) shall be granted.

(iv)    Restricted Unit Terms.  The specific terms and conditions (including the vesting schedules described above and the applicability of preemptive rights pursuant to Section 3.3(b) of the Operating Agreement) of the Restricted Units to be granted pursuant to Sections 3(c)(i), (ii), and (if any) (iii) will be as set forth in a restricted unit grant notice and a restricted unit agreement (collectively, the "Restricted Unit Grant Documents") for such grant to be mutually agreed and executed by Holdings and Executive.  If the Restricted Unit Grant Documents for the Restricted Units to be granted pursuant to Sections 3(c)(i) and (ii) are not mutually agreed and executed, and such Restricted Units are not granted, on or prior to September 30, 2013, then, until such time following September 30, 2013 that such Restricted Unit Grant Documents are mutually agreed and executed, and such Units are granted, Executive may resign from his employment with the Company and shall not be subject to the restrictions set forth in Section 5(b).

(v)    Certain Representations.   The Company represents, warrants, and covenants to Executive that (i) other than a single class of convertible preferred Units, upon the date of the grants made pursuant to Sections 3(c)(i) and (ii), Holdings will not have any ownership interests senior in rights or priority to the Class D Units; (ii) the amount of Restricted Units to be granted pursuant to Section 3(c)(i) and Sections 3(c)(ii)(A), (B), and (C) will equal, respectively, 7%, 1%, 1%, and 1% of Holdings's fully-diluted ownership interests as of the date of such grant; and (iii) the Unit Pool equals 8% of Holdings's fully-diluted ownership interests after giving effect to the grants contemplated in Sections 3(c)(i) and (ii).

(d)    Executive Benefits.  During the Term, Executive will be entitled to participate in the Company's employee benefit plans and programs (now existing or later established by the Company) for which salaried employees of the Company generally are eligible, subject to satisfying the applicable eligibility requirements and except to the extent such plans or programs are duplicative of the benefits otherwise provided hereunder ("Additional Benefits").  The Additional Benefits will in all respects be paid or provided in accordance with the then-existing plans, policies, programs or arrangements establishing or governing such Additional Benefits.  The Company reserves the right to add, terminate or amend any existing plans, policies, programs or arrangements.  If Executive (on his behalf and on behalf of his dependents) elects not to participate in the Company's health insurance plan, the Company will reimburse Executive for any out-of-pocket expenses incurred by Executive with respect to health insurance coverage for Executive and his dependents (up to $500 per month).  Such reimbursement shall be subject to the Policies for expense pre-approval, verification, documentation, and reimbursement.

(e)    Vacation.  Executive will receive four weeks of paid vacation per calendar year (pro-rated for partial years) and such paid holidays provided to employees of the Company, in accordance with the Policies.  Vacation may not be taken in more than two week increments and may not be carried forward to any subsequent year if not taken during the year in which it is earned.

(f)    Business Expenses.  The Company will reimburse Executive for his reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in the performance of his duties and responsibilities hereunder.  Such reimbursement shall be subject to the Policies for expense pre-approval, verification, documentation, and reimbursement; provided, however, that, upon Executive's request, the Company shall reimburse Executive for first class airfare (to the extent such expense is otherwise reimbursable pursuant to this Section 3(f)).

(g)    Documentation Expenses.  Promptly following the Effective Date, the Company shall reimburse Executive for up to a maximum of $12,500 in legal fees and expenses incurred by Executive on or before the date hereof in connection with the negotiation and preparation hereof.  Such reimbursement shall be subject to Policies for expense verification, documentation, and reimbursement.

-4-

4.    Development of Inventions, Improvements or Know-How.

(a)    Disclosure Obligation.  Executive and his heirs, assigns, and representatives will disclose fully and promptly to the Company any and all Work Product.

(b)    Assignment.  Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Work Product.  The Records are the sole and exclusive property of the Company, and Executive will surrender them upon the termination of employment or upon the Company's request.  All Work Product that is a work of authorship is deemed a "work made for hire" in accordance with the U.S. Copyright Act, and Executive agrees that the Company will be the sole owner of all Work Product and all underlying rights therein without any further obligations to Executive.  If the Work Product, or any portion thereof, is deemed not to be work made for hire, Executive hereby irrevocably conveys, transfers, and assigns to the Company, all right, title and interest in and to such Work Product including the right to receive all past, present and future proceeds and damages therefrom.  In addition, Executive hereby unconditionally waives any so-called "moral rights" and any other non-assignable rights with respect to such Work Product, including any and all currently existing and future monetary rights in and to the Work Product and all other rights that may issue thereon, including any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Company.  Executive will, at any time during and subsequent to the Term, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Work Product.  Executive will also execute assignments to the Company (or its designee) of the applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain, protect, enforce, or defend the Work Product for the Company's benefit, all without additional compensation to Executive from the Company, but entirely at the Company's expense.  Executive appoints the Company as his agent and grants the Company a power of attorney for the limited purpose of executing all such documents.  Notwithstanding the foregoing, the Company acknowledges that Executive has deep experience in the industry of the Company and Executive's general knowledge and understanding of the Company's industry cannot be separated from the Company's business and Confidential Information, and the Company agrees that, without limiting Executive's obligations under this Agreement, this Agreement shall not restrict Executive's use of such overall general knowledge and understanding of such industry.

(c)    Disclosure.  During and after the Term, whether upon Company's request or voluntarily, Executive will promptly disclose to Company, or its designee, all Work Product that Executive has created, contributed to or knows about, regardless of the nature of that knowledge, and regardless of whether such Work Product, or any aspect of such Work Product, has been described, committed to writing, or reduced to practice, in whole or part, by any other Person.

(d)    Publication.  Except as required for performance of Executive's work for the Company or as authorized in writing by the Company, Executive (a) will not publish or submit for publication, or otherwise disclose to any Person other than the Company, any data or results from Executive's work on behalf of the Company without the prior written consent of the Company; (b) will not remove, other than in the case of any Work Product removed temporarily in connection with the performance of his duties and responsibilities hereunder, any Work Product from the Company's premises; and (c) will hold all Work Product in trust for the Company and deliver it to the Company upon request and in any event at the end of the Term.

(e)    Ventures.  If during the Term Executive is engaged in or associated with the planning or implementing of any project, program or venture involving the Company and another Person (other than Shoals or an Arizona Entity), all rights in the project, program or venture will belong to the Company and will constitute a corporate opportunity belonging exclusively to the Company.  Executive

-5-

will not be entitled to any interest in such project, program or venture or to any commission, finder's fee or other compensation in connection therewith (other than the compensation to be paid to Executive pursuant to Section 3).

5.    Restrictive Covenants. As consideration for the employment offered to Executive by the Company and such other good and valuable consideration, including the Units to be granted pursuant to Section 3(c), received and acknowledged by Executive to be adequate and sufficient including the severance provisions set forth in Section 6(c), and the disclosure to Executive, as discussed below, of certain confidential and proprietary information of the Company and its subsidiaries, including trade secrets, policies and procedures, systems and methods of operation, marketing and pricing information, business models, business strategies, financial information, customer information and lists, and referral sources, Executive agrees to the following terms and conditions of employment set forth in this Agreement:

(a)    Non-Disclosure of Confidential Information. At the time Executive executes this Agreement, the Company will immediately provide Executive with the confidential and proprietary information of the Company and its Affiliates, including the Business Information; and thereafter, during the Term, the Company will continue to provide Executive with additional confidential information along with special training with respect to the Company's and its Affiliates' methods of operation among other things. Executive recognizes that Executive has had, or will have, access to, and knowledge of, matters concerning the Business conducted or proposed to be conducted by the Protected Parties during the Term (the "Protected Parties' Business"), including contents of manuals, procedures, methods of doing business, the identity of referral sources and suppliers, information contained in the books and records of the Protected Parties, financial information, trade secrets and customer lists; acquisition, expansion, marketing, and other business information and plans of the Protected Parties; research and development; computer programs; sources of supply; cost and pricing; employee information (including personnel, payroll, compensation and benefit data and plans); and books and records, methods of doing business, policies, procedures, including all such information recorded in manuals, memoranda, projections, minutes, plans, drawings, designs, formula books, specifications, computer programs and records, whether or not legended or otherwise identified as Confidential Information, as well as such information that is the subject of meetings and discussions and not recorded. All such information is hereinafter referred to as "Confidential Information." Executive acknowledges that the Confidential Information is valuable, proprietary and confidential to the Protected Parties, that the Protected Parties have paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble or maintain the Confidential Information, and that reasonable efforts have been put forth by the Protected Parties to maintain the secrecy of such Confidential Information.    Executive agrees that the Confidential Information shall be treated as valuable, proprietary, and confidential regardless of whether any Person would consider it valuable, proprietary, and confidential. Executive agrees that Executive will not at any time, disclose, divulge, or make known to any Person, use, or otherwise appropriate for Executive's own benefit or the benefit of others any Confidential Information, or permit any Person to examine or make copies of any documents or electronic records that contain or are derived from Confidential Information, without the prior written consent of the Board. Executive agrees that upon termination of Executive's employment, Executive will turn over to the Protected Parties all writings and all records of whatever nature, including computer records and contact lists, containing Confidential Information kept by Executive or in Executive's possession, whether originals or copies, it being agreed that said records are the sole and exclusive property of Protected Parties, as applicable. The obligations under this Section 5(a) are in addition to and not in lieu of any other rights or obligations, at law or in equity, to maintain the confidentiality of the Confidential Information, including under the any applicable state's Uniform Trade Secrets Act and any other applicable "trade secret" laws. Confidential Information shall not be deemed to include information that (i) is demonstrated by Executive to have been known by Executive prior to the Effective Date, (ii) is or becomes generally available to the public other than as a result of an

-6-

impermissible disclosure hereunder by Executive or any Person that Executive knows to have a duty not to disclose, or (iii) Executive is required by law to disclose, provided that Executive (if feasible and permitted) shall give the Company prompt written notice of such requirement prior to such disclosure so that the Company may seek an appropriate protective order.

(b)    Non-Competition.  As an ancillary covenant to the promises set forth in this Agreement, including the Company's promise to provide the Confidential Information to Executive, Executive hereby acknowledges and agrees that the Protected Parties' Business is highly competitive and that Executive is, or will become, knowledgeable about the methods of doing business that are and will be employed by the Protected Parties, the names and histories of payors, customers, patients, suppliers, manuals, procedures, programs, protocols, referral sources, and advisors, pricing strategies, business plans, financial information, and other information that the Protected Parties deem to be confidential, proprietary and a trade secret, including all Confidential Information.  Executive further acknowledges that (i) Executive will perform services of a unique nature for the Company and its Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business in violation of this Agreement will result in irreparable harm to the Protected Parties and that should Executive enter into competition with any Protected Party, Executive would have a competitive advantage as a result of Executive's knowledge, and exposure acquired during employment, concerning the Protected Parties' Business; (ii) Executive will have access to trade secrets and other Confidential Information of the Company and the other Protected Parties that, if disclosed, would unfairly and inappropriately assist in competition against the Protected Parties; (iii) in the course of Executive's employment by a competitor in violation of this Agreement, Executive would inevitably be in a position to use or disclose such trade secrets and other Confidential Information; (iv) the Protected Parties have substantial relationships with their customers and Executive will have access to these customers; (v) Executive will receive specialized training from the Company and its Affiliates; and (vi) Executive will generate goodwill for the Company and its Affiliates in the course of Executive's employment. Accordingly, in consideration of the benefits conveyed hereunder, Executive agrees that during the Restricted Period, Executive shall not in any manner, directly or indirectly, jointly or individually, on Executive's own behalf, or in conjunction with or for the benefit of, any Person (whether as agent, employee, owner, partner, member, stockholder, joint venturer, independent contractor, investor, consultant, employer or advisor): (A) engage in, or assist others in engaging in, competition with a Protected Party, or (B) establish or own any financial, beneficial or other interest in (other than any interest consisting of less than 1% of publicly traded security acquired in a public market free of transfer restriction), make any loan to or for the benefit of, or render any managerial, marketing, or other advice, services, or other assistance, to any Person engaged in competition with a Protected Party. Notwithstanding the foregoing, Executive shall not be subject to the restrictions set forth in this Section 5(b) if upon Executive's resignation without Good Reason the Company is operating subject to the Forbearance Agreement.

For purposes of this Section 5, a Person (including Executive) shall be deemed to be a competitor of one or more of the Protected Parties, or a Person (including Executive) shall be deemed to be engaging in competition with one or more of the Protected Parties, if, at the time of determination, such Person (1) engages in any business engaged in or proposed to be engaged in by any of the Protected Parties, provided that Executive is aware of such proposal or (2) in any way conducts, operates, carries out, or engages in the business of managing any Person engaged in any business described in clause (1).

(c)    Non-Solicitation; Non-Disparagement.  In addition to the preceding covenants, and not in limitation thereof, Executive further agrees that during the Restricted Period, Executive will not in any manner, directly or indirectly, on Executive's own behalf, or in conjunction with or for the benefit of any other Person, (i) solicit, aid, or induce any patient, supplier, or other customer or known prospective customer of a Protected Party or any of their Affiliates (collectively, "Restricted Customers"), for the purpose of competing with any Protected Party or any of their Affiliates for the business of the

-7-

Restricted Customers or for the purpose of influencing Restricted Customers to cease using the services of any Protected Party or any of their Affiliates; (ii) solicit, aid, or induce any other Person that has a relationship, contractual or otherwise, with any Protected Party or any of their Affiliates for the purpose of disrupting or attempting to disrupt any such relationships with any Protected Party or any of their Affiliates in a manner that would compete with or adversely affect the Business of a Protected Party or for the purpose of assisting or creating such a relationship for any other Person with business or operations engaged in the Protected Parties' Business; (iii) solicit, aid, or induce, or attempt to solicit, aid or induce, any employee, representative, contractor or agent of any Protected Party or any of their Affiliates to leave such employment or retention, as applicable, with any Protected Party or any of their Affiliates or, in the case of employees, to accept employment with or render services to or with any other Person unaffiliated with any Protected Party, or hire or retain any such employee, or take any action to assist or aid any other Person in identifying, hiring or soliciting any such employee, or otherwise interfere with the relationship between any Protected Party or any of their Affiliates and any employee, representative, contractor or agent of any Protected Party or any of their Affiliates; (iv) discourage any customer, referral source, distributor, manufacturer or supplier from doing business with any Protected Party or any Affiliate thereof; (v) disparage, defame, or denigrate any Protected Party, or any of its or their past, present, or future agents, members, stockholders, partners, managers, directors, officers, or employees, whether to the public, the media, any individual or to any other Person; (vi) acquire or attempt to acquire (A) any existing business of the Protected Parties, (B) any potential acquisition target of the Protected Parties (an "Acquisition Target") that Executive knows, or reasonably should know, a Protected Party intends to pursue or is interested in pursuing; or (vii) take any action to induce or attempt to induce any Acquisition Target to consummate any acquisition, investment, or other similar transaction with any Person other than the Company or any of its Affiliates. An employee, representative, agent, or contractor shall be deemed to be covered by this Section 5(c) while so employed or retained and for a period of 12 months thereafter. Notwithstanding the foregoing, Executive shall not be subject to the restrictions set forth in clauses (i), (ii), and (iii) of this Section 5(c) if upon Executive's resignation without Good Reason the Company is operating subject to the Forbearance Agreement.

(d)    Acknowledgements.    Executive acknowledges and agrees that the definition of the Protected Parties' Business, the length of the time periods, and the geographical area applicable to the restrictive covenants set forth in Sections 5(a), 5(b), and 5(c) are appropriate and reasonable, in view of the nature of the Company's business and Executive's employment with the Company and knowledge of its business.    Executive acknowledges that Executive has carefully considered the terms of this Agreement, including the restrictive covenants set forth in Sections 5(a), 5(b), and 5(c), and acknowledges that if this Agreement is enforced according to its terms, Executive will be able to earn a reasonable living in commercial activities unrelated to the Protected Parties' Business satisfactory to Executive.  Executive also acknowledges that the restrictive covenants set forth in Sections 5(a), 5(b), and 5(c) are a vital part of and are intrinsic to the ongoing operations of the Company, in light of the nature of the Business and the unique position, skills and knowledge of Executive with the Company. Executive further covenants that Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in Sections 5(a), 5(b), and 5(c). Notwithstanding the foregoing, if any provision or portion of this Section 5 is held to be unenforceable because of the scope, duration, territory, or terms thereof, the parties agree that the court making such determination shall have the power to reduce the scope, duration, territory, or terms of such provision, and to delete specific words or phrases in such provision, so that the provision is enforceable by the court, and such provision as amended shall be enforced by the court.  Executive further agrees that if suit is successfully brought to enforce this Agreement against Executive or to seek damages for its breach, Executive will pay to the Protected Parties, in addition to any other damages caused to Protected Parties, all attorney fees incurred by the Protected Parties in seeking such relief. Executive specifically acknowledges that the Protected Parties are intended third party beneficiaries of the covenants set out in this Agreement and that any of the Protected Parties suffering harm as a result of a breach of such covenants shall be entitled to enforce the

-8-

provisions of the covenant without the necessity of joining any of the other Protected Parties and in such event, the covenants contained in this <u>Section 5</u> shall be deemed to have been entered into directly with the Protected Party that has suffered harm

(e)    <u>Direct or Indirect Violations</u>.  Executive will be in violation of <u>Sections 5(a)</u>, <u>5(b)</u>, and <u>5(c)</u> if Executive engages in any or all of the activities set forth in those sections directly as an individual on Executive's own account, or indirectly for any other Person, whether as partner, joint venturer, employee, agent, salesperson, officer, manager or director of any Person or as an equity holder of any Person in which Executive or Executive's spouse, child, or parent owns, directly or indirectly, any of the outstanding equity interests.

(f)    <u>Tolling of Covenants</u>.  In the event of any violation of the provisions of this <u>Section 5</u>, Executive acknowledges and agrees that the post-termination restrictions contained in this <u>Section 5</u> shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(g)    <u>Remedies</u>.  Executive acknowledges that should he violate any of the covenants contained in <u>Sections 5(a)</u>, <u>5(b)</u>, <u>5(c)</u>, <u>5(d)</u> and <u>5(f)</u>, it will be difficult to determine the resulting damages to the Company and, in addition to any other remedies it may have, the Protected Parties, jointly or severally, will be entitled to injunctive relief, without posting bond or other security, in addition to any other available rights and remedies in cases of any such breach or threatened breach; <u>provided, however</u>, that nothing contained herein will be construed as prohibiting a Protected Party from pursuing any other rights and remedies available for any such breach or threatened breach.  Failure to seek any or all remedies in one case does not restrict the Protected Parties from seeking any remedies in another situation.  Such action by the Protected Parties will not constitute a waiver of any of the Protected Parties' rights.

(h)    <u>Survival</u>.  The obligations contained in <u>Sections 4</u> and <u>5</u> shall survive the termination or expiration of the Term and Executive's employment with the Company and shall be fully enforceable thereafter.

6.    <u>Termination of Executive's Employment with the Company</u>.

(a)    <u>Events Triggering Termination of Employment</u>.  Executive's employment with the Company will terminate immediately upon Executive's death or Disability.  In addition to giving notice of nonrenewal pursuant to <u>Section 1</u>, the Company has the right to terminate Executive's employment with the Company for any reason or no reason, with or without advance notice to Executive.  In addition to giving notice of nonrenewal pursuant to <u>Section 1</u>, Executive may terminate his employment for any reason or no reason by written notice of resignation delivered to the Company specifying a termination date not less than 90 days after the date on which such notice is given.  Upon receipt of such notice, the Company may, at its option, determine an earlier termination date in which event Executive will be paid only through the date selected by the Company.  During the notice period referenced in this <u>Section 6(a)</u>, Executive will continue to be an employee, will assist the Company in the transition of his responsibilities, and will be entitled to receive his Annual Base Salary pursuant to <u>Section 3(a)</u> and Additional Benefits pursuant to <u>Section 3(d)</u>.  The Company may require that Executive not come in to work during the notice period and, may assign one or more of Executive's duties and authority to another individual or individuals.  In no event, however, may Executive perform services for any other employer during the notice period, and, during such period, Executive will remain fully subject to the provisions of <u>Section 5</u>.

-9-

(b)    Accrued Obligations.  Upon termination of Executive's employment with the Company for any reason, the Company shall pay to Executive, in accordance with the Company's Policies, an amount equal to the sum of Executive's (i) accrued but not yet paid Annual Base Salary, if any, through the Date of Termination at the rate in effect at the time Notice of Termination is given and (ii) unreimbursed expenses that are reimbursable in accordance with Section 3(f) (collectively, the "Accrued Obligations") in a lump sum, payable within 30 days following the Date of Termination.

(c)    Severance Payments.  If the Company terminates Executive's employment with the Company without Cause (including by giving notice of nonrenewal pursuant to Section 1), or Executive resigns for Good Reason, then in addition to the payment of any Accrued Obligations under Section 6(b), and subject to Executive's execution and delivery (which such execution and delivery is an express condition to the Company's obligations under this Section 6(c)) to the Company of a general release of any claims that Executive may have against the Company, or any of the other Protected Parties, as of the termination of Executive's employment with the Company (excluding any claims Executive may have as an equity holder of any of the Protected Parties), in the form and substance reasonably satisfactory to the Company (the "Executive Release"), the Company shall pay to Executive during the period between the Date of Termination and the second anniversary of the Date of Termination (the "Severance Period") severance payments at the monthly rate of the Annual Base Salary in effect on the Date of Termination (the "Severance Payments").  Severance Payments under this Section 6(c) shall be paid in equal monthly installments over the Severance Period and otherwise in accordance with the Policies, commencing immediately after the effective date of the Executive Release.  Notwithstanding the foregoing, however, the Company at all times reserves the right to increase the amount of or otherwise modify the payment terms of any Severance Payments paid to Executive in order to maximize the enforceability of Section 5 pursuant to a particular state's laws.  Notwithstanding anything in this Section 6(c) to the contrary, the Company's obligation to pay the Severance Payments will terminate immediately upon Executive's breach or violation of any material provision of this Agreement, including any provision of Section 4 or Section 5.  In addition, the Company will not be obligated to make any payments under this Section 6(c) unless Executive, if reasonably requested by the Board and for no additional consideration, completes such reasonable transitional duties as the Board may assign for no more than 60 days after the Date of Termination (or such shorter period that falls within the Severance Period).

(d)    Death.  If, during the Term, Executive dies, (i) Executive's employment shall terminate on the Date of Termination and (ii) the Company will pay to Executive's estate the Accrued Obligations, in addition to (A) any payments Executive's spouse, beneficiaries, or estate may be entitled to receive pursuant to any employee benefit or bonus plan or other arrangement or life insurance policy maintained by the Company in accordance with the terms of such plans or policies and (B) in accordance with Section 3(b), any Bonus that would otherwise be due pursuant to Section 3(b) had Executive been employed by the Company at the time of the payment of such Bonus (an "Unpaid Bonus").

(e)    Disability.  If, during the Term, Executive suffers a Disability, (i) Executive's employment will terminate on the Date of Termination and (ii) the Company will pay to Executive the Accrued Obligations, in addition to (A) any payments Executive or Executive's spouse or beneficiaries may be entitled to receive pursuant to any employee benefit or bonus plan or other arrangement or life insurance policy maintained by the Company in accordance with the terms of such plans or policies and (B) in accordance with Section 3(b), any Unpaid Bonus.

(f)    General Termination Provisions.

-10-

(i)    Any termination of Executive's employment by the Company or by Executive (other than termination because of the death of Executive) shall be communicated by written Notice of Termination to the other party.

(ii)    Upon the occurrence of an event described in the definition of Good Reason, Executive may terminate Executive's employment hereunder for Good Reason provided that an occurrence meets the definition and the conditions set forth in such definition are satisfied.

(iii)    In the case of any termination of Executive for Cause, the Company will give Executive a Notice of Termination. Executive's termination for Cause shall be effective as of the date specified in the Notice of Termination, subject to Executive's cure rights, if any.

(iv)    Upon any termination of Executive's employment with the Company, Executive shall immediately resign from, and shall be deemed to have immediately resigned from, any position as an officer, director, manager, or fiduciary of any Protected Party.

7.    <u>Executive's Representations</u>. Executive hereby represents and warrants to the Company that: (a) the execution, delivery, and performance of this Agreement by Executive does not and will not conflict with, breach, violate, or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Executive is a party or by which he is bound; (b) Executive is not a party to or bound by any employment agreement; any non-compete, non-solicit, or confidentiality agreement or covenant; (c) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms; and (d) Executive is able to provide proof to the Company, within three days after the Effective Date, that Executive is eligible to work in the United States in compliance with the Immigration Reform and Control Act. Executive agrees to indemnify, defend, and hold harmless the Protected Parties and their respective employees, officers, directors, managers, partners, stockholders, members, successors, and assigns from and against and be liable for all Damages sustained or incurred by any such Person to the extent caused by, arising out of, resulting from or attributable to a breach or any inaccuracy of Executive's representations and warranties under this <u>Section 7</u>.

8.    <u>Definitions</u>. The following terms have the meanings set forth in this <u>Section 8</u>:

"<u>Affiliate</u>" with respect to any Person means any other Person that directly or indirectly controls, is controlled by or is under common control with the first Person. For the purposes of this definition, "<u>control</u>" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Business</u>" means (a) the business of any Protected Party, including being ambulance service providers specializing in non-emergency and emergency inter facility transport and other ambulance and ambulance related transport and all business and activities incidental or ancillary thereto, conducted at any time during the Term, and (b) any business of any Protected Party proposed by such Protected Party to be conducted at any time during or after the Term.

"<u>Cause</u>" means, as determined by the Board after due investigation, any (a) commission by Executive of a felony or any act or omission involving embezzlement or fraud; (b) unlawful conduct or other misconduct by Executive in the performance of his duties under this Agreement that otherwise has caused a demonstrable adverse impact, monetary or reputational, to the Company or any of its Affiliates; (c) breach by Executive of any fiduciary duty owed to the Company or any of its Affiliates that, to the

extent curable, has not been remedied within 10 days following receipt of written notice from the Company of such breach; (d) failure by Executive to follow the lawful directives of the Board within 10 days following receipt of written notice from the Company of such failure; or (e) breach by Executive of any of his obligations under this Agreement (including a breach of Section 2(b)) or any material, written Policy that, to the extent curable, has not been remedied within 10 days following receipt of written notice from the Company of such breach. Notwithstanding the foregoing, (w) any billing irregularities (relating to services performed prior to the date hereof, regardless of when billed) deemed in any investigation or audit to have occurred prior to the date hereof ("Prior Billing Irregularities") shall not constitute Cause; (x) any investigation or audit initiated solely with respect to Prior Billing Irregularities shall not, in and of itself, constitute Cause; (y) any billing irregularities deemed to have occurred as a result of actions taken by the Company in good faith based upon the advice of legal counsel or written advice to the Company by the applicable payor or government health program, or its agent, or any billing consultant engaged by the Company pursuant to an agreement approved in good faith by the Board, that the billing practices giving rise to the billing irregularities were compliant with applicable laws, regulations and available guidance shall not constitute Cause; and (z) an investigation or audit for billing irregularities in which Executive is not named in the investigation or charged with unlawful conduct, or if he is so named or charged but the investigation or audit results from an actions taken by the Company in good faith where such billing practices are not clearly prohibited by applicable laws, regulations and available guidance shall not, in and of itself, constitute Cause.

"Change of Control" means a "Change on Control" as defined in the Plan.

"Contingent Payments" means any post-closing adjustments or consideration (a) payable only as an "earn out" contingency upon certain performance thresholds being achieved (i.e., minimum revenue or earnings thresholds), (b) payable in installments, including any seller or Company provided financing, or (c) subject to an escrow or similar arrangement or other contingent consideration.

"Damages" means all assessments, levies, losses, damages, fines, penalties, Third Party Claims and reasonable attorneys' fees and expenses incurred in investigating or defending a Third Party Claim.

"Date of Termination" means (a) if Executive's employment is terminated by Executive's death, the date of Executive's death; (b) if Executive's employment is terminated because of a Disability, then 10 days after Notice of Termination is given (provided that Executive shall not have returned to the performance of Executive's duties on a full-time basis during such 10-day period); (c) if Executive's employment is terminated by the Company for Cause or by Executive for Good Reason, then, subject to Sections 6(f)(ii) or (iii) the date specified in the Notice of Termination; or (d) if Executive's employment is terminated for any other reason, the date on which a Notice of Termination is given.

"Disability" means Executive is unable, by reason of accident or illness (including mental illness), to perform his duties with the Company or its Affiliates for 120 consecutive days or for 180 cumulative days during any 365-day period, as determined in good faith by the Board based on the opinion of a licensed physician selected by the Company or its insurers.

"EEF" means Enhanced Equity Fund II, L.P., a Delaware limited partnership, or its successor or assigns.

"Forbearance Agreement" means that certain Forbearance Agreement and Fourth Amendment to Credit Agreement, dated as of March 31, 2012, by and among American Ambulette & Ambulance Service, Inc., an Ohio corporation, the Company, Holdings, the guarantors thereto, the lenders thereto, and Bank of Montreal, as Administrative Agent for such lenders (as amended, modified, supplemented, or waived from time to time).

-12-

"Good Reason" means any of the following occurrences without Executive's consent:

      (a)     a diminution in Executive's then authority, duties or responsibilities;

      (b)     a reduction in the Annual Base Salary;

      (c)     a material breach by the Company of this Agreement; or

      (d)     a requirement by the Company for Executive to report for the performance of his services hereunder on a regular or permanent basis at any location or office more than 30 miles from the Scottsdale, Arizona metropolitan area.

Notwithstanding the above, the occurrence of any of the events described above will not constitute "Good Reason" unless (A) Executive gives the Company written notice within 30 days after the initial occurrence of an event that Executive believes constitutes Good Reason and describes in such notice the details of such event (a "Good Reason Notice"); (B) the Company thereafter fails to cure any such event within 30 days of its receipt of such Good Reason Notice; and (C) Executive's Date of Termination as a result of such event occurs within 90 days after the initial occurrence of such event. Otherwise, any claim that the occurrence giving rise to the Good Reason Notice constitutes "Good Reason" shall be deemed irrevocably waived by Executive.

"Notice of Termination" means a written notice that will indicate the specific termination provision in this Agreement relied upon and will set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated.

"Operating Agreement" means Holdings's Third Amended and Restated Limited Liability Company Agreement, as amended, modified, supplemented, or waived from time to time.

"Person" means any natural person, general partnership, limited partnership, corporation, trust, limited liability company or other association or entity, or the United States of America or any other nation, state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Plan" means Holdings's 2011 Equity Incentive Plan, as amended, modified, supplemented, or waived from time to time.

"Proceeds" means cash proceeds (excluding any Contingent Payments) from a Change of Control, together with any then-previously received cash dividends or other distributions of cash to EEF, in respect of equity interests of Holdings held by EEF.

"Protected Parties" means the Company and its Affiliates and their successors and assigns.

"Restricted Area" means Kentucky, North Carolina, Ohio, South Carolina, Virginia, West Virginia, Washington D.C. and any other State in which the Company or any other Protected Party performs services during the Term and any State that is contiguous with any of the foregoing States (excluding, in any event, the area within a 100-mile radius of Florence, Alabama and Maricopa, Pima, and Pinal counties in Arizona).

"Restricted Period" means the period beginning on the Effective Date and ending on the second anniversary of the date that Executive ceases to be performing services for the Company (including service as a member or consultant to the Company or its Affiliates) or any of its Affiliates.

-13-

"Return on Investment" means, in the case of a Change of Control, a return on investment for EEF net of all expenses and as customarily calculated by financial conventions after adjusting for payments to Executive or any other holder of equity grants that vest in connection with such Change of Control.

"Third Party Claim" means any arbitration, action, lawsuit, proceeding, investigation, hearing, or like matter that is asserted or overtly threatened by a Person other than the parties.

"Total Invested Capital" means EEF's total invested capital in Holdings as of the date of the effective time of the Change of Control.

"Work Product" means any and all promotional and advertising materials, catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, ideas, inventions, discoveries, methodologies, improvements, work products, developments, works of authorship, trade secrets, processes, compositions, and any technology, know-how or intellectual property (including rights in any trademarks, service marks, trade secrets, copyrights, and patents) made, developed, conceived of or reduced to practice by Executive, in whole or in part, alone or with others during or as a direct result of Executive's employment with the Company (whether or not conceived, developed, reduced to practice or created during regular working hours) other than any such item: (a) for which no equipment, supplies, or facility of the Company or any of its Affiliates or Confidential Information was used; (b) that was developed entirely on Executive's time; (c) that does not relate (i) directly to the Business or (ii) to the Company's actual or anticipated research, development or business; and (d) that does not result from any work performed by Executive for the Company or any of its Affiliates.

    9.    Return of Records and Property.  Upon termination of Executive's employment with the Company or at any time upon the Company's request, in addition to all other obligations under Section 5, Executive will promptly deliver to the Company any and all of the Company's and its Affiliate's records and any and all of the Company's and its Affiliate's property in his possession or under his control, including manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, source codes, data, tables or calculations and all copies thereof, documents that in whole or in part contain any trade secrets or confidential, proprietary or other secret information of the Company or its Affiliates and all copies thereof, and keys, access cards, access codes, passwords, credit cards, personal computers, telephones and other electronic equipment belonging to the Company or its Affiliates.

    10.    Entire Agreement.  This Agreement sets forth the entire understanding of the parties regarding this subject matter and supersedes all prior contracts, agreements, arrangements, communications, discussions, term sheets, representations and warranties, whether oral or written, between the parties regarding this subject matter.

    11.    Assignment.  This Agreement is binding upon and inures to the benefit of the heirs, successors, representatives and assigns of each party, but no rights, obligations, or liabilities of Executive under this Agreement will be assignable without the prior written consent of the Company.  The Company may assign this Agreement and its obligations hereunder, without Executive's consent, to any other Protected Party and to any Person (a) with which the Company may merge or consolidate or (b) to which the Company may sell or transfer all or substantially all of the business, assets, or equity interests of the Company.  Any such successor or assign of the Company to which this Agreement has been assigned shall be deemed to be the "Company" for purposes of all rights and obligations under this Agreement.

-14-

12.     Amendment; Waivers. This Agreement may be amended or modified only by a writing executed by the parties. None of the terms of this Agreement will be deemed to be waived or amended by either party unless such a waiver or amendment specifically references this Agreement and is in writing signed by an authorized representative of the party to be bound. Any such signed waiver will be effective only in the specific instance and for the specific purpose for which it was made or given.

13.     Represented by Counsel. Executive acknowledges that, subject to Section 19, he has been provided with the right and opportunity to consult with an attorney or other personal advisor concerning the legal effect of this Agreement and his and the Company's rights and obligations hereunder, and that Executive enters into this Agreement voluntarily.

14.     Notices. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier (charges prepaid), or sent by confirmed email to: if to the Company, Eastern Shore Acquisition Corporation, c/o Enhanced Equity Fund II, L.P., 601 Lexington Avenue, 55th Floor, New York, NY 10022, Attn: Samarth Chandra, Email: schandra@enhancedcap.com (with a copy, which shall not constitute notice, to Enhanced Equity Fund II, L.P., 601 Lexington Avenue, 55th Floor, New York, NY 10022, Attn: Malcolm T. Kostuchenko, Email: mkostuchenko@enhancedequity.com); and if to Executive, Bryan Gibson, 7610 E. Soaring Eagle Way, Scottsdale, AZ 85266, Email: bgibsonems@gmail.com (with a copy, which shall not constitute notice, to Pitts & Eckl, P.C., 401 East Tuscaloosa Street, Florence, AL 35630, Attn: Conrad C. Pitts, Email: cpitts@pelaw.net); or to such other Person or at such other address as may be designated by a party by written notice served in accordance with the provisions of this Section 14. Notice will be deemed given upon receipt (or refusal of receipt).

15.     Severability. Each section and subsection of this Agreement constitutes a separate and distinct provision of this Agreement. It is the intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement is adjudicated to be invalid, ineffective or unenforceable, the remaining provisions will not be affected by such adjudication. The invalid, ineffective or unenforceable provision will, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective or unenforceable provision; provided, however, that such amendment will apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

16.     Applicable Law. All matters relating to the interpretation, construction, application, validity and enforcement of this Agreement, and any disputes or controversies arising hereunder, shall be governed by the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule, whether of the State of Delaware or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Delaware.

17.     Waiver of Trial by Jury. EACH OF THE PARTIES HERETO WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LAWSUIT, ACTION OR PROCEEDING SEEKING ENFORCEMENT OF SUCH PARTY'S RIGHTS UNDER THIS AGREEMENT.

18.     Consent to Jurisdiction. THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED IN AND WILL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF DELAWARE. EACH OF THE PARTIES HERETO AGREES TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE, WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION ARISING UNDER OR RELATING TO THIS AGREEMENT, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS THAT ALL SERVICES OF PROCESS BE MADE BY REGISTERED OR

CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO IT AT ITS ADDRESS AS SET FORTH IN <u>SECTION 14</u>, AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED WHEN RECEIVED. EACH OF THE PARTIES HERETO WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS AND WAIVES ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER. NOTHING IN THIS <u>SECTION 18</u> WILL AFFECT THE RIGHTS OF THE PARTIES HERETO TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

19.    <u>Non-Disclosure of Employment Terms</u>. Executive agrees that he will keep confidential and not disclose the terms and conditions of this Agreement to any Person without the prior written consent of the Company, except to his spouse or personal accountant or attorney, provided that such Person also agrees to maintain the confidentiality of the Agreement. Executive will be responsible for any disclosure by such Person. Executive further represents that he has not disclosed the terms and conditions of this Agreement to anyone other than his spouse or personal accountant or attorney. This <u>Section 19</u> does not prohibit disclosure of this Agreement if required by applicable law, provided Executive has given the Company prompt written notice of any legal process and cooperated with the Company's efforts to seek a protective order.

20.    <u>Income Tax Reporting; Withholding</u>. Executive will report the Annual Base Salary, any Bonus, and all other payments made to Executive under this Agreement as ordinary income for federal, state, and local tax income tax purposes. The Company may withhold from any payments made or benefits provided under this Agreement such federal, state, and local taxes as may be required to be withheld pursuant to applicable law.

21.    <u>Life Insurance</u>. The Company may, in its discretion, at any time apply for and obtain as owner and for its own benefit or the benefit of the Company's lenders, insurance on the life of Executive in such amounts and in such form or forms as the Company may choose. In connection therewith, Executive will use his best efforts to assist the Company in the procuring of such insurance, including at the request of the Company submitting to such medical examinations, supplying such information and executing such documents as may be requested by the insurance company or companies to which the Company has applied for such insurance at no cost to Executive. Executive will have no interest whatsoever in any such policy or policies.

22.    <u>Section 409A</u>. The parties intend that this Agreement and the payments and benefits provided hereunder be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and the Treasury Regulations and official guidance issued in respect of Section 409A of the Code ("<u>Section 409A</u>"), to the maximum extent possible, whether pursuant to the short-term deferral exception described in Treasury Regulation Section 1.409A-1(b)(4), the involuntary separation pay plan exception described in Treasury Regulation Section 1.409A-1(b)(9)(iii), or otherwise. To the extent that Section 409A is applicable to this Agreement, the parties intend that this Agreement and any payments and benefits thereunder comply with the deferral, payout and other limitations and restrictions imposed under Section 409A. Notwithstanding anything herein to the contrary, this Agreement shall be interpreted, operated and administered in a manner consistent with such intentions. Without limiting the generality of the foregoing, and notwithstanding any other provision of this Agreement to the contrary:

(a)    if at the time Executive's employment hereunder terminates, Executive is a "specified employee," as defined in Treasury Regulation Section 1.409A-1(i) and determined using the identification methodology selected by the Company from time to time, or if none, the default methodology, then to the extent necessary to avoid subjecting Executive to the imposition of any additional tax under Section 409A, any and all amounts payable under this Agreement on account of such

-16-

termination of employment that would (but for this provision) be payable within six months following the date of termination, shall instead be paid in a lump sum on the first day of the seventh month following the date on which Executive's employment terminates or, if earlier, upon Executive's death;

(b)    a termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service," as defined in Treasury Regulation Section 1.409A-1(h) after giving effect to the presumptions contained therein, and, for purposes of any such provision of this Agreement, references to "terminate," "termination," "termination of employment" and like terms shall mean separation from service;

(c)    each payment made under this Agreement shall be treated as a separate payment and the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments, and

(d)    with regard to any provision in this Agreement that provides for reimbursement of expenses or in-kind benefits, except for any expense, reimbursement or in-kind benefit provided pursuant to this Agreement that does not constitute a "deferral of compensation," within the meaning of Treasury Regulation Section 1.409A-1(b), (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year, and (iii) such payments shall be made no later than two and a half months after the end of the calendar year in which the expenses were incurred.

Notwithstanding anything herein to the contrary, the Company makes no representations or warranties to Executive with respect to any tax, economic or legal consequences of this Agreement or any payments or other benefits provided hereunder, including under Section 409A, and no provision of the Agreement shall be interpreted or construed to transfer any liability for failure to comply with Section 409A from Executive or any other individual to the Company or any of its Affiliates. Executive, by executing this Agreement, shall be deemed to have waived any claim against the Company or any of its Affiliates with respect to any such tax, economic or legal consequences.

23.    <u>No Strict Construction</u>.  Each party hereby agrees and acknowledges that such party has had full opportunity to consult with counsel and tax advisors of his or its selection in connection with the preparation and negotiation of this Agreement.  The parties jointly participated in the negotiation and drafting of this Agreement.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their collective mutual intent. This Agreement will be construed as if drafted jointly by the parties, and no rule of strict construction will be applied against any Person.

24.    <u>Interpretation</u>.  Whenever the term "include" or "including" is used in this Agreement, it will mean "including, without limitation," (whether or not such language is specifically set forth) and will not be deemed to limit the range of possibilities to those items specifically enumerated.  The words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision.  Terms defined in the singular have a comparable meaning when used in the plural and vice versa.  As used in this Agreement, the word "or" will not be exclusive, and the masculine, feminine or neuter gender will be deemed to include the others whenever the context so indicates or requires.  All references herein to a "party" or "parties" are to a party or parties to this Agreement unless otherwise specified.

25.    _Delivery by Electronic Means_.  This Agreement and any amendments hereto, to the extent signed and delivered by means of a PDF, facsimile machine or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

26.    _Attorneys' Fees_.  Should either party employ attorneys to enforce any of the provisions of this Agreement, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges, and expenses, including reasonable attorneys' fees, expended or incurred in connection therewith.

27.    _Counterparts_.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which, when taken together, will constitute one instrument.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

EASTERN SHORE ACQUISITION CORPORATION

By: _____

Name: _SAMARTH CHANDRA_____

Title: _PRESIDENT._____

BRYAN GIBSON

<u>SCHEDULE 3(C)(II)</u>

ILLUSTRATIVE PERFORMANCE VESTING EXHIBIT

| | | | |
|---|---|---|---|
| EEF Invested Capital as of 7/29/2013 | $33,568,066 | $33,568,066 | $33,568,066 |
| | | | |
| EEF Return Proceeds | $33,568,066 | $67,136,133 | $100,704,199 |
| EEF Multiple of Invested Capital | 1.0x | 2.0x | 3.0x |
| | | | |
| Executive's Time Vested Restricted Units % | 7.0% | 7.0% | 7.0% |
| Executive's Performance Vested Restricted Units % | 1.0% | 2.0% | 3.0% |
| Executive's Total Restricted Units % | 8.0% | 9.0% | 10.0% |

## SCHEDULE 3(C)(III)(A)

### SAMPLE ANTI-DILUTION CALCULATIONS

      The example below illustrates the anti-dilution adjustment set forth in Section 3(c) assuming an initial 10% equity ownership in Holdings by Executive and a subsequent dilutive equity issuance by Holdings to EEF and other investors of $20,000,000, which triggers an issuance of an aggregate of 1,111,111 combined Restricted Shares (of which 777,778 would be Time Units, 111,111 would be 1x Performance Units, 111,111 would be 2x Performance Units, and 111,111 would be 3x Performance Units) by Holdings to Executive, thus allowing Executive to maintain a 6.8% equity ownership in Holdings after the dilutive equity issuance to EEF.

| Step 1 | Existing Ownership | |
|---|---|---|
| | Units | % |
| EEF | 8,000,000 | 80.0% |
| Executive | 1,000,000 | 10.0% |
| Other | 1,000,000 | 10.0% |
| Total | 10,000,000 | 100.0% |

| Step 2 | New Units | |
|---|---|---|
| | Units | % |
| EEF | 16,000,000 | 80.0% |
| Executive | - | 0.0% |
| Other | 4,000,000 | 20.0% |
| Total | 20,000,000 | 100.0% |

| Step 3 | Anti-Dilution Protection on EEF Units | |
|---|---|---|
| | Units | % |
| EEF | - | 0.0% |
| Executive (1) | 1,111,111 | 100.0% |
| Other | - | 0.0% |
| Total | 1,111,111 | 100.0% |

| Step 4 | New Ownership | |
|---|---|---|
| | Units | % |
| EEF | 24,000,000 | 77.1% |
| Executive | 2,111,111 | 6.8% |
| Other | 5,000,000 | 16.1% |
| Total | 31,111,111 | 100.0% |

---

(1) Equals total new units (20,000,000) divided by 90% (one minus existing Executive ownership percentage) less the total new units; multiplied by EEF percentage of total new units issuable (excluding any units issuable to EEF in respect of aggregate investments by EEF after the date hereof in excess $10,000,000).

# Exhibit

# L

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made as of August 26, 2013 (the "Effective Date"), by and between Eastern Shore Acquisition Corporation, a Delaware corporation (the "Company"), and Steven Blackburn, a resident of the State of Ohio ("Executive"). Capitalized terms used and not otherwise defined in the body of this Agreement have the meanings assigned to such terms in Section 8.

## RECITALS

A.     The Company desires to employ Executive as an employee of the Company, and Executive desires to enter into this Agreement with the Company, subject to the terms and conditions set forth in this Agreement.

B.     During Executive's employment with the Company, Executive will have access to each Protected Party's confidential, proprietary, and trade secret information and contact with customers, vendors, and other Persons with whom the Protected Parties maintain goodwill. It is desirable and in the best interests of the Company to protect the confidential, proprietary, and trade secret information and goodwill of the Company, to prevent unfair competition by employees and former employees of the Company following separation of their employment with the Company and to secure cooperation from employees and former employees with respect to matters related to their employment with the Company.

## AGREEMENTS

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

1.     Term of Employment. The Company will employ Executive, and Executive will serve the Company, for a continuous term ("Initial Term") beginning on the Effective Date and ending on August 26, 2017. On the day following the last day of the Initial Term and each anniversary thereof, the term of this Agreement will be extended automatically for additional one-year periods (each a "Renewal Term"), on the same terms and conditions as set forth in this Agreement (as modified in writing from time to time by the parties), unless either party gives the other party written notice of its or his decision not to renew the term of this Agreement at least sixty (60) days prior to the end of the Initial Term or any Renewal Term. Notwithstanding the foregoing, Executive's employment under this Agreement may terminate earlier pursuant to, and with the effect set forth in, Section 6. The period of time between the Effective Date and the termination of Executive's employment hereunder will be referred to herein as the "Term of Employment."

2.     Position, Duties and Responsibilities.

(a)     Position and Duties. The Company will employ Executive, and Executive will serve the Company, as the Company's President, reporting to the Company's Chief Executive Officer (the "CEO") or his designee; provided that, at the CEO's discretion, the Company may promote Executive to the position of Chief Operating Officer. Executive will perform the duties and responsibilities commensurate with such positions, and as may be assigned to him from time to time by the CEO or his designee.

(b)     Standard of Performance. Executive will be employed on a full-time basis and will devote his full business time and attention to the business and affairs of the Protected Parties.

Executive will serve the Protected Parties, faithfully and to the best of his ability in a diligent, trustworthy, businesslike, and efficient manner and will comply with all policies, practices, and procedures of the Company as in effect from time to time ("Policies") for the conduct of its employees. Executive will use his best efforts to promote the interests, prospects, condition (financial and otherwise) and welfare of the Protected Parties. Without limiting the generality of the foregoing, during the Term of Employment Executive will not, without the prior written approval of the Board of Directors of the Company (the "Board"), render services of a business, professional or commercial nature for compensation or otherwise to any Person other than the Protected Parties; provided that Executive may serve on association and corporate boards of charitable organizations so long as such service does not, individually or in the aggregate, materially detract from the performance of his duties to the Protected Parties or conflict with his obligations under this Agreement.

3.    Compensation and Benefits.  As full compensation for the services to be rendered to or on behalf of the Company and the other obligations undertaken by Executive, during the Term of Employment the Company will pay and provide to Executive the following compensation and benefits:

(a)    Base Salary.  During the Term of Employment, the Company will pay to Executive, in accordance with the Company's payroll Policies, an annual base salary (the "Annual Base Salary") of $250,000 (pro-rated for 2013 based on the number of days from the Effective Date through December 31, 2013); provided, however, that the Annual Base Salary may be increased at any time and from time to time by the Board in its sole discretion.

(b)    Bonus.  Executive will be eligible to earn an annual bonus (each a "Bonus") in an amount equal to up to 60% of his Annual Base Salary for such calendar year (pro-rated for 2013 based on the number of days from the Effective Date through December 31, 2013). Each Bonus will be based on Company financial and performance targets for each calendar year ended during the Term of Employment as determined by the Board. The percentage of the performance targets achieved, and any Bonus earned by Executive, for a calendar year will be determined in good faith by the Board, after the final audit report relating to the financial statements of the Company is issued for the applicable calendar year. Any Bonus earned by Executive will be paid in the calendar year following the year for which it was earned as soon as reasonably practicable after determined and otherwise in accordance with the Policies. Other than as set forth in Section 6, in order to be eligible to receive any Bonus, Executive must be employed by the Company through the date such Bonus is paid.

(c)    Employee Benefits.  Executive will be entitled to participate in the Company's employee benefit plans and programs for which salaried employees of the Company generally are eligible, and for which he has satisfied the applicable eligibility requirements, under any plan or program now existing or established later by the Company generally for employees of the Company, which programs currently include medical health insurance coverage and a 401(k) plan and except to the extent such plans or programs are duplicative of the benefits otherwise provided hereunder ("Additional Benefits"). The Additional Benefits will in all respects be paid or provided in accordance with the then-existing plans, policies, programs or arrangements establishing or governing such Additional Benefits. The Company reserves the right to add, terminate or amend any existing plans, policies, programs or arrangements.

(d)    Vacation.  Executive will receive four (4) weeks of paid vacation per calendar year (pro-rated for partial years) and such paid holidays provided to employees of the Company, in accordance with the Policies. Vacation may not be taken in more than two week increments and may not be carried forward to any subsequent year if not taken during the year in which it is earned.

-2-

(e)    Expenses.  The Company will reimburse Executive for his reasonable and necessary out-of-pocket travel, business, and entertainment expenses incurred by Executive in connection with his employment by the Company, in accordance with the Policies and subject to the submission of appropriate receipts and expense reports.  In addition, during the Term of Employment, the Company shall pay Executive an automobile allowance of $1,000 per month, payable in accordance with the Company's payroll Policies.

(f)    Restricted Units.

(i)    Time-Vesting Restricted Units.  As soon as practicable following the Effective Date, Ambulance Holdings LLC, a Delaware limited liability company and the direct parent of the Company ("Holdings"), will grant Executive 7,469 Class D Units (as defined in the Operating Agreement), which will vest and become exercisable (A) over a period of four years (with one-quarter of such shares vesting on the first anniversary of the Effective Date and the remainder vesting ratably over the 12 fiscal quarters thereafter) and (B) immediately prior to the consummation of any Change of Control; provided that, in either case, Executive is still performing services for the Company immediately prior to such time.

(ii)    Performance-Vesting Restricted Units.  As soon as practicable following the Effective Date, Holdings will grant Executive 7,470 Class D Units, which will vest and become exercisable immediately prior to the consummation of any Change of Control as follows:

(A)    with respect to 2,490 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 100% of Total Invested Capital;

(B)    with respect to 2,490 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 200% of Total Invested Capital; and

(C)    with respect to 2,490 Class D Units, if EEF actually receives (or will receive upon the consummation of a Change of Control) Proceeds that constitute, or if EEF has otherwise achieved, a Return on Investment equal to 300% of Total Invested Capital;

provided that, in the case of clause (A), (B), or (C), Executive is still performing services for the Company immediately prior to such time.  For the avoidance of doubt, (x) if the event outlined in clause (B) (but not the event outlined in clause (C)) occurs, a total of 4,980 Class D Units will vest and become exercisable and (y) if the event outlined in clause (C) occurs, a total of 7,470 Class D Units will vest and become exercisable.

(g)    Documentation Expenses.  The Company shall reimburse Executive for up to a maximum of $7,500 in reasonable, out-of-pocket legal fees and expenses incurred by Executive on or before the date hereof solely in connection with the negotiation and preparation of this Agreement.  Such reimbursement shall be in accordance with the Policies and subject to the submission of appropriate receipts and expense reports.

4.    Development of Inventions, Improvements or Know-How.

(a)    Disclosure Obligation. Executive and his heirs, assigns and representatives will disclose fully and promptly to the Company any and all Work Product.

-3-

(b)    Assignment.    Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Company, of all Work Product.  The Records are the sole and exclusive property of the Company, and Executive will surrender them upon the termination of employment or upon the Company's request.  All Work Product that is a work of authorship is deemed a "work made for hire" in accordance with the U.S. Copyright Act, and Executive agrees that the Company will be the sole owner of all Work Product and all underlying rights therein without any further obligations to Executive.  If the Work Product, or any portion thereof, is deemed not to be work made for hire, Executive hereby irrevocably conveys, transfers, and assigns to the Company, all right, title and interest in and to such Work Product including the right to receive all past, present and future proceeds and damages therefrom.  In addition, Executive hereby unconditionally waives any so-called "moral rights" and any other non-assignable rights with respect to such Work Product, including any and all currently existing and future monetary rights in and to the Work Product and all other rights that may issue thereon, including any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Company.  Executive will, at any time during and subsequent to the Term of Employment, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be requested from time to time by the Company with respect to the Work Product.  Executive will also execute assignments to the Company (or its designee) of the applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain, protect, enforce, or defend the Work Product for the Company's benefit, all without additional compensation to Executive from the Company, but entirely at the Company's expense.  Executive appoints the Company as his agent and grants the Company a power of attorney for the limited purpose of executing all such documents.  Notwithstanding the foregoing, the Company acknowledges that Executive has deep experience in the industry of the Company and Executive's general knowledge and understanding of the Company's industry cannot be separated from the Company's business and Confidential Information, and the Company agrees that, without limiting Executive's obligations under this Agreement, this Agreement shall not restrict Executive's use of such overall general knowledge and understanding of such industry.

(c)    Disclosure.    During and after the Term of Employment, whether upon Company's request or voluntarily, Executive will promptly disclose to Company, or its designee, all Work Product that Executive has created, contributed to or knows about, regardless of the nature of that knowledge, and regardless of whether such Work Product, or any aspect of such Work Product, has been described, committed to writing, or reduced to practice, in whole or part, by any other Person.

(d)    Publication.    Except as required for performance of Executive's work for the Company or as authorized in writing by the Company, Executive (i) will not publish or submit for publication, or otherwise disclose to any Person other than the Company, any data or results from Executive's work on behalf of the Company without the prior written consent of the Company; (ii) will not remove any Work Product from the Company's premises; and (iii) will hold all Work Product in trust for the Company and deliver it to the Company upon request and in any event at the end of the Term of Employment.

(e)    Ventures.    If during the Term of Employment Executive is engaged in or associated with the planning or implementing of any project, program or venture involving the Company and another Person, all rights in the project, program or venture will belong to the Company and will constitute a corporate opportunity belonging exclusively to the Company.  Executive will not be entitled to any interest in such project, program or venture or to any commission, finder's fee or other compensation in connection therewith (other than the compensation to be paid to Executive pursuant to Section 3).

-4-

5.    <u>Restrictive Covenants</u>. As consideration for the employment offered to Executive by the Company and such other good and valuable consideration, including the Class D Units to be granted pursuant to <u>Section 3(f)</u>, received and acknowledged by Executive to be adequate and sufficient including the severance provisions set forth in <u>Section 6(g)</u>, and the disclosure to Executive, as discussed below, of certain confidential and proprietary information of the Protected Parties, including trade secrets, policies and procedures, systems and methods of operation, marketing and pricing information, business models, business strategies, financial information, customer information and lists, and referral sources, Executive agrees to the following terms and conditions of employment set forth in this Agreement:

(a)    <u>Non-Disclosure of Confidential Information</u>. At the time Executive executes this Agreement, the Company will immediately provide Executive with the confidential and proprietary information of the Company and the Protected Parties; and thereafter, during the Term of Employment, the Company will continue to provide Executive with additional confidential information along with special training with respect to the Company's and the Protected Parties' methods of operation among other things. Executive recognizes that Executive has had, or will have, access to, and knowledge of, matters concerning the Business conducted or proposed to be conducted by the Protected Parties during the Term of Employment (the "<u>Protected Parties' Business</u>"), including contents of manuals, procedures, methods of doing business, the identity of referral sources and suppliers, information contained in the books and records of the Protected Parties, financial information, trade secrets and customer lists; acquisition, expansion, marketing, and other business information and plans of the Protected Parties; research and development; computer programs; sources of supply; cost and pricing; employee information (including personnel, payroll, compensation and benefit data and plans); and books and records, methods of doing business, policies, procedures, including all such information recorded in manuals, memoranda, projections, minutes, plans, drawings, designs, formula books, specifications, computer programs and records, whether or not legended or otherwise identified as Confidential Information, as well as such information that is the subject of meetings and discussions and not recorded. All such information is hereinafter referred to as "<u>Confidential Information</u>." Executive acknowledges that the Confidential Information is valuable, proprietary and confidential to the Protected Parties, that the Protected Parties have paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble or maintain the Confidential Information, and that reasonable efforts have been put forth by the Protected Parties to maintain the secrecy of such Confidential Information. Executive agrees that the Confidential Information shall be treated as valuable, proprietary, and confidential regardless of whether any Person would consider it valuable, proprietary, and confidential. Executive agrees that Executive will not at any time, (i) disclose, divulge, or make known to any Person or use any Confidential Information (other than in the performance of his duties and responsibility hereunder or with the prior written consent of the Board), (ii) permit any Person to examine or make copies of any documents or electronic records that contain or are derived from Confidential Information (other than in the performance of his duties and responsibility hereunder or with the prior written consent of the Board), or (iii) otherwise appropriate for Executive's own benefit or the benefit of any other Person any Confidential Information. Executive agrees that upon termination of Executive's employment, Executive will turn over to the Protected Parties all writings and all records of whatever nature, including computer records and contact lists, containing Confidential Information kept by Executive or in Executive's possession, whether originals or copies, it being agreed that said records are the sole and exclusive property of the Protected Parties, as applicable. The obligations under this <u>Section 5(a)</u> are in addition to and not in lieu of any other rights or obligations, at law or in equity, to maintain the confidentiality of the Confidential Information, including under the any applicable state's Uniform Trade Secrets Act and any other applicable "trade secret" laws. Confidential Information shall not be deemed to include information that (x) is demonstrated by Executive to have been known by Executive prior to the Effective Date, (y) is or becomes generally available to the public other than as a result of an impermissible disclosure hereunder by Executive or any Person that Executive knows to have a duty not to disclose, or (z) Executive is required by law to disclose, <u>provided</u> that Executive (if feasible and permitted) shall give the Company

prompt written notice of such requirement prior to such disclosure so that the Company may seek an appropriate protective order.

(b)    Non-Competition.    As an ancillary covenant to the promises set forth in this Agreement, including the Company's promise to provide the Confidential Information to Executive, Executive hereby acknowledges and agrees that the Protected Parties' Business is highly competitive and that Executive is, or will become, knowledgeable about the methods of doing business that are and will be employed by the Protected Parties, the names and histories of payors, customers, patients, suppliers, manuals, procedures, programs, protocols, referral sources, and advisors, pricing strategies, business plans, financial information, and other information that the Protected Parties deem to be confidential, proprietary and a trade secret, including all Confidential Information, and from which the Protected Parties derive valuable goodwill. Executive further acknowledges that (i) Executive will perform services of a unique nature for the Protected Parties that are irreplaceable, and that Executive's performance of such services to a competing business in violation of this Agreement will result in irreparable harm to the Protected Parties and that should Executive enter into competition with any Protected Party, Executive would have a competitive advantage as a result of Executive's knowledge, and exposure acquired during employment, concerning the Protected Parties' Business; (ii) Executive will have access to trade secrets and other Confidential Information of the Company and the other Protected Parties that, if disclosed, would unfairly and inappropriately assist in competition against the Protected Parties; (iii) in the course of Executive's employment by a competitor in violation of this Agreement, Executive would inevitably be in a position to use or disclose such trade secrets and other Confidential Information; (iv) the Protected Parties have substantial relationships with their customers and Executive will have access to these customers; (v) Executive will receive specialized training from the Protected Parties; and (vi) Executive will generate goodwill for the Protected Parties in the course of Executive's employment. Accordingly, in consideration of the benefits conveyed hereunder, Executive agrees that during the Non-Compete Period, Executive shall not in any manner, directly or indirectly, jointly or individually, on Executive's own behalf, or in conjunction with or for the benefit of, any Person (whether as agent, employee, owner, partner, member, stockholder, joint venturer, independent contractor, investor, consultant, employer or advisor) within the Restricted Area: (A) engage in, or assist others in engaging in, competition with a Protected Party, or (B) establish or own any financial, beneficial or other interest in (other than any interest consisting of less than 5% of publicly traded security acquired in a public market free of transfer restriction), make any loan to or for the benefit of, or render any managerial, marketing, or other advice, services, or other assistance, to any Person engaged in competition with a Protected Party.

For purposes of this Section 5, a Person (including Executive) shall be deemed to be a competitor of one or more of the Protected Parties, or a Person (including Executive) shall be deemed to be engaging in competition with one or more of the Protected Parties, if, at the time of determination, such Person (1) engages in any business engaged in or proposed to be engaged in by any of the Protected Parties, provided that Executive is aware of such proposal or (2) in any way conducts, operates, carries out, or engages in the business of managing any Person engaged in any business described in clause (1).

(c)    Non-Solicitation; Non-Disparagement.    In addition to the preceding covenants, and not in limitation thereof, Executive further agrees that, in the case of clauses (i), (ii), (iv) and (vi) during the One-Year Non-Solicit Period, and, in the case of clauses (iii), and (v), during the Two-Year Non-Solicit Period, Executive will not in any manner, directly or indirectly, on Executive's own behalf, or in conjunction with or for the benefit of any other Person, (i) solicit, aid, or induce any patient, supplier, or other customer or known prospective customer of any Protected Party (collectively, "Restricted Customers"), for the purpose of competing with any Protected Party for the business of the Restricted Customers or for the purpose of influencing Restricted Customers to cease using the services of any Protected Party; (ii) solicit, aid, or induce any other Person that has a relationship, contractual or otherwise, with any Protected Party for the purpose of disrupting or attempting to disrupt any such

-6-

relationships with any Protected Party in a manner that would compete with or adversely affect the Business of a Protected Party or for the purpose of assisting or creating such a relationship for any other Person with business or operations engaged in the Protected Parties' Business; (iii) solicit, aid, or induce, or attempt to solicit, aid or induce, any employee, representative, contractor or agent of any Protected Party to leave such employment or retention, as applicable, with any Protected Party or, in the case of employees, to accept employment with or render services to or with any other Person unaffiliated with any Protected Party, or hire or retain any such employee, or take any action to assist or aid any other Person in identifying, hiring or soliciting any such employee, or otherwise interfere with the relationship between any Protected Party and any employee, representative, contractor or agent of any Protected Party; (iv) discourage any customer, referral source, distributor, manufacturer or supplier from doing business with any Protected Party; (v) disparage, defame, or denigrate any Protected Party, or any of its or their past, present, or future agents, members, stockholders, partners, managers, directors, officers, or employees, whether to the public, the media, any individual or to any other Person; (vi) acquire or attempt to acquire (A) any existing business of the Protected Parties, (B) any potential acquisition target of the Protected Parties (an "<u>Acquisition Target</u>") that Executive knows, or reasonably should know, prior to or at the termination of Executive's employment, a Protected Party intends to pursue or is interested in pursuing; or (vii) take any action to induce or attempt to induce any Acquisition Target to consummate any acquisition, investment, or other similar transaction with any Person other than any Protected Party. An employee, representative, agent, or contractor shall be deemed to be covered by this <u>Section 5(c)</u> while so employed or retained and for a period of 12 months thereafter.

(d)    <u>Acknowledgements</u>.  Executive acknowledges and agrees that the restrictions contained in <u>Sections 5(a)</u>, <u>5(b)</u>, and <u>5(c)</u> are appropriate and reasonable, in view of the nature of the Company's business and Executive's employment with the Company and knowledge of its business. In the event that any such restrictions are held by any court of competent jurisdiction to be in any respect unreasonable, the courts so holding may limit the territory to which it pertains or the period of time in which it operates, or effect any other change to the extent necessary to make it enforceable. The remaining provisions shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect and any invalid or unenforceable provision shall be deemed (without further action on the part of the parties hereto) modified, amended and limited, to the extent necessary to render the same valid and enforceable to the maximum extent permissible.

(e)    <u>Cooperation</u>.  Upon the receipt of reasonable notice from the Company (including outside counsel), Executive agrees that while employed by the Company and thereafter, Executive will respond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Company, and will provide reasonable assistance to each Protected Party and its representatives in defense of any claims that may be made against any Protected Party, and will assist each Protected Party in the prosecution of any claims that may be made by any Protected Party, to the extent that such claims may relate to the period of Executive's employment with the Company. Executive agrees to promptly inform the Company if Executive becomes aware of any lawsuits involving such claims that may be filed or threatened against any Protected Party. Executive also agrees to promptly inform the Company (to the extent that Executive is legally permitted to do so) if Executive is asked to assist in any investigation of any Protected Party (or its actions), regardless of whether a lawsuit or other proceeding has then been filed against any Protected Party with respect to such investigation, and will not do so unless legally required. If Executive is required to provide any services pursuant to this <u>Section 5(e)</u> following the termination of his employment with the Company, then any request for such cooperation will take into account Executive's business commitments to a subsequent employer. The Company shall pay or reimburse Executive, in accordance with the Policies, for all reasonable expenses incurred by Executive in complying with this <u>Section 5(e)</u>.

-7-

(f)     Reformation.  Notwithstanding the foregoing, if any provision or portion of this Section 5 is held to be unenforceable because of the scope, duration, territory or terms thereof, the parties agree that the court making such determination will have the power to reduce the scope, duration, territory or terms of such provision, and to delete specific words or phrases in such provision, so that the provision is enforceable by the court, and such provision as amended will be enforced by the court. Executive and the Company further agree that if suit is successfully brought by one Party against the other Party to enforce this Agreement  or to seek damages for its breach, the losing Party  will pay to the Prevailing Party , in addition to any other damages caused to the losing Party , all reasonable attorney fees incurred by the Prevailing Party  in seeking such relief.  Executive specifically acknowledges that the Protected Parties are intended third party beneficiaries of the covenants set out in this Agreement and that any of the Protected Parties suffering harm as a result of a breach of such covenants will be entitled to enforce the provisions of the covenant without the necessity of joining any of the other Protected Parties and in such event, the covenants contained in Section 5 will be deemed to have been entered into directly with the Protected Party that has suffered harm.

(h)     Direct or Indirect Violations.  Executive will be in violation of Sections 5(a), 5(b), and 5(c) if Executive engages in any or all of the activities set forth in those sections directly as an individual on Executive's own account, or indirectly for any other Person, whether as partner, joint venturer, employee, agent, salesperson, officer, manager or director of any Person or as an equity holder of any Person in which Executive or Executive's spouse, child, or parent owns, directly or indirectly, any of the outstanding equity interests.

(g)     Tolling of Covenants.  If it is judicially determined that Executive has violated any of his obligations under this Section 5 then the period applicable to each obligation that Executive has been determined to have violated automatically will be extended by a period of time equal in length to the period during which such violation(s) occurred.

(h)     Remedies.  Executive agrees that the remedy at law for any breach or threatened breach of the requirements of this Section 5 will be inadequate and that any breach or attempted breach would cause immediate and permanent damages to each Protected Party in an amount which will be difficult to ascertain. Accordingly, Executive agrees and consents that in the event of any breach or threatened breach of this Section 5, in addition to any and all other legal and equitable remedies available to any Protected Party for such breach or threatened breach (including a recovery of damages), each Protected Party shall be entitled to obtain preliminary or permanent injunctive relief without posting bond or other security and without the necessity of proving actual damages by reason of such breach, and, to the extent permissible under applicable law, Executive agrees that a temporary restraining order may be granted upon commencement of such an action; provided, however, that (i) nothing contained herein shall be construed as prohibiting a Protected Party from pursuing any other rights or remedies available for any such breach or threatened breach, (ii) failure to seek any or all remedies in one case does not restrict the Protected Parties from seeking any remedies in another situation, and (iii) such action by the Protected Parties will not constitute a waiver of any of the Protected Parties' rights.

6.     Termination

(a)     End of Term.  This Agreement automatically terminates at the expiration of the Term of Employment due to a non-extension of the Term of Employment by the Company or Executive pursuant to the provisions of Section 1 (a "Non-Extension").

(b)     By the Company.  Notwithstanding any other provision of this Agreement, the Company may terminate Executive's engagement at any time for Cause or without Cause upon delivery of a Notice of Termination to Executive.

-8-

(c)    <u>By Executive</u>.    Notwithstanding any other provision of this Agreement, Executive may terminate his employment with the Company for Good Reason, upon delivery of a Notice of Termination to the Company, or without Good Reason, upon delivery of a Notice of Termination to the Company at least sixty (60) days prior to the Date of Termination (which the Company may, in its sole discretion, make effective earlier than the date set forth in the Notice of Termination).

(d)    <u>Death</u>.    Executive's employment with the Company will terminate immediately upon his death.

(e)    <u>Disability</u>.    The Company shall have the right, in its discretion, to terminate Executive's employment hereunder in the event of Executive's Disability by providing Executive sixty (60) days written notice of the Company's intention to terminate the employment.

(f)    <u>Accrued and Unpaid Salary and Benefits</u>.    Upon termination of Executive's employment with the Company for any reason, Executive (or in the event of Executive's death, his Beneficiary), will receive (i) accrued but not yet paid Annual Base Salary, if any, through the Date of Termination, paid in accordance with the Company's payroll Policies in effect on the Date of Termination, (ii) payment for accrued but unpaid vacation pay determined in accordance with the Policies, if any, through the Date of Termination, paid within thirty (30) days following the Date of Termination, and (iii) all other applicable payments and benefits to which Executive may be entitled under, and paid or provided in accordance with, the terms of this Agreement or any other arrangement or benefit plan or program of the Company applicable to Executive as of the Date of Termination (collectively, the "<u>Accrued Obligations</u>").

(g)    <u>Severance Benefits</u>.    If the Company terminates Executive's employment with the Company without Cause (other than as a result of Executive's death or Disability, or a Non-Extension by the Company) or Executive resigns for Good Reason, then in each case, in addition to the Accrued Obligations and, subject to <u>Section 23</u>, the Company will pay or provide to Executive (i) continued payments of the Annual Base Salary (but not as an employee), at the rate in effect on the Date of Termination, for a period of twelve (12) months following the Date of Termination (the "<u>Severance Payments</u>"), paid in accordance with the Company's payroll Policies, and (ii) any earned and accrued but not yet paid Bonus with respect to the calendar year ended immediately prior to the calendar year in which the Date of Termination occurs (the "<u>Prior Year's Bonus</u>"), payable when such Bonus would have otherwise been paid in accordance with <u>Section 3(b)</u>. Notwithstanding anything in this <u>Section 6(g)</u> to the contrary, the Company's obligation to pay or provide the Severance Payments and the Prior Year's Bonus under this <u>Section 6(g)</u> will terminate immediately upon Executive's breach of <u>Section 4</u> or <u>Section 5</u>.

(h)    <u>Death, Disability or Non-Extension by the Company</u>.    If Executive's employment terminates due to his death, or Executive's employment with the Company is terminated by the Company by reason of his having a Disability or as a result of a Non-Extension by the Company, then in addition to the Accrued Obligations, the Company will pay to Executive (or in the case of his death, his estate) the Prior Year's Bonus, payable when such Bonus would have otherwise been paid in accordance with <u>Section 3(b)</u>.

(i)    <u>Release</u>.    As a condition to the Company's obligations under <u>Section 6(g)</u> or <u>Section 6(h)</u> (other than the Accrued Obligations), as applicable, following the Date of Termination, Executive (or in the case of his death, his estate) will execute and delivery to the Company a general release of any claims that Executive may have against any Protected Party arising out of or relating to Executive's employment (including board service) with any Protected Party in form and substance satisfactory to the Company but excluding from said Release any remaining obligations of the Company pursuant to <u>Sections 6(g)</u> and <u>6(h)</u>.

-9-

7.    <u>Executive's Representations</u>.  Executive hereby represents, warrants, and covenants to the Company that: (a) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound; (b) Executive is not (and has received advice from his personal legal counsel that he is not) subject to or bound by any employment or severance agreement with, or any non-compete, non-solicit, confidentiality or other restrictive agreement with or restrictive covenant to, any other Person that will prevent, restrict, or otherwise interfere with his employment with the Company or the performance of his duties hereunder; (c) upon the execution and delivery of this Agreement by the Company, this Agreement will be the valid and binding obligation of Executive, enforceable in accordance with its terms; (d) Executive does not possess, has not used or disclosed to any Protected Party or otherwise since his termination from his prior employer, and will not use or disclose, any confidential information or trade secrets of any prior employer; (e) Executive has returned to each prior employer any and all materials, whether in hard copy or electronic format, that contain any confidential information or trade secrets of such prior employer; (f) Executive will use only information that is generally known and used by persons with training and experience comparable to his own, that is common knowledge in the industry, that is otherwise legally in his possession or the public domain, or that is Confidential Information; (g) since his termination from any prior employer Executive has not solicited for employment or engagement as a contractor any individual who at such time was or will be currently employed or engaged as a contractor by such prior employer; (h) since his termination from any prior employer Executive has not solicited any current or prospective customer, vendor, or supplier who at such time was or will be a current or prospective customer, vendor, or supplier of such prior employer; and (i) Executive, to the best of his knowledge and good faith belief, has not engaged in any other conduct that would lead any prior employer to pursue any legal action against him or any Protected Party.

8.    <u>Definitions</u>.  The following terms have the meanings set forth in this <u>Section 8</u>:

"<u>Beneficiary</u>" means the person or persons designated in writing as such by Executive and filed with the Company at any time.  Any such designation may be withdrawn or changed in writing by Executive, but only the last such designation on file shall be effective. If the Beneficiary shall predecease Executive and no contingent Beneficiary was designated, or if Executive failed to designate a Beneficiary, the Beneficiary shall be Executive's estate.

"<u>Business</u>" means (a) the business of any Protected Party, including being ambulance service providers specializing in non-emergency and emergency inter facility transport and other ambulance and ambulance related transport and all business and activities incidental or ancillary thereto, conducted at any time during the Term of Employment, and (b) any business of any Protected Party proposed by such Protected Party to be conducted at any time during or after the Term of Employment.

"<u>Cause</u>" means Executive's:

(a)    (i) non-performance, or willful misconduct or gross negligence in the performance, of his duties, (ii) continued insubordination, or (iii) other refusal to adhere to any Policy or follow any lawful directive of the Board or any officer of the Company to whom Executive reports, <u>provided</u> that Executive has been given written notice of such behavior and Executive fails to cure such behavior within twenty (20) days after receipt of such notice;

(b)    material breach of a fiduciary duty owed to the Company;

(c)    conviction of, or entering of a guilty plea or plea of no contest, to, a felony;

-10-

(d)      the misappropriation (or attempted misappropriation) of any of the funds or property of the Company;

(e)      commission of any other act or omission involving theft, misappropriation, embezzlement, fraud or dishonesty;

(f)      breach of any, or making of any false or inaccurate, representation, warranty, or covenant in Section 7;

(g)      violation of Section 4 or 5;

(h)      material breach of any of his obligations under any other section of this Agreement or any material written Policy and such breach, to the extent curable, has not been remedied within twenty (20) days following receipt of written notice from the Company of such breach; or

(i)      other willful misconduct or gross negligence that has caused a demonstrable adverse impact, monetary or reputational, to any Protected Party or on Executive's ability to effectively perform his duties with the Company as determined in good faith by the Board.

"Change of Control" means a "Change on Control" as defined in the Plan.

"Contingent Payments" means any post-closing adjustments or consideration (a) payable only as an "earn out" contingency upon certain performance thresholds being achieved (i.e., minimum revenue or earnings thresholds), (b) payable in installments, including any seller or Company provided financing, or (c) subject to an escrow or similar arrangement or other contingent consideration.

"Date of Termination" mean (a) if Executive's employment is terminated by his death, the date of his death; (b) if Executive's employment is terminated by the Company, the date specified in the Notice of Termination; (c) if Executive's employment is terminated by Executive for Good Reason, then the date specified in the Notice of Termination, which for the purposes of this clause (c) may be no earlier than the thirty-first (31st) day following the date the Company received the applicable Good Reason Notice or later than the sixtieth (60th) day after the initial occurrence of such Good Reason event; provided that the Company may, in its sole discretion, make such Date of Termination effective earlier than the date set forth in such Notice of Termination; (d) if Executive's employment is terminated by Executive without Good Reason, the date specified in the Notice of Termination which for the purposes of this clause (d) may be no earlier than the ninetieth (90th) day following the date such Notice of Termination is delivered to the Company; provided that the Company may, in its sole discretion, make such Date of Termination effective earlier than the date set forth in such Notice of Termination; or (e) if Executive's employment with the Company is terminated due to a Non-Extension, the last day of the Initial Term or any Renewal Term, as applicable.

"Disability" will be deemed to exist if Executive is unable, despite reasonable accommodation, to perform the essential functions of his current position due to physical or mental illness, injury or other medical condition for a period of not less than 120 consecutive days (including weekends and holidays) or 180 cumulative days (including weekends and holidays) in any twelve (12) month period.

"EEF" means Enhanced Equity Fund II, L.P., a Delaware limited partnership, or its successor or assigns.

"Good Reason" will mean any of the following occurrences without Executive's consent:

-11-

(a)     a material diminution in Executive's then authority, duties or responsibilities;

(b)     the elimination of Executive's position within the Company;

(c)     a material reduction in Executive's Annual Base Salary;

(d)     a material change in Executive's then job duties or responsibilities; or

(e)     a material breach by the Company of this Agreement.

Notwithstanding the above, the occurrence of any of the events described above will not constitute "Good Reason" unless (A) Executive gives the Company written notice within thirty (30) days after the initial occurrence of an event that Executive believes constitutes Good Reason and describes in such notice the details of such event (a "Good Reason Notice"); (B) the Company thereafter fails to cure any such event within thirty (30) days of its receipt of such Good Reason Notice; and (C) Executive's Date of Termination as a result of such event occurs within ninety (90) days after the initial occurrence of such event.

"Non-Compete Period" means the period beginning on the Effective Date and ending on the first anniversary of the date that Executive ceases to be performing services for any Protected Party (including service as a member or consultant to any Protected Party).

"Notice of Termination" will mean a written notice which will indicate the specific termination provision in this Agreement relied upon and will set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated.

"One-Year Non-Solicit Period" means the period beginning on the Effective Date and ending on the first anniversary of the date that Executive ceases to be performing services for any Protected Party (including service as a member or consultant to any Protected Party).

"Operating Agreement" means Holdings's Third Amended and Restated Limited Liability Company Agreement, as amended, modified, supplemented, or waived from time to time.

"Person" means any natural person, general partnership, limited partnership, corporation, trust, limited liability company or other association or entity, or the United States of America or any other nation, state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Plan" means Holdings's 2011 Equity Incentive Plan, as amended, modified, supplemented, or waived from time to time.

"Proceeds" means cash proceeds (excluding any Contingent Payments) from a Change of Control, together with any then-previously received cash dividends or other distributions of cash to EEF, in respect of equity interests of Holdings held by EEF.

"Protected Party" means Holdings, the Company, any other direct or indirect subsidiary of Holdings, and any successor or assign of any of the foregoing.

"Restricted Area" means Kentucky, North Carolina, Ohio, South Carolina, Virginia, West Virginia, Washington D.C. and any other State in which the Company or any other Protected Party performs services during the Term and any State that is contiguous with any of the foregoing States.

"Return on Investment" means, in the case of a Change of Control, a return on investment for EEF net of all expenses and as customarily calculated by financial conventions after adjusting for payments to Executive or any other holder of equity grants that vest in connection with such Change of Control.

"Total Invested Capital" means EEF's total invested capital in Holdings as of the date of the effective time of the Change of Control.

"Two-Year Non-Solicit Period" means the period beginning on the Effective Date and ending on the second anniversary of the date that Executive ceases to be performing services for any Protected Party (including service as a member or consultant to any Protected Party).

"Work Product" means any and all promotional and advertising materials, catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, ideas, inventions, discoveries, methodologies, improvements, work products, developments, works of authorship, trade secrets, processes, compositions, and any technology, know-how or intellectual property (including rights in any trademarks, service marks, trade secrets, copyrights, and patents) made, developed, conceived of or reduced to practice by Executive, in whole or in part, alone or with others during or as a direct result of Executive's employment with the Company (whether or not conceived, developed, reduced to practice or created during regular working hours) other than any such item: (a) for which no equipment, supplies, or facility of any Protected Party or Confidential Information was used; (b) that was developed entirely on Executive's time; (c) that does not relate (i) directly to the Business or (ii) to the Company's actual or anticipated research, development or business; and (d) that does not result from any work performed by Executive for the Company.

9.    Return of Records and Property.  Upon termination of Executive's employment with the Company or at any time upon the Company's request, in addition to all other obligations under Section 5, Executive will promptly deliver to the Company any records and other property of any Protected Party in his possession or under his control, including manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, source codes, data, tables or calculations and all copies thereof, documents that in whole or in part contain any trade secrets or confidential, proprietary or other secret information of any Protected Party and all copies thereof, and keys, access cards, access codes, passwords, credit cards, personal computers, telephones and other electronic equipment belonging to any Protected Party.

10.    Entire Agreement.  This Agreement sets forth the entire understanding of the parties regarding this subject matter and supersedes all prior contracts, agreements, arrangements, communications, discussions, term sheets, representations and warranties, whether oral or written, between the parties regarding this subject matter, including the letter agreement between the parties dated February 12, 2013.

11.    Assignment.  This Agreement is binding upon and inures to the benefit of the heirs, successors, representatives and assigns of each party, but no rights, obligations or liabilities of Executive under this Agreement will be assignable without the prior written consent of the Company.  The Company may assign this Agreement and its obligations hereunder, without Executive's consent, to any other Protected Party and to any Person (a) with which the Company may merge or consolidate or (b) to which the Company may sell or transfer all or substantially all of the business, assets, or equity interests of the Company.  As used in this Agreement, "Company" will mean the Company, its successors and any successor to its business, assets, or equity interests.

-13-

12.     Amendment; Waivers.  This Agreement may be amended or modified only by a writing executed by the parties.  None of the terms of this Agreement will be deemed to be waived or amended by either party unless such a waiver or amendment specifically references this Agreement and is in writing signed by an authorized representative of the party to be bound.  Any such signed waiver will be effective only in the specific instance and for the specific purpose for which it was made or given.

13.     Represented by Counsel.  Executive acknowledges that, subject to Section 20, he has been provided with the right and opportunity to consult with an attorney or other personal advisor concerning the legal effect of this Agreement and his and the Company's rights and obligations hereunder, and that Executive enters into this Agreement voluntarily.

14.     Notices.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier (charges prepaid), or sent by confirmed email to: if to the Company, Eastern Shore Acquisition Corporation, 601 Lexington Avenue, 55th Floor, New York, NY 10022, Attn: Samarth Chandra, Email: schandra@enhancedcap.com (with a copy, which shall not constitute notice, to Enhanced Equity Fund II, L.P., 601 Lexington Avenue, 55th Floor, New York, NY 10022, Attn: Malcolm T. Kostuchenko, Email: mkostuchenko@enhancedequity.com); and if to Executive, Steven Blackburn, 591 Banbridge Street, Pickerington, Ohio 43147, Email: sb910@aol.com (with a copy, which shall not constitute notice, to Kegler Brown Hill & Ritter LPA, Suite 1800, 65 East State Street, Columbus, Ohio 43215-4292, Attn: Luis Manuel Alcalde, Email: lalcalde@keglerbrown.com); or to such other Person or at such other address as may be designated by a party by written notice served in accordance with the provisions of this Section 14.  Notice will be deemed given upon receipt (or refusal of receipt).

15.     Severability.  Each section and subsection of this Agreement constitutes a separate and distinct provision of this Agreement.  It is the intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought.  Accordingly, if any provision of this Agreement is adjudicated to be invalid, ineffective or unenforceable, the remaining provisions will not be affected by such adjudication.  The invalid, ineffective or unenforceable provision will, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective or unenforceable provision; provided, however, that such amendment will apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

16.     Applicable Law.  All matters relating to the interpretation, construction, application, validity and enforcement of this Agreement, and any disputes or controversies arising hereunder, will be governed by the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule, whether of the State Delaware or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Delaware.

17.     Dispute Resolution.  Any dispute, controversy, or claim, whether contractual or non-contractual, including any federal or state statutory claim, common law or tort claim, or claim for attorneys' fees, between the parties arising directly or indirectly out of, or connected with, this Agreement or the parties employment relationship (a "Dispute"), unless mutually settled by the parties, shall be resolved by binding arbitration conducted pursuant to the Federal Arbitration Act and in accordance with the employment Arbitration Rules of the American Arbitration Association (the "AAA").  The parties agree that before proceeding to arbitration that they will mediate any Dispute before a mutually selected mediator.  If the parties are unable to mutually select a mediator, then the parties shall jointly request that the AAA appoint a mediator.  Any arbitration shall be conducted by an arbitrator, or panel of three (3) arbitrators, mutually selected by the parties (or if the parties are unable to mutually select an arbitrator or panel of three (3) arbitrators, the parties shall jointly request that the AAA appoint an arbitrator), in

-14-

Columbus, Ohio. The resolution of the Dispute by the arbitrator(s) shall be final, binding, nonappealable, and fully enforceable by a court of competent jurisdiction under the Federal Arbitration Act. The arbitrator(s) may award damages to the prevailing party. The arbitration award shall be in writing and shall include a statement of the reasons for the award. All AAA, mediation and arbitrator's fees and costs shall be split equally by the parties. The arbitrator(s) may award reasonable attorneys' fees or costs to the prevailing party. Notwithstanding the foregoing, if a party is seeking specific performance in connection with any Dispute, such party may elect to seek such remedy from a court of competent jurisdiction pursuant to Sections 5(h), 18, and 19 without submitting such Dispute to arbitration pursuant to this Section 17.

18.    Waiver of Trial by Jury. EACH OF THE PARTIES WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LAWSUIT, ACTION OR PROCEEDING SEEKING ENFORCEMENT OF SUCH PARTY'S RIGHTS UNDER THIS AGREEMENT.

19.    Consent to Jurisdiction. THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED IN AND WILL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF DELAWARE. EACH OF THE PARTIES AGREES, SUBJECT TO SECTION 17, TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE, WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION ARISING UNDER OR RELATING TO THIS AGREEMENT, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS THAT ALL SERVICES OF PROCESS BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO IT AT ITS ADDRESS AS SET FORTH IN SECTION 14, AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED WHEN RECEIVED. EACH OF THE PARTIES WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS AND WAIVES ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER. NOTHING IN THIS SECTION 19 WILL AFFECT THE RIGHTS OF THE PARTIES TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

20.    Non-Disclosure of Employment Terms. Executive agrees that he will keep confidential and not disclose the terms and conditions of this Agreement to any Person without the prior written consent of the Company, except to his spouse or personal accountant or attorney, provided that such Person also agrees to maintain the confidentiality of the Agreement. Executive will be responsible for any disclosure by such Person. Executive further represents that he has not disclosed the terms and conditions of this Agreement to anyone other than his spouse or personal accountant or attorney. This Section 20 does not prohibit disclosure of this Agreement in the following circumstances: (i) if required by applicable law, provided Executive has given the Company prompt written notice of any legal process and cooperated with the Company's efforts to seek a protective order; or (ii) if necessary for Executive to initiate legal action against the Company for breach of this Agreement.

21.    Income Tax Reporting; Withholding. Executive will report the Annual Base Salary, any Bonus and all other payments made to Executive under this Agreement as ordinary income for federal, state and local income tax purposes. The Company may withhold from any payments made or benefits provided under this Agreement such federal, state, and local taxes as may be required to be withheld pursuant to any applicable law.

22.    Life Insurance. The Company may, in its discretion, at any time apply for and obtain as owner and for its own benefit or the benefit of the Company's lenders, insurance on the life of Executive in such amounts and in such form or forms as the Company may choose. In connection therewith, Executive will use his best efforts to assist the Company in the procuring of such insurance, including at the request of the Company submitting to such medical examinations, supplying such information and executing such documents as may be requested by the insurance company or companies to which the

Company has applied for such insurance at no cost to Executive. Executive will have no interest whatsoever in any such policy or policies.

23.    409A. Although the Company does not guarantee the tax treatment of any payments under this Agreement, this Agreement is intended to be interpreted and operated to the fullest extent possible so that the payments and benefits under this Agreement either will be exempt from the requirements of Section 409A ("Code Section 409A") of the Internal Revenue Code of 1986, as amended (the "Code") under Treasury Regulation section 1.409A-1(b)(9)(iii) or otherwise or will comply with the requirements of Code Section 409A; provided, however, that notwithstanding anything to the contrary in this Agreement in no event will the Company be liable to Executive for or with respect to any taxes, penalties or interest which may be imposed upon Executive pursuant to Code Section 409A. Notwithstanding anything in this Agreement or elsewhere to the contrary, (i) a termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of Executive's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and (ii) if the Severance Payments constitute "non-qualified deferred compensation" within the meaning of Code Section 409A, then the first payment of the Severance Payments shall be made on the sixtieth (60th) day after the Date of Termination, and will include payment of any amount of the Severance Payments that were otherwise due prior thereto. Each payment under this Agreement or otherwise (including any installment payments) will be treated as a separate payment for purposes of Code Section 409A. Whenever a payment under this Agreement may be paid within a specified period, the actual date of payment within the specified period will be within the sole discretion of the Company. In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Code Section 409A. Any taxable reimbursement of costs and expenses by the Company provided for under this Agreement will be made in accordance with the Company's applicable policy and this Agreement but in no event later than December 31 of the calendar year next following the calendar year in which the expenses to be reimbursed are incurred. With regard to any provision in this Agreement that provides for reimbursement of expenses or in-kind benefits, except as permitted by Code Section 409A, (i) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year will not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year, provided that the foregoing clause (ii) will not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect.

24.    No Strict Construction. Each party hereby agrees and acknowledges that such party has had full opportunity to consult with counsel and tax advisors of his or its selection in connection with the preparation and negotiation of this Agreement. The parties jointly participated in the negotiation and drafting of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their collective mutual intent. This Agreement will be construed as if drafted jointly by the parties, and no rule of strict construction will be applied against any Person.

25.    Interpretation. Whenever the term "include" or "including" is used in this Agreement, it will mean "including, without limitation," (whether or not such language is specifically set forth) and will not be deemed to limit the range of possibilities to those items specifically enumerated. The words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision. Terms defined in the singular have a comparable meaning when used in the plural and vice versa. As used in this Agreement, the word "or" will not be exclusive, and the masculine, feminine or neuter gender will be deemed to include the others whenever the context so

-16-

indicates or requires.  All references herein to a "party" or "parties" are to a party or parties to this Agreement unless otherwise specified.

26.    Delivery by Electronic Means.  This Agreement and any amendments hereto, to the extent signed and delivered by means of a PDF, facsimile machine or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

27.    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which, when taken together, will constitute one instrument.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

EASTERN SHORE ACQUISITION CORPORATION

By: _____
Name:  Bryan Gibson
Title:    Chief Executive Officer

_____
STEVEN BLACKBURN

[Signature Page to Employment Agreement]

# Exhibit

# M

12 Month Trend Income Statement

**AM LLC and Subsidiaries**
**Consolidated Income Statement**
**13 Month Trend**
**October 31, 2013**

| | Oct 2012 | Nov 2012 | Dec 2012 | Jan 2013 | Feb 2013 | Mar 2013 | Apr 2013 | May 2013 | Jun 2013 | Jul 2013 | Aug 2013 | Sep 2013 | Oct 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | |
| **Expenses:** | | | | | | | | | | | | | |
| Salaries, Direct & EMT Ambulance | | | | | | | | | | | | | |
| Payroll taxes & benefits | | | | | | | | | | | | | |
| Professional Fees—Ambulance | | | | | | | | | | | | | |
| Ambulance Fuel | | | | | | | | | | | | | |
| Medical Supplies | | | | | | | | | | | | | |
| **Direct Station Personnel** | | | | | | | | | | | | | |

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS<br>Algernon L. Butler, as Chapter 7 Trustee of American Ambulette & Ambulance Serice, Inc., et al. | DEFENDANTS<br>Enhanced Equity Fund II, L.P., et al. |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Michael J. Parrish, c/o Ward and Smith, P.A.<br>PO Box 867, New Bern, NC 28563-0867<br>(252) 672-5400 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor        ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☒ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor        ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This Complaint asserts various claims against former directors, officers, and related persons and entities for wrongful conduct against the FirstMed Entities.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

<table>
<tr><td colspan="3"><b>BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES</b></td></tr>
<tr><td colspan="2">NAME OF DEBTOR American Ambulette & Ambulance Service, Inc., et al., Consolidated for Administration</td><td>BANKRUPTCY CASE NO. Lead Case No. 13-07673-8-SWH</td></tr>
<tr><td colspan="2">DISTRICT IN WHICH CASE IS PENDING<br>Eastern</td><td>DIVISION OFFICE<br>Wilmington    NAME OF JUDGE<br>Hon. Stephani W. Humrickhouse</td></tr>
<tr><td colspan="3"><b>RELATED ADVERSARY PROCEEDING (IF ANY)</b></td></tr>
<tr><td>PLAINTIFF</td><td>DEFENDANT</td><td>ADVERSARY PROCEEDING NO.</td></tr>
<tr><td>DISTRICT IN WHICH ADVERSARY IS PENDING</td><td>DIVISION OFFICE</td><td>NAME OF JUDGE</td></tr>
<tr><td colspan="3">SIGNATURE OF ATTORNEY (OR PLAINTIFF)</td></tr>
<tr><td>DATE<br>November 13, 2015</td><td colspan="2">PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Michael J. Parrish, Esq.<br><i>Counsel for Plaintiff</i></td></tr>
</table>

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.